**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | No. 08-01789 (BRL) |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. _____ (BRL) |
| Plaintiff, | |
| v. | |
| JEFFRY M. PICOWER, individually and as trustee for the Picower Foundation; | |
| BARBARA PICOWER, individually and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation; | |
| CAPITAL GROWTH COMPANY; | |
| FAVORITE FUNDS; | |
| JA PRIMARY LIMITED PARTNERSHIP; | |
| JA SPECIAL LIMITED PARTNERSHIP; | |

JAB PARTNERSHIP;

JEMW PARTNERSHIP;

JF PARNERSHIP;

JFM INVESTMENT COMPANY;

JLN PARTNERSHIP;

JMP LIMITED PARTNERSHIP;

JEFFRY M. PICOWER SPECIAL CO.;

JEFFRY M. PICOWER, P.C.;

DECISIONS INCORPORATED;

THE PICOWER FOUNDATION;

THE PICOWER INSTITUTE FOR MEDICAL RESEARCH;

THE TRUST FBO GABRIELLE H. PICOWER; and DOES 1-25.

Defendants.

## COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), by and through his undersigned counsel,

for his Complaint, states as follows:

## NATURE OF PROCEEDING

1.    This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff").  In early December 2008, BLMIS generated client account

statements for its nearly 7,000 client accounts at BLMIS.  When added together, these statements

purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS.

In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts. Defendants received avoidable transfers from BLMIS, and the purpose of this proceeding is to recover the avoidable transfers received by one or more of the Defendants.

2.      Jeffry Picower ("Picower") was a beneficiary of this Ponzi scheme for more than 20 years. Since December 1995, he and the other Defendants collectively profited from this scheme through the withdrawal of more than $6.7 billion dollars. The Trustee's investigation to date has revealed that at least five billion dollars of this amount was fictitious profit from the Ponzi scheme. In other words, Defendants have received, at a minimum, more than five *billion* dollars of other people's money.

3.      Among other reasons, Defendants knew or should have known that they were profiting from fraud because of the implausibly high rates of return that their accounts supposedly achieved. Picower was one of a handful of BLMIS clients with special access to information from BLMIS, including access to information about BLMIS' 'target' rates of return for Defendants' accounts. In several cases, Defendants' purported annual rates of return were more than 100%, with some annual returns as high as 500% or even 950% per year. The average annual rate of return for Defendants' regular trading accounts between 1996 and 2007 was approximately 22%, even taking into account extremely low rates of return in 2000 (ranging as low as *negative* 770%). These anomalous and astronomical rates of return – both positive and negative – were neither credible nor consistent with legitimate trading activity, and should have caused any reasonable investor to inquire further.

4.      Picower and the other Defendants also knew or should have known that they were reaping the benefits of manipulated purported returns, false documents and fictitious profit. For

example, some purported "trades" in Defendants' accounts supposedly took place before the relevant direction from the Defendants, or even before the relevant account was opened or funded. BLMIS records further suggest that not only was Picower aware (or at a minimum, should have been aware) that BLMIS was creating backdated transactions, but that Picower and/or his agent may have used backdated documents to direct such backdated trades themselves.

5. This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a) and 551 of 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt & Cred. §270 *et seq*. (McKinney 2001)) and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, damages and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of Defendants. The Trustee seeks to set aside such transfers and preserve the property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

6. This is an adversary proceeding brought in this Court, the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

7. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E), (F), (H) and (O).

8. Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

9.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending in the District Court.  The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

10.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS.

11.     On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

12.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

      a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C.§78eee(b)(3);

      b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

      c.     removed the case to this Bankruptcy Court pursuant to 15 U.S.C. §78eee(b)(4).

13.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

14.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.) Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (Id. at 23:20-21.)

15.     As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

16.     Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to 15 U.S.C. § 78fff(b).  Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

17.     Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

18.     The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1 and the Bankruptcy Code, including 11 U.S.C. § 101 *et seq*. and sections 323(b) and 704(a)(1), because, among other reasons:

    a.      BLMIS incurred losses as a result of the claims set forth herein;

    b.      The Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes; and

    c.      The Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of this date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of persons who have suffered injury in fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.

## THE FRAUDULENT PONZI SCHEME

19.     BLMIS is a New York limited liability company that is wholly owned by Madoff. Founded in 1959, BLMIS operated from its principal place of business at 885 Third Avenue,

New York, New York. Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b). By that registration, BLMIS is a member of SIPC. BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading.

20.     For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses. For example, the strategy was executed by either purporting to purchase small groups of securities transactions near lows and then purporting to sell those same securities at highs, or by purporting to sell securities near highs and then purporting to repurchase those securities near lows.

21.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients other than the Defendants, there is no record of BLMIS having cleared any purchase or sale of securities at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

22.     Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours.  To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity wholly owned by Madoff.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

23.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased.

24.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff concealed the ongoing fraud in an effort to hinder and delay other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others, including Defendants, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

25.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

26.     When payments were made to or on behalf of these investors, including the Defendants, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investors' principal as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors, such as the Defendants, the inflated amounts reflected in the falsified financial statements, including non-existent principal and fictitious profits, not such investors' true depleted account balances.

27.     BLMIS used the funds deposited from investors or new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due to the siphoning and diversion of new investments to pay requests for payments or redemptions from other investors, particularly longer-term account holders like the Defendants, BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

28.     Picower and the other Defendants were among the primary beneficiaries of this scheme, reaping billions of dollars of other people's money.  Defendants knew or should have known that the activity purportedly conducted in their accounts was patently false on its face, and that their purported returns and profits were fictitious.

29.     In an effort to hinder, delay and defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until September 2006.

30.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23

customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had over 4,900 active client accounts with a purported value of approximately $68 billion under management.

31.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York. Of the three employees at the firm, one employee was an assistant and one was a semi-retired accountant living in Florida.

32.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

33.     This and similar complaints are being brought to recapture monies paid to or for the benefit of certain investors so that this customer property can be equitably distributed among all of the victims of BLMIS in accordance with the provisions of SIPA.

### RELEVANT INDIVIDUALS, THE DEFENDANTS AND THE TRANSFERS

34.     Defendant Jeffry M. Picower ("Picower") is a sophisticated investor and businessman who invested in BLMIS over many decades through 24 entity and/or personal accounts. According to a 2002 *Forbes* article entitled "Unaccountable," Picower is a former attorney, accountant and tax shelter promoter who has been active in the financial industry for more than 25 years. He maintains residences at 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 4900 Congress Street, Fairfield, Connecticut 06824. Upon information and belief, Picower has been closely associated with Madoff on both a business and social level for the last 30 years. Picower holds an individual BLMIS account in the name "Jeffry M. Picower," with the account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480.

Upon information and belief, Picower is trustee for the Picower Foundation and Chairman of the Board of Defendant Decisions Incorporated.

35.     Defendant Barbara Picower is a person residing at 1410 South Ocean Boulevard, Palm Beach, Florida 33480.  Upon information and belief, Barbara Picower is married to Picower.  Upon information and belief, Barbara Picower holds an individual account at BLMIS in the name "Barbara Picower," with the account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480.  Upon information and belief, Barbara Picower is trustee for Defendant Trust FBO Gabrielle H. Picower, an officer and/or director of Defendant Decisions Incorporated  and trustee and Executive Director of the Picower Foundation.

36.     Not named as a defendant herein, but relevant to this adversary proceeding, April C. Freilich ("Freilich") is a person residing in Armonk, New York.  Upon information and belief, Freilich is an officer and/or director of Defendant Decisions Incorporated, and a Limited Partner of Defendants Capital Growth Company, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, and JLN Partnership.

37.     Defendant Decisions Incorporated ("Decisions") is a corporation organized under the laws of Delaware with a principal place of business at 950 Third Avenue, New York, New York 10022 and an alternate mailing address or its BLMIS account listed as 22 Saw Mill River Road, Hawthorne, New York, 10532.  Upon information and belief, the Decisions office in Hawthorne was merely a store-front office through which little or no business was conducted.  Upon information and belief, Decisions is a general partner of Defendants Capital Growth Company, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JLN Partnership, JMP Limited Partnership and Jeffry M. Picower Special Co.

38.        Upon information and belief, Defendant Capital Growth Company purports to be a limited partnership with a mailing address for its BLMIS account listed at 22 Saw Mill River Road, Hawthorne, New York, 10532, care of Decisions Incorporated.  Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of Capital Growth Company, and Decisions Incorporated, Picower, and/or Freilich transact business through this entity.

39.    Defendant JA Primary Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594.  Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JA Primary Partnership, and Decisions Incorporated, Picower, and/or April Freilich transact business through this defendant entity.

40.        Defendant JA Special Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York, New York 10594.  Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JA Special Limited Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity.

41.        Upon information and belief, Defendant JAB Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532.  Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JAB

Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity.

42.     Upon information and belief, Defendant JEMW Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532.  Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JEMW Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity.

43.     Upon information and belief, Defendant JF Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532.  Upon information and belief, Defendant Decisions Incorporated and/or Defendant Picower serves as General Partner or Director of JF Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity.

44.     Upon information and belief, Defendant JFM Investment Company is an entity through which Decisions Incorporated, Picower and/or Freilich transact business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532.  Upon information and belief, JFM Investment Company is a Limited Partner of Capital Growth Company, and Decisions Incorporated and/or Picower serves as General Partner or Director of JFM Investment Company.

45.     Upon information and belief, Defendant JLN Partnership is a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532.  Upon information and belief, Decisions Incorporated and/or

Picower serves as General Partner or Director of JLN Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity.

46.         Defendant JMP Limited Partnership is a limited partnership organized under the laws of Delaware, with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of JMP Partnership, and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity.

47.         Upon information and belief, Defendant Jeffry M. Picower Special Co. is an entity through which Decisions Incorporated, Picower and/or Freilich transact business, with a mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of Jeffry M. Picower Special Co.

48.         Defendant Favorite Funds is an entity through which Picower transacts business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of Favorite Funds.

49.         Upon information and belief, Defendant Jeffry M. Picower P.C. purports to be a limited partnership with a listed mailing address at 25 Virginia Lane, Thornwood, New York, New York 10594. Upon information and belief, Decisions Incorporated and/or Picower serves as General Partner or Director of Jeffry M. Picower P.C., and Decisions Incorporated, Picower, and/or Freilich transact business through this defendant entity.

50.         Upon information and belief, Defendant Picower Foundation is a trust organized for charitable purposes with Picower listed as donor and Picower and Barbara

Picower, among others, listed as Trustees. Picower Foundation's addresses are reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 9 West 57th Street, Suite 3800, New York, New York 10019.

51.     Upon information and belief, Defendant Picower Institute for Medical Research is a nonprofit entity organized under the laws of New York, with a principal place of business at 350 Community Drive, Manhasset, New York 11030.

52.     Defendant Trust FBO Gabrielle H. Picower is a trust established for beneficiary Gabrielle H. Picower, who upon information and belief is the daughter of Picower and Barbara Picower, with Defendant Barbara Picower listed as trustee and the trust's BLMIS account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480.

53.     On information and belief, the Defendants described in Paragraphs 37 through 52 (collectively the "Picower Entities") in dealing with BLMIS have been dominated by and used merely as the instrument of Picower to advance his personal interests rather than corporate ends. As set forth herein, Picower exercised complete dominion over the Picower Entities in dealing with BLMIS, which he knew or should have known was predicated on fraud. As a result, the Picower Entities functioned as alter egos of Picower and no corporate veil can be maintained between them.

54.     On information and belief, Freilich's conduct alleged herein was undertaken as the agent of Picower and/or the other Defendants, as it was within the scope of her employment by and/or her responsibilities to Picower and other Defendants, she was authorized by Picower and/or other Defendants to engage in such conduct, and her conduct was for the benefit of Picower and/or other defendants, who accepted the benefit of such conduct. Indeed, as described

below and on information and belief, at least certain of Freilich's conduct alleged herein was at Picower's express direction.

55. At all times relevant hereto, one or more of the Defendants was a client of the IA Business. According to BLMIS' records, Defendants maintained the accounts with BLMIS set forth on Exhibit A (the "Accounts"). The Accounts were opened on or about the dates set forth on Exhibit A. Upon information and belief, for each Account, either Freilich and/or one or more of the Defendants executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options, (the "Account Agreements"), and delivered such documents to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

56. The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Accounts were held in New York, New York, and the Defendants consistently wired funds to BLMIS' account at JPMorgan Chase & Co., Account #000000140081703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the conducting of trading activities. Between December 1, 1995 and the Filing Date, the Defendants made deposits to BLMIS through multiple checks and wire transfers into the BLMIS Bank Account. Defendants have intentionally taken advantage of the benefits of conducting transactions in the State of New York and have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

57. Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") totaling over $6.7 billion to one or more of the Defendants. The Transfers were made to or for the benefit of one or more of the Defendants and include, but are not limited to, the Transfers listed on Exhibit B.

58.     Defendant Picower is a sophisticated investor, accountant and lawyer who has organized buyouts of healthcare and technology companies since at least the 1980s. He has reportedly known Madoff for decades, and has been invested in BLMIS since at least the 1980s. Madoff served as a trustee of the Picower Institute for Medical Research.

59.     Picower and, through him, the other Defendants, therefore enjoyed an unusually close relationship with Madoff, and were privy to information and dealings not known to other BLMIS investors including, for example, BLMIS' targeted rates of return for Defendants' accounts. As a result of this access to information and Picower's relationship to Madoff, among other reasons, Defendants knew or should have known that Madoff's IA Business was predicated on fraud, that they were benefitting from fraudulent transactions in their accounts, and that their purported account activity was inconsistent with legitimate trading activity and credible returns.

60.     Among other things, Picower, both directly and through his agent Freilich and/or others, directed purported purchases and sales of securities within Defendants' accounts, including direction that sales or purchases be made for purposes of achieving gains or losses; directed that funds be transferred among Defendants' accounts; directed and received withdrawals of funds from Defendants' accounts; directed payments to and among various Defendants from their own and other Defendants' accounts; executed Customer Agreements, Trade Authorization Agreements and tax related documentation for the Accounts; and otherwise communicated with and provided direction to BLMIS regarding Defendants' accounts.

61.     Defendants Picower and Freilich maintained a "client appraisal" or "portfolio appraisal" system through which they tracked and monitored Defendants' accounts at BLMIS. Picower and Freilich relied on their own monitoring of BLMIS accounts to point out apparent

inconsistencies with BLMIS customer statements and portfolio reports, or to issue direction to BLMIS employees about the accounts.

62.     The source of funds in many of Defendants' accounts was fictitious profits received by Picower as a consequence of his participation in the Ponzi scheme.

63.     The Defendants knew or should have known that they were benefitting from fraudulent activity or, at a minimum, failed to exercise reasonable due diligence with respect to BLMIS and its auditors in connection with the Ponzi scheme.  Among other things, the Defendants were on notice of the following indicia of irregularity and fraud in their own accounts but failed to make sufficient inquiry:

a.     Defendants' accounts regularly earned extraordinary and implausibly high rates of return.  For example, Picower's "Decision Inc. #3" and "Decision Inc. #4" regular trading accounts purportedly earned annual rates of return over 100% for four consecutive years, from 1996-1999, inclusive.  The annual rates of return for these accounts during the period from 1996 to 1999 ranged from a "low" of approximately 120% to a high of over 550%.  Nor were these isolated or unusual occurrences; Picower's "Decision Inc. #2" account, for example, purported to earn *over 950%* in 1999.  Indeed, between 1996 and 2007, Defendants' 24 regular trading accounts enjoyed 14 instances of supposed annual returns of more than 100% and 25 in which the annual returns purportedly exceeded 50%.  On information and belief, the high returns reported on Defendants' accounts were a form of compensation by Madoff to Picower for perpetuating the Ponzi scheme by investing and maintaining millions of dollars in BLMIS.

b.     These implausibly high purported returns have enabled Picower and the other Defendants to collectively withdraw more than $6.7 billion since December 1995.  At

least $5.1 billion of that sum was over and above any funds deposited by Defendants and constituted money belonging to victims of the fraud.

      c.      Even Defendants' low annual rates of return were anomalous. In 2000, several of Defendants' regular trading accounts reported significantly *negative* annual rates of return, ranging from negative 74% to negative 779%. A contributing factor to these negative returns was the unwinding in January 2000 of close to $11 billion in short "sales" created in December 1999. As of November 1999, these accounts reflected a total negative cash balance of approximately $3.8 billion. In December 1999, however, Defendants "executed" $8.5 billion of short sales, resulting in the cash balance in these accounts moving from net negative to net positive. In January 2000, Defendants "completed" the short trades, resulting in a new net cash deficit of approximately $6.3 billion. The net effect of the January 2000 transactions was to increase the net cash deficit across these accounts by $2.5 billion over the net cash deficit in November 1999. In other words, Defendants "executed" short trades that reversed Defendants' year-end net cash, making it net positive as of December 31, 1999, but which then resulted in a net loss of $2.5 billion a month later. Such unusual year-end activity reflecting a multi-billion dollar loss would have caused a reasonable investor to question such trades.

      d.      Picower and the other Defendants knew or should have known that fictitious and backdated trading activity was being reported in their accounts, and that their accounts reflected fictitious holdings. For example, Decisions maintained several accounts with BLMIS. One of those accounts, "Decisions Inc.," was used by Picower and the other Defendants as the primary source of cash withdrawals from BLMIS. The account reflected little trading activity and relatively few holdings, but Picower directed quarterly distributions from this account in the millions to hundreds of millions of dollars throughout the 1990s and

2000s. Indeed, as of the date of Madoff's arrest, the account had a reported negative net cash balance of more than $6 billion. Most distribution requests were signed by Picower and faxed to BLMIS by Freilich, although some were signed by Freilich and in other cases Picower directed that any questions should be addressed to "April [Freilich]."

   e.  Even more brazenly, one account combined outrageous returns with backdating to create trades that "occurred" before the account was even opened by BLMIS. On or about April 24, 2006, Decisions opened a sixth account with BLMIS ("Decisions 6") by wire transfer on April 18 of $125 million. BLMIS promptly began "purchasing" securities in the account, but it backdated the vast majority of these purported transactions to January 2006. By the end of April, a scant 12 days later, the purported net equity value of the account was over $164 million, a gain of $39 million, or a return of more than 30% in less than two weeks of purported trading. The reason for this massive gain: the Decisions 6 April 2006 customer account statement reflected 57 purported purchases of securities between January 10 and January 24, 2006, almost three months before the account was opened or funded. Defendants knew or should have known that the account that they opened in April could not legitimately have purchased securities in January, and that the $125 million deposited on April 18 could not legitimately have grown by more than 30% in less than two weeks, which, annualized, would have resulted in a rate of return of more than 750%. The majority of the securities "purchased" in January were "purchased" near the lowest prices for the period from January to April 2006, and were purportedly chosen in order to create an unusually high unrealized gain by the end of April.

   f.  Additionally, on information and belief, Picower, directly and/or through and/or with the assistance of Freilich, directed fictitious, backdated trades in order to achieve

fictitious gains or losses in earlier periods. For example, BLMIS records reflect several conversations beginning around May 14, 2007 between "April" and BLMIS employees about gains that the Picower Foundation "need[ed] during Jan & Feb [20]06." On information and belief, "April" is [Defendant] April Freilich. Since any legitimate gains or losses in January or February 2006 had to have been achieved more than one year before these conversations even occurred, Freilich and Defendants knew or should have known that they were participating in fraudulent activity.

    *i.*      On May 18, 2007, Freilich indicated the Foundation needed "$20 mil in gains" for January and February and "want[ed] 18% for year[] 07 appreciation," but that she had to check the numbers "with Jeff." On information and belief, "Jeff" is Defendant Jeffry Picower. Five days later, on May 23, Freilich told BLMIS that the numbers she had provided earlier were wrong, and the Foundation "needs only $12.3 mil [in gains] for" January and February 2007.

    *ii.*      Accordingly, the Picower Foundation's May 2007 statement reflected millions of dollars in securities transactions for the months of January and February 2007 that collectively resulted in a purported gain to the account of $12.6 million. These transactions had not appeared on the January or February 2007 statements, nor on any prior monthly customer statements that had been generated before May 2007, nor were the corresponding equity positions or values reflected on those earlier statements. With these "new" positions, the reported value of the Picower Foundation's account appeared to increase by $54.6 million – from $711.3 million in April 2007 to $765.9 million in May 2007 – because the May 2007 statement was (and subsequent statements were) based on an entirely different account history: one in which various trades had taken

place more than 15 months earlier, resulting in entirely different positions and values. The mysterious appearance of securities transactions months after the purported trades settled—and which had not appeared on the earlier statements during the relevant trade period—was not credible and would have raised questions by an accountholder who was not complicit in the manipulation.

g.    BLMIS' statements to Defendants reflected a consistent ability to buy stocks near their monthly lows, and to sell stocks near their monthly highs (or, when requested by Defendants to generate losses, to do the opposite). No experienced investment professional could reasonably have believed that this could have been accomplished legitimately.

h.    Indeed, BLMIS records suggest that Picower and Freilich knew that "trades" were being backdated, and that they took steps to hide the backdating and their knowledge of it. For example, on or around December 22, 2005, Picower and/or Freilich faxed to BLMIS a letter signed by Picower and bearing a date of December 1, 2005. The letter directed the sale of specific positions across at least 4 accounts, and purported "sales" consistent with those instructions are reported on Defendants' December 2005 account statement as having settled on December 2, and thus "sold" before December 1, as the settlement date is usually 3 business days after the trade date. But Defendants' letter, though dated December 1, references and attaches Defendants' "portfolio appraisal" dated December 16, 2005, which purports to show the dates and purchase prices of the stocks that Defendants sought to sell, apparently to assist BLMIS in calculating the gains from the sales of these positions. Notably, the December 16 "portfolio appraisal" purports to show the respective accounts still holding the positions, *as of December 16*, that were purportedly sold by December 2. Thus, even if the letter had been delivered to BLMIS on December 1, 2005

instead of December 22, 2005 as noted by the fax header and suggested by the December 16 "portfolio appraisal," the sale would have predated the letter.

      i.     BLMIS records, together with Picower's own documents, further suggest Picower's and his agents' complicity in the fraud, through two additional backdated trades in December 2005. On or around December 29, 2005, April Freilich, acting on behalf of Picower, faxed to BLMIS a letter signed by Picower that directed BLMIS to "pick up long term capital gains in the accounts listed below before December 31, 2005" across five Decisions accounts. The letter further directed BLMIS to realize $50,000,000 in gains, and attached the relevant "portfolio appraisal" statements for the five Decisions accounts listed in the letter. Each "portfolio appraisal," created by Picower and/or his agents, purported to show the securities held in each account, the date they were "purchased," the quantity held, and also purported to calculate the unrealized gain or loss on each security based on the market values as of November 30, 2005, the date of the "portfolio appraisal." According to Picower's own "portfolio appraisals," none of these Decisions accounts held more than 11 different securities, and three of these accounts held 5 or fewer securities as of November 30, 2005.

      *i.*     Upon Picower's instruction, BLMIS "sold" Agilent Technologies ("Agilent") and Intel Corporation ("Intel") across these accounts, realizing a long-term gain of approximately $46.3 million, a significant majority of the requested gain. According to the account statements generated by BLMIS for December 2005 – and forwarded to Picower and his agents – these trades purportedly settled around December 8 and 9, 2005, approximately 3 weeks before the relevant instruction was sent to BLMIS. Picower's failure to question BLMIS' apparent clairvoyance suggests that Picower knew that BLMIS was backdating trades.

*ii.* In December 2005, BLMIS also created backdated "purchases" on margin of Google, Diamond Offshore Drilling ("Diamond") and Burlington Resources, Inc. ("Burlington") across all of the referenced accounts. These "purchases" – with purported settlement dates between January 12 and January 20, 2005 – were entirely fictitious and were reflected for the first time in the BLMIS-created account statements issued at the end of December 2005. This backdated trading activity resulted in an immediate purported 12-month unrealized "gain" for Picower of approximately $79 million and a portfolio value of over $155 million as of the end of December as a result of the increase in the market value of these securities during the calendar year. BLMIS' December 2005 account statements also credited the Decisions accounts with $82,000 of Burlington quarterly dividends for March, June and September 2005, which also had not appeared on any BLMIS account statement or "portfolio appraisal" in any of the preceding months because these accounts did not "hold" Burlington until December 2005. The new Burlington, Diamond and Google positions continued to be reported in subsequent account statements. Picower was aware of the fictitious nature of the transactions because none of the purported purchases or dividend payments had been reflected in any previous BLMIS monthly account statements and, further, were not reflected in Picower's own "portfolio appraisal" statements that he created and used to track his investments during that year. Moreover, because the "portfolio appraisal" statements for these particular accounts reflected relatively few positions, the sudden and inexplicable appearance of these positions in Picower's accounts is clear evidence that BLMIS was engaged in a fraud, and could not have gone unnoticed. Picower's failure to question or to repudiate these trades – indeed, he benefited from them by being paid dividends and by

selling the positions years later – is evidence of Picower's awareness of BLMIS' fraudulent activities.

64. Beyond these indicia of fraud in Defendants' own accounts, Defendants ignored numerous other indicia of irregularity and fraud from the general manner in which BLMIS operated. Among other things, Defendants were on notice of the following additional indicia of irregularity and fraud but failed to make sufficient inquiry:

a. Financial industry press reports, including a May 27, 2001 article in Barron's entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," and a May, 2001 article in MAR/Hedge, a widely read industry newsletter entitled "Madoff Tops Charts; Skeptics Ask How," raised serious questions about the legitimacy of BLMIS and Madoff and their ability to achieve the IA Business returns they purportedly had achieved using the investment strategy Madoff claimed to employ for most clients. Picower and many of the other Defendants were invested in BLMIS when these reports were issued.

b. BLMIS functioned as both investment manager and custodian of securities. This arrangement eliminated another frequently utilized check and balance in investment management by excluding an independent custodian of securities from the process, and thereby furthering the lack of transparency of BLMIS to other investors, regulators and outside parties.

c. All of the Defendants received far higher purported annual rates of return on their investments with BLMIS, approximating 22%, as compared to the interest rates BLMIS could have paid to commercial lenders during the relevant time period. Upon information and belief, Picower and the other Defendants never questioned why Madoff

accepted their investment capital in lieu of other available alternatives, including commercial loans at far lower interest rates, that would have been more lucrative for BLMIS.

d.      BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall.  No experienced business person, especially one with an accounting background, could have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

e.      At no time did Picower or the other Defendants conduct a performance audit of BLMIS or match any trade confirmations provided by BLMIS with actual trades executed through any domestic or foreign public exchange despite the fact that Defendants' accounts purportedly had billions of dollars in assets and easily could have afforded to do this.

f.      Based on all of the foregoing factors, many banks and industry advisors who made an effort to conduct reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that their IA Business operations were not legitimate.  In contrast, Picower and the other Defendants, who had more visibility into the incredibility of their reported trading activity on their account statements and their outsized rates of return, continued to do business with BLMIS until Madoff could no longer sustain the Ponzi scheme and the fraud was publicly disclosed.

65.     The Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

66.     The Transfers were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the Accounts ("Fictitious Profits").

67.     The Transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. CPRL 203(g) (McKinney 2001) and N.Y. Debt. & Cred. §§ 273 – 276 (McKinney 2001).  From December 1995 to the Filing Date, Defendants withdrew approximately $6.5 billion from their accounts at BLMIS, at least $5 billion of which was other people's money.

68.     Of the Transfers, more than 220 transfers in the collective amount of at least $2.4 billion (the "Six Year Transfers") were made during the six years prior to the Filing Date and are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. §§ 273 – 276.

69.     Of the Six Year Transfers, more than 50 transfers in the collective amount of at least approximately $250.6 million (the "Two Year Transfers") were made during the two years prior to the Filing Date, and are additionally recoverable under sections 548(a)(1), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. 78fff-2(c)(3).

70.     Of the Two Year Transfers, two transfers in the collective amount of at least approximately $6.85 million (the "90 Day Transfers") were made during the 90 days prior to the Filing Date, and are additionally recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

71.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

72. The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

**COUNT ONE**
**TURNOVER AND ACCOUNTING – 11 U.S.C. § 542**

73. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

74. The Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

75. As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from the Defendants of any and all Transfers made by BLMIS, directly or indirectly, to any Defendant.

76. As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all such Transfers received by any Defendant from BLMIS, directly or indirectly.

**COUNT TWO**
**PREFERENTIAL TRANSFERS - 11 U.S.C. §§ 547(b), 550 AND 551**

77. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

78. At the time of each of the 90 Day Transfers (hereafter, the "Preference Period Transfers"), the Defendants were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

79. Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

80.     Each of the Preference Period Transfers was to or for the benefit of a Defendant.

81.     Pleading in the alternative, each of the Preference Period Transfers was made on account of an antecedent debt owed by BLMIS before such transfer was made.

82.     Each of the Preference Period Transfers were made while BLMIS was insolvent.

83.     Each of the Preference Period Transfers were made during the preference period under section 547(b)(4) of the Bankruptcy Code.

84.     Each of the Preference Period Transfers enabled Defendant to receive more than the receiving Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

85.     Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the applicable Defendant pursuant to section 550(a).

86.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

### COUNT THREE
### FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551

87.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

88.     The Two Year Transfers were made on or within two years before the filing date of BLMIS' case.

89.     The Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

90.     The Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a).

91.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550 AND 551

92.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

93.     The Two Year Transfers were made on or within two years before the Filing Date.

94.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

95.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

96.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

97. At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

98. The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a).

99. As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

### COUNT FIVE
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551

100. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

101. At all times relevant to the Six Year, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

102. The Six Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

103. As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy

Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

**COUNT SIX**
**FRAUDULENT TRANSFER --NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107**

104.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

105.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

106.    BLMIS did not receive fair consideration for the portion of the Six Year Transfers.

107.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

108.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278 and 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFERS—NEW YORK DEBTOR AND CREDITOR LAW
## §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107

109.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

110.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

111.     BLMIS did not receive fair consideration for the Six Year Transfers.

112.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

113.     As a result of the foregoing, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b) and 550(a) of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT EIGHT
## FRAUDULENT TRANSFERS-NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A) AND 551

114.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

115.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

116.     BLMIS did not receive fair consideration for the Six Year Transfers.

117.     At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

118.     As a result of the foregoing, pursuant to sections 275, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550(a) and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

**COUNT NINE**
**UNDISCOVERED FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE**
**LAW AND RULES 203(g) AND NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551**

119.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

120.     At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

121.     At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

122.     The Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

123.     As a result of the foregoing, pursuant to NY CPLR 203(g) sections 276, 276-a, 278 and/or 279 of the and New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

**COUNT TEN**
**RECOVERY OF SUBSEQUENT TRANSFERS - NEW YORK DEBTOR AND**
**CREDITOR LAW § 278 AND 11 U.S.C. §§ 544, 547, 548, 550(a) AND 551**

124.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

125.     Each of the Transfers are avoidable under sections 544, 547 and/or 548 of the Bankruptcy Code.

126.     On information and belief, some or all of the Transfers were subsequently transferred by one or more Defendants to other Defendants in the form of transfers from one account to another or other means (collectively, the "Subsequent Transfers").

127.     Each of the Subsequent Transfers were made directly or indirectly to one or more Defendants

128.     One or more Defendants are immediate or mediate transferees of the Subsequent Transfers from Defendant Picower and/or other Defendants.

129.      As a result of the foregoing, pursuant to section 278 of the New York Debtor and Creditor Law, sections 550(a) and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3),

the Trustee is entitled to a judgment against one or more Defendants (a) preserving the Subsequent Transfers, (b) recovering the Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (c) recovering attorneys' fees from Defendants.

**COUNT ELEVEN**
**OBJECTION TO DEFENDANTS' SIPA CLAIMS**

130. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

131. One or more Defendants has filed, or will file, a claim under SIPA.

132. Defendants' claims (the "Claims") are not supported by the books and records of BLMIS nor the claim materials submitted by Defendants, and, therefore, should be disallowed.

133. The Claims also should not be allowed as general unsecured claims. Defendants are the recipients of transfers of BLMIS' property which are recoverable under sections 547, 548 and 550 of the Bankruptcy Code, and Defendants have not returned the Transfers to the Trustee. As a result, pursuant to section 502(d) the Claim must be disallowed unless and until the Defendants return the Transfers to the Trustee.

134. As a result of the foregoing, the Trustee is entitled to an order disallowing the Claims.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

*i.* On the First Claim for Relief, pursuant to sections 542, 550(a) and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by the Defendants of the property that was the subject of the Transfers or the value of such property;

*ii.* On the Second Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

*iii.* On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

*iv.* On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

*v.* On the Fifth Claim for Relief, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and sections 544(b), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants;

*vi.* On the Sixth Claim for Relief, pursuant to sections 273, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550 and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

*vii.* On the Seventh Claim for Relief, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551 and 1107 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the state of BLMIS;

*viii.* On the Eighth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 275, 278 and/or 279 and Bankruptcy Code §§ 544(b), 550, 551, and 1107: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

*ix.* On the Ninth Claim for Relief, pursuant to NY CPLR 203(g) and sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

*x.* On the Tenth Claim for Relief, pursuant to section 278 of the New York Debtor and Creditor Law, sections 550(a) and 551 of the Bankruptcy Code, and 15 USC § 78fff-2(c)(3): (a) preserving the Subsequent Transfers, (b) directing that the Subsequent Transfers be set aside; (c) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Defendants.

*xi.* On the Eleventh Claim for Relief, that the claim or claims of Defendants be disallowed;

*xii.* On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001 and 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

*xiii.* On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

*xiv.* On all Claims for Relief, assignment of Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

*xv.* Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

*xvi.* Granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

Date: May 12, 2009

  s/David J. Sheehan
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*