**Schulte Roth & Zabel LLP**
919 Third Avenue
New York, New York  10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955
William D. Zabel
Email:  william.zabel@srz.com
Michael L. Cook
Email:  michael.cook@srz.com
Marcy Ressler Harris
Email:  marcy.harris@srz.com
Frank J. LaSalle
Email:  frank.lasalle@srz.com

*Attorneys for the Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>      Plaintiff,<br><br>      v.<br><br>     JEFFRY M. PICOWER, individually and as trustee for the Picower Foundation;<br><br>     BARBARA PICOWER, individually and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation;<br><br>     CAPITAL GROWTH COMPANY; | Adv. Pro. No. 09-1197 (BRL) |

FAVORITE FUNDS;

JA PRIMARY LIMITED PARTNERSHIP;

JA SPECIAL LIMITED PARTNERSHIP;

JAB PARTNERSHIP;

JEMW PARTNERSHIP;

JF PARTNERSHIP;

JFM INVESTMENT COMPANY;

JLN PARTNERSHIP;

JMP LIMITED PARTNERSHIP;

JEFFRY M. PICOWER SPECIAL CO.;

JEFFRY M. PICOWER, P.C.;

DECISIONS INCORPORATED;

THE PICOWER FOUNDATION;

THE PICOWER INSTITUTE FOR
MEDICAL RESEARCH;

THE TRUST FBO GABRIELLE H.
PICOWER; and DOES 1-25.

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
UNDER FED. R. BANKR. P. 7012(b) AND 7009**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 4

SUMMARY OF ARGUMENT .............................................................................. 9

ARGUMENT ........................................................................................................ 12

I.     THE CONCLUSORY AND SPECULATIVE ALLEGATIONS OF MR. PICOWER'S PURPORTED PARTICIPATION IN MADOFF'S FRAUD MUST BE DISMISSED. ......................................................................... 13

II.    THE TRUSTEE HAS FAILED TO ALLEGE AN ALTER EGO CLAIM AGAINST MR. PICOWER. ...................................................................... 17

    A.    Delaware Law Applies To The Trustee's Alter Ego Theory. .............................. 18

    B.    The Trustee Has Not Alleged Any Basis To Pierce The Corporate Veil With Respect To The Picower Foundation Or The Trust. ................................... 19

    C.    The Trustee Has Not Alleged Any Basis To Pierce The Corporate Veil With Respect To The Entity Defendants. .............................. 21

III.    AVOIDANCE CLAIMS AGAINST DEFENDANTS NOT ALLEGED TO HAVE RECEIVED ANY TRANSFERS FROM BLMIS MUST BE DISMISSED. ........................................................................................... 23

IV.    THE TRUSTEE'S TURNOVER CLAIM IS PRECLUDED AS A MATTER OF LAW BECAUSE THE TRANSFERS ARE NOT "PROPERTY OF THE ESTATE." ......................................................................................... 25

V.    TRANSFERS MADE MORE THAN SIX YEARS BEFORE THE FILING OF THE ADVERSARY COMPLAINT ARE NOT VOIDABLE UNDER NEW YORK LAW OR SECTION 544(b) OF THE BANKRUPTCY CODE. ......................... 27

    A.    Under New York Law, As Incorporated By Section 544(b), The "Six Year Transfers" Must Be Measured From The Date Of The Adversary Complaint, And Transfers Occurring More Than Six Years Before The Adversary Complaint Are Not Voidable. ............................. 28

    B.    There Is No Statutory Support For Measuring The "Six Year Transfers" From The Filing Date, As the Trustee Has Done. ................................. 29

        1.    The Bankruptcy Act Provided For Tolling Of State Statutes Of Limitation In Connection With Creditor And Debtor-Based Claims. ........ 31

        2.    The Bankruptcy Code Does Not Provide For Tolling Of State Statutes Of Limitations In Connection With Creditor-Based Claims. ...... 32

3. When The Avoidance Provisions To Which Section 546(a) Applies Are Examined, The "Look Back" Period Under Section 544(b) Is Not Meant To Run From The Petition Date. .............................................. 34

4. By Its Nature, Section 544(b) Requires The Trustee To Step Into The Shoes Of An Actual Creditor, Subject To The Same Defenses As That Creditor, Which Is Inconsistent With Freezing The Statute Of Limitations As Of The Petition Date. .................................................... 36

C. The Policy Arguments Advanced In Support Of Limiting The Applicability Of State Limitations Periods To The Date Of The Petition Are Contrary To The Intent Of Congress. ........................................... 37

VI. THE TRUSTEE CANNOT RELY ON THE DISCOVERY RULE TO REACH TRANSFERS THAT OCCURRED MORE THAN SIX YEARS FROM THE COMMENCEMENT OF THE ADVERSARY PROCEEDING. ................................... 40

A. The Trustee's "Undiscovered Transfers" Claim Is Insufficient On Its Face ......... 41

B. The Trustee's Own "Red Flags" Allegations Preclude Any Inference That An Investor Exists Who Could Not Have Discovered The Fraud. ....................... 43

VII. THE CONSTRUCTIVE FRAUD CLAIMS MUST BE DISMISSED BECAUSE THE TRUSTEE HAS FAILED TO PLEAD A LACK OF FAIR CONSIDERATION. .................................................................................................... 45

A. The Complaint Itself Demonstrates That The Six Year Transfers Were Made For Fair Consideration. ................................................................ 46

B. The Trustee's Allegation That The Six Year Transfers Were Not Made For Value Ignores Defendants' Claims Against BLMIS. ........................... 47

VIII. THE TRUSTEE'S CLAIM TO AVOID SUBSEQUENT TRANSFERS MUST BE DISMISSED BECAUSE THE TRUSTEE HAS NOT ALLEGED ANY SUBSEQUENT TRANSFERS. ........................................................................... 50

IX. THE DEFENDANTS' SIPA CLAIMS SHOULD BE ALLOWED. .............................. 51

X. THE TRUSTEE IS NOT ENTITLED TO A CONSTRUCTIVE TRUST OR ASSIGNMENT OF DEFENDANTS' TAX REFUNDS ................................................... 54

A. The Trustee Has No Entitlement To A Constructive Trust. ................................. 54

B. The Trustee Is Not Entitled to Defendants' Income Tax Refunds. ....................... 55

CONCLUSION ............................................................................................................... 56

# TABLE OF AUTHORITIES

Cases

Page

*Ashcroft v. Iqbal,*
    – U.S. –, 129 S. Ct. 1937 (2009)...................................................................................... 12, 41-42

*Atlanta Shipping Corp. v. Chem. Bank,*
    818 F.2d 240 (2d Cir. 1987) ...........................................................................................45

*Avalon LLC v. Coronet Prop. Co.,*
    306 A.D.2d 62 (1st Dep't 2003) .....................................................................................29

*Baldi v. Samuel Son & Co. (In re McCook Metals, LLC),*
    No. 05 C 2990, 2007 WL 4287507 (N.D. Ill. Dec. 4, 2007) ..................................29

*Bankers Sec. Life Ins. Soc'y v. Shakerdge,*
    49 N.Y.2d 939 (1980) .....................................................................................................55

*Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc.),*
    238 B.R. 558 (Bankr. S.D.N.Y. 1999)...........................................................................34

*Bash v. Cunningham (In re Cunningham),*
    Adv. No. 07-01146, 2008 WL 2746023 (Bankr. N.D. Ohio July 11, 2008) ...................29, 35

*Bay State Milling Co. v. Martin (In re Martin),*
    142 B.R. 260 (Bankr. N.D. Ill. 1992) ......................................................................30, 38

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................12, 13, 18, 42, 46

*Bernheim v. Litt,*
    79 F.3d 318 (2d Cir. 1996) .............................................................................................12

*Bianchi v. United States,*
    46 Fed. Cl. 363 (Ct. Cl. 2000) .......................................................................................33

*Bloom v. Fry (In re Leach),*
    380 B.R. 25 (Bankr. D.N.M. 2007) ...............................................................................30

*Buchman v. Am. Foam Rubber Corp.,*
    250 F. Supp. 60 (S.D.N.Y. 1965) ..................................................................................36

*Coleman v. Cmty. Trust Bank (In re Coleman),*
    426 F.3d 719 (4th Cir. 2005) ....................................................................................33, 35

*Crosse v. BCBSD, Inc.,*
    836 A.2d 492 (Del. 2003) ...............................................................................................19

*Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.*
    *(In re Adelphia Commc'ns Corp.),* 322 B.R. 509 (Bankr. S.D.N.Y. 2005).......................20, 22

*Donell v. Kowell,*
    533 F.3d 762 (9th Cir. 2008) ..........................................................................................47

*Dzikowski v. Friedlander (In re Friedlander Capital Mgmt.)*,
  Adv. No. 05-03088-PGH, 2009 WL 1231085 (Bankr. S.D. Fla. Apr. 29, 2009).................28

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
  980 F.2d 125 (2d Cir. 1992) ........................................................................................25

*FDIC v. Marke Painting Co.*,
  No. 88 Civ. 8675, 1992 WL 212372 (S.D.N.Y. Aug. 25, 1992) .........................................55

*Feldman v. First Nat'l City Bank*,
  511 F.2d 460 (2d Cir. 1975) ........................................................................................31

*Fink v. Graven Auction Co. (In re Graven)*,
  64 F.3d 453 (8th Cir. 1995) .........................................................................................28

*First Union Nat'l Bank v. Gibbons (In re Princeton-N.Y. Investors, Inc.)*,
  219 B.R. 55 (D.N.J. 1998) .......................................................................................28, 38

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
  – U.S. –, 128 S. Ct. 2326 (2008)...................................................................................38

*Geron v. Palladin Overseas Fund, Ltd. (In re Applied Theory Corp.)*,
  323 B.R. 838 (Bankr. S.D.N.Y.), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005) ...............................47

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*,
  313 B.R. 612 (Bankr. D.N.J. 2004) ...............................................................................36

*Giacometti v. Arton Bermuda Ltd. (In re Sia)*,
  349 B.R. 640 (Bankr. D. Haw. 2006) ............................................................................42

*Giordano v. Thomson*,
  438 F. Supp. 2d 35 (E.D.N.Y. 2005) .............................................................................23

*Global Crossing Estate Representative v. Winnick*,
  No. 04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) ..........................32, 34, 39, 43

*Gosconcert v. Hillyer*,
  No. 92 CIV. 7152, 1993 WL 106117 (S.D.N.Y. Apr. 5, 1993).............................................22

*Halpert v. Engine Air Serv., Inc.*,
  116 F. Supp. 13 (E.D.N.Y. 1953) ..................................................................................31

*Hansen v. Hansen (In re Hansen)*,
  114 B.R. 927 (Bankr. N.D. Ohio 1990)...........................................................................34

*Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.)*,
  32 B.R. 199 (Bankr. S.D.N.Y. 1983)..........................................................................14, 29

*Hill v. Gibson Dunn & Crutcher, LLP (In re MS55, Inc.)*,
  No. 06-cv-01233, 2008 WL 2358699 (Bankr. D. Colo. June 6, 2008) ...................................37

*Hirsch v. Gersten (In re Centennial Textiles, Inc.)*,
  220 B.R. 165 (Bankr. S.D.N.Y. 1998)........................................................................28, 56

iv

*In re Alper Holdings*,
No. 07-12148, 2008 WL 160203 (Bankr. S.D.N.Y. Jan. 15),
*aff'd*, 398 B.R. 736 (S.D.N.Y. 2008) ............................................................18

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) ......................................................13, 17

*In re New Times Sec. Servs., Inc.*,
371 F.3d 68 (2d Cir. 2004) ................................................49, 52, 53, 54

*In re Saunders*,
101 B.R. 303 (N.D. Fla. 1989)..................................................................26

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
8 F.3d 130 (2d Cir. 1993) ......................................................................18

*Kaliner v. Load Rite Trailers, Inc. (In re Sverica Acquisition Corp.)*,
179 B.R. 457 (Bankr. E.D. Pa. 1995) ..............................................42

*Lawler v. RepublicBank Dallas (In re Lawler)*,
53 B.R. 166 (Bankr. N.D. Tex. 1985)....................................................31

*Levit v. Spatz (In re Spatz)*,
222 B.R. 157 (N.D. Ill. 1998) ..................................................................29

*MacLeod v. Kapp*,
81 F. Supp. 512 (S.D.N.Y. 1948) ............................................................31

*Madonna v. United States*,
878 F.2d 62 (2d Cir. 1989) ...............................................................13, 14

*Mahoney, Trocki & Assocs. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.)*,
111 B.R. 914 (Bankr. S.D. Cal. 1990) ................................................29, 30

*Mancuso v. Cont'l Bank Nat'l Ass'n Chicago (In re Topcor, Inc.)*,
132 B.R. 119 (Bankr. N.D. Tex. 1991)....................................................30

*Moreno-Bravo v. Gonzales*,
463 F.3d 253 (2d Cir. 2006) ...........................................................33, 35

*Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*,
398 B.R. 761 (Bankr. S.D.N.Y. 2008)................................... 42-43, 51

*Nielson v. Union Bank of Cal., N.A.*,
290 F. Supp. 2d 1101 (C.D. Cal. 2003) ................................................42

*Nord Serv., Inc. v. Palter*,
548 F. Supp. 2d 366 (E.D. Tex. 2008)....................................................20

*Norwest Bank Worthington v. Ahlers*,
485 U.S. 197 (1988)..................................................................................38

*Nyhuis v. Reno*,
204 F.3d 65 (3d Cir. 2000) .....................................................................34

v

*O'Brien v. Nat'l Prop. Analysts Partners*,
    936 F.2d 674 (2d Cir. 1991) ................................................................13, 17

*O'Connell v. Arthur Andersen, LLP (In re Alphastar Ins. Group Ltd.)*,
    383 B.R. 231 (Bankr. S.D.N.Y. 2008) ................................................................5

*O'Connell v. Shallo (In re Die Fleidermaus LLC)*,
    323 B.R. 101 (Bankr. S.D.N.Y. 2005) ..............................................................30

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.*
    *(In re Verestar, Inc.)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006)................................23

*Official Comm. of Unsecured, Creditors of M. Fabrikant & Sons, Inc. v.*
    *JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008) ..............................................................50

*Old Orchard Bank & Trust Co. v. Josefik (In re Josefik)*,
    72 B.R. 393 (Bankr. N.D. Ill. 1987) .................................................................29

*Orr v. Bernstein (In re Bernstein)*,
    259 B.R. 555 (Bankr. D.N.J. 2001) ..................................................................30

*Peavy v. WFAA-TV, Inc.*,
    221 F.3d 158 (5th Cir. 2000) ...........................................................................34

*Pfohl Bros. Landfill Site Steering Comm. v. Allied Waste Sys., Inc.*,
    255 F. Supp. 2d 134 (W.D.N.Y. 2003) ........................................................ 54-55

*Pierce County v. Guillen*,
    537 U.S. 129 (2003)........................................................................................34

*R.F.M.A.S., Inc. v. So*,
    No. 06 Civ. 13114, 2009 WL 1395947 (S.D.N.Y. May 13, 2009)........................18

*Robertson-Ceco Corp. v. Cornelius*,
    No. 3:03cv475, 2007 WL 1020326 (N.D. Fla. Mar. 30, 2007) ............................18

*Rosania v. Haligas (In re Dry Wall Supply, Inc.)*,
    111 B.R. 933 (D. Colo. 1990) ...............................................................30, 32, 38

*Ross v Bolton*,
    904 F.2d 819 (2d Cir 1990) .............................................................................13

*Russello v. United States*,
    464 U.S. 16 (1983).............................................................................33, 35, 37

*Satterwhite v. The Image Bank, Inc.*,
    No. 01 Civ. 7097, 2002 WL 31098496 (S.D.N.Y. Sept. 19, 2002).......................41

*Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*,
    307 B.R. 744 (Bankr. S.D.N.Y. 2004).............................................................26

*Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*,
    325 B.R. 134 (Bankr. S.D.N.Y. 2005).........................................................25, 26

*Scarborough v. Perez*,
　　870 F.2d 1079 (6th Cir. 1989) ........................................................................22

*Schnittjer v. Linn Area Credit Union (In re Sickels)*,
　　392 B.R. 423 (Bankr. N.D. Iowa 2008) .............................................................56

*Sears Petroleum & Trans. Co. v. Burgess Constr. Servs., Inc.*,
　　417 F. Supp. 2d 212 (D. Mass. 2006) ...........................................................28, 30

*Seligson v. N.Y. Produce Exch.*,
　　378 F. Supp. 1076 (D.C.N.Y. 1974) ..................................................................29

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
　　403 F.3d 43 (2d Cir. 2005) ...............................................................................45

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distrib., Inc.)*,
　　379 B.R. 5 (Bankr. E.D.N.Y. 2007) ...................................................................50

*Silverman v. Sound Around, Inc. (In re Allou Distrib., Inc.)*,
　　392 B.R. 24 (Bankr. E.D.N.Y. 2008) .............................................................36, 41

*SL v. CD*,
　　No. XX-07, 2007 WL 4198248 (N.Y. Sup. Ct. Nov. 28, 2007) ...........................55

*Smith v. Am. Founders Fin., Corp.*,
　　365 B.R. 647 (S.D. Tex. 2007) ..........................................................................38

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
　　547 F.3d 406 (2d Cir. 2008) ...............................................................................8

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*,
　　335 B.R. 539 (D. Del. 2005) ..............................................................................26

*Steege v. Lyons (In re Lyons)*,
　　130 B.R. 272 (Bankr. N.D. Ill. 1991) ................................................................34

*Stone v. I.N.S.*,
　　514 U.S. 386 (1995) ..........................................................................................34

*T.C.I. Ltd. v. Sears Bank & Trust Co. (In re T.C.I. Ltd.)*,
　　21 B.R. 876 (Bankr. N.D. Ill. 1982) ..................................................................33

*Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*,
　　289 B.R. 563 (Bankr. S.D.N.Y. 2003) ...........................................................12, 13

*Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*,
　　313 B.R. 46 (Bankr. S.D.N.Y 2004) .........................................................18, 19, 22

*Trevino v. Merscorp, Inc.*,
　　583 F. Supp. 2d 521 (D. Del. 2008) ...................................................................19

*United Parcel Serv., Inc. v. U.S. Postal Serv.*,
　　604 F.2d 1370 (3d Cir. 1979) ............................................................................38

*Visconsi v. Lehman Bros., Inc.*,
　　No. 06-3304, 2007 WL 2258827 (6th Cir. Aug. 8, 2007) ....................................48

*Wallace v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999) ...................................................................18, 19

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
   933 F.2d 131 (2d Cir. 1991) ...........................................................................18

*Wyle v. C.H. Rider & Family (United Energy Corp.)*,
   944 F.2d 589 (9th Cir. 1991) ................................................................. 47, 49-50

*Young v. Paramount Comm's Inc. (In re Wingspread Corp.)*,
   178 B.R. 938 (Bankr. S.D.N.Y. 1995) .............................................................42

Federal Statutes & Rules

11 U.S.C. § 29(e) (repealed 1978) .............................................................30, 31, 32, 33

11 U.S.C. § 108(a) ....................................................................................... *passim*

11 U.S.C. § 541 ........................................................................................25, 26

11 U.S.C. § 542 ........................................................................................... *passim*

11 U.S.C. § 544 ........................................................................................... *passim*

11 U.S.C. § 546 ........................................................................................... *passim*

11 U.S.C. § 547 ........................................................................................... *passim*

11 U.S.C. § 548 ........................................................................................... *passim*

11 U.S.C. § 550 ........................................................................................... *passim*

15 U.S.C. § 78*fff*(a)(1)(B) ...............................................................................52

15 U.S.C. § 78*fff*-2(c)(3) ..................................................................................26

15 U.S.C. § 78*lll*(7)(B) ....................................................................................11

15 U.S.C. § 78*lll*(11) ..................................................................................49, 51, 52

Fed. R. Bankr. P. 7009 ....................................................................................1, 13

Fed. R. Bankr. P. 7012(b) .................................................................................1, 12

Fed. R. Civ. P. 9(b) ..................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ...................................................................................1, 12

State Statutes & Rules

N.Y. C.P.L.R. § 203(g) ...................................................................................40

N.Y. C.P.L.R. § 213 ................................................................................27, 29, 40

N.Y. Debt. & Cred. Law § 272 ...........................................................................47

N.Y. Debt. & Cred. Law § 273 .......................................................................24, 45

N.Y. Debt. & Cred. Law § 274 .......................................................................24, 45

N.Y. Debt. & Cred. Law § 275 .......................................................................24, 45

N.Y. Debt. & Cred. Law § 276 ................................................................................................24

N.Y. Debt. & Cred. Law § 276-a ............................................................................................24

N.Y. Debt. & Cred. Law § 278 ..........................................................................................24, 54

N.Y. Debt. & Cred. Law § 279 ................................................................................................24

Miscellaneous

Brief of Appellant SIPC, *Stafford v. Giddens (In re New Times Sec. Servs., Inc.),*
    No. 05-5527 (2d Cir. filed Dec. 27, 2005) ......................................................................49

H.R. Rep. No. 95-746 (1977) ..................................................................................................53

S. Rep. No. 95-763 (1978) ......................................................................................................53

S. Rep. No. 95-989 (1978) ................................................................................................32, 39

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Complaint in its entirety, pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b), with respect to Defendants Favorite Fund, JFM Investment Company ("JFM Investment"), JMP Limited Partnership ("JMP LP"), Jeffry M. Picower, P.C. ("Picower P.C."), JA Primary Limited Partnership ("JA Primary"), JA Special Limited Partnership ("JA Special") and the Picower Institute for Medical Research (the "Picower Institute"), and to dismiss the Complaint in part, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and Fed. R. Bankr. P. 7009 and 7012(b), with respect to the remaining Defendants.

## <u>PRELIMINARY STATEMENT</u>

Over the course of more than thirty years, Jeffry M. Picower invested huge sums of money with Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of himself, his businesses, his family, and the charitable entities through which the Picowers conducted their extensive and well-documented philanthropy. Mr. Picower invested with BLMIS because he trusted Bernie Madoff, whom he – and the world – believed to be a brilliant trader, a successful businessman, an industry leader, and a pillar of the financial community.

Mr. Picower learned the ugly truth about Bernie Madoff on December 11, 2008, following Madoff's arrest for running the largest Ponzi scheme in history. Like thousands of other BLMIS investors, financial professionals, and regulators around the world, Mr. Picower learned for the first time on that date that Madoff – to whom he had entrusted much of his fortune – had callously betrayed that trust. The consequence of Madoff's betrayal to all BLMIS investors, including Mr. Picower and the other Defendants, was devastating. For Mr. Picower's wife, Barbara, the consequence of Madoff's fraud was immeasurable, as it caused the closure of the Picower Foundation, which Mrs. Picower had nurtured and to which she had devoted herself over many years.

Rather than recognizing Mr. Picower and the other Defendants as victims of Madoff's fraud, the Trustee instead casts them as villains in history's largest Ponzi scheme. The Trustee argues in the Complaint that Mr. Picower knew or should have known of Madoff's fraud due to "implausibly high" investment returns that the Trustee believes were a form of compensation in exchange for investing and leaving money at BLMIS, thereby perpetuating Madoff's scheme.

The Trustee's villainous portrayal of Mr. Picower is unsupported by facts, but it is entirely consistent with the Trustee's stated intention to favor later BLMIS investors over earlier ones. (*See* Ex. 1.)[1] As victims, the Defendants – which include some of BLMIS' earliest investors – would be entitled to share in any recovery the Trustee achieves. Since their overall losses total billions of dollars, their *pro rata* share of the Trustee's recovery would be enormous. But by attempting to cast them as villains, the Trustee hopes to limit the Defendants' own recoveries, and claw back a greater amount of the Defendants' withdrawals, leaving more money for later investors.

The Trustee's portrait of complicity has led to gross overreaching in the Complaint, which includes legally unsustainable claims that are unsupported by facts or logic. Even the underlying premise of the Complaint is specious, given that the Defendants' account returns were not implausible. Rather, the Defendants' account statements clearly reflected that Madoff was pursuing a "buy and hold" strategy on their behalf whereby BLMIS purportedly bought equity securities and held them in the Defendants' BLMIS accounts for extended periods, even years. The Defendants' account returns were generally consistent with movements in the

---

[1]    Documents referenced herein, which are all publicly available, are contained in the transmittal Affirmation of Marcy Ressler Harris, Esq., dated July 31, 2009, and cited as "Ex. ___."

broader markets and with returns achieved by other large and distinguished investment managers, such as Warren Buffett, James Simons and John Paulson, among others.

In any event, the Trustee's allegations do not make sense.  The Defendants were not perpetuating Madoff's Ponzi scheme by withdrawing billions of dollars from their BLMIS accounts.  If anything, such large withdrawals would have placed an extraordinary strain on the scheme, forcing Madoff to raise billions of dollars elsewhere on short notice.  There is no rational reason why Madoff would have compensated Mr. Picower for making his scheme more difficult.

Moreover, had Mr. Picower known Madoff was running a Ponzi scheme, Mr. Picower would not have left more than half a billion dollars in his wife's, daughter's and Foundation's accounts at BLMIS, the values of which were lost upon Madoff's arrest.  Rather, Mr. Picower would have accelerated withdrawals from the Defendants' BLMIS accounts, particularly as the economy faltered, expecting that a recession would spur an increase in withdrawals, which, in turn, could cause the Ponzi scheme to unravel.  Yet as Exhibit B to the Complaint reflects, less than 4% of the withdrawals the Trustee seeks to avoid were made in 2007 and 2008, as the economy worsened.  Similarly, had Mr. Picower known the BLMIS trades were fictitious, there would have been no reason for him to have transferred cash and securities *into* the Defendants' BLMIS accounts.

Mr. Picower became a victim of Madoff's fraud for the same reasons thousands of other investors and financial professionals succumbed:  he was taken in by the professional, timely and superior service BLMIS provided its customers, and the strong returns it reported; the fact that respected business people were clamoring to invest with Madoff; Madoff's impeccable reputation, his leadership role in the securities industry, and his clean regulatory record even

after numerous Securities Exchange Commission ("SEC") examinations; Madoff's distinguished service as president of NASDAQ, his expert use of technology, his close relationships with SEC chairmen and industry professionals; and Madoff's notable record of charitable service and philanthropy. Most of all, like thousands of others, Mr. Picower genuinely believed in the personal and professional integrity of Bernie Madoff, and he had no reason to know that Madoff was engaged in a massive Ponzi scheme that even the regulators – who, unlike the Defendants, had access to all of BLMIS' records and are charged with uncovering fraud – failed to detect for more than twenty years.

## BACKGROUND

The Complaint against the Picower Defendants is a paradigm of excess. In its conclusory legal claims, its exaggerated rendition of the facts, and its aggressive demands for relief, the Complaint reflects a frenzied effort to deliver to the estate unprecedented sums from one of Madoff's wealthiest investors.

The Court cannot appreciate the excesses of the Trustee's characterizations and claims on the basis of the limited background information in the Complaint. Accordingly, presented below is a more complete and accurate recitation of certain relevant background information, taken from records that are publicly available or from the Defendants' BLMIS account records, all of which are available to the Trustee or are in his possession, and which Trustee plainly (and very selectively) relied on in preparing the Complaint.[2]

---

[2] The facts provided herein are not offered or relied upon as bases for dismissal of the Complaint. Rather, these background facts are simply presented to correct and provide context to facts alleged in the Complaint.

**The Defendants**

Mr. Picower is a highly successful businessman and private investor who also is an inactive Certified Public Accountant and retired attorney. (Compl. ¶ 34.) In addition to investing with BLMIS, over the years Mr. Picower and the entities through which he invests have earned substantial returns from their significant non-BLMIS investments, including in companies engaged in healthcare and technology. (*See id.* ¶ 58.) As reflected in SEC filings, the sale of Alaris Medical Systems, Inc. in 2004 alone netted Mr. Picower and certain related entities nearly $1 billion. (*See* Ex. 2.)[3]

Defendant Decisions Incorporated ("Decisions"), of which Mr. Picower is the Chairman, is the principal entity through which Mr. Picower transacts his investment business. (*See* Compl. ¶¶ 34, 37.) Decisions is a corporation organized under the laws of Delaware with its principal place of business in New York. (*Id.* ¶ 37.) Decisions is a general partner of Defendants Jeffry M. Picower Special Co. ("Special Co."), Capital Growth Company ("Capital Growth"), JA Primary, JA Special, JAB Partnership ("JAB"), JEMW Partnership ("JEMW"), JF Partnership ("JF"), JLN Partnership ("JLN"), and JMP LP (collectively, the "Partnership Defendants"), through which Mr. Picower also transacts business. (*Id.* ¶¶ 38-43, 45-47.) Defendants Favorite Fund, JFM Investment, and Picower P.C. (collectively with the Partnership Defendants, the "Entity Defendants"), similarly are or were entities through which Mr. Picower transacts business. (*Id.* ¶¶ 44, 48-49.)

Barbara Picower is Mr. Picower's wife. (*Id.* ¶ 35.) Mrs. Picower is the Executive Director (*id.*) and a Trustee of the Picower Foundation, a 501(c)(3) tax-exempt charitable foundation established in 1989. (*See* Exs. 3-4.) Mr. Picower is the principal donor to the

---

[3] The Court may take judicial notice of filings with the SEC without converting the motion into a motion for summary judgment. *See, e.g.*, *O'Connell v. Arthur Andersen, LLP (In re Alphastar Ins. Group Ltd.)*, 383 B.R. 231, 256 (Bankr. S.D.N.Y. 2008).

Foundation and is the Trustee charged with making investment decisions on behalf of the Foundation. (*See* Ex. 3.) Since 2002, under the diligent stewardship of Mrs. Picower, the Picower Foundation has issued grants in excess of $163.9 million to a variety of charitable organizations including, among others, The Educational Broadcasting Company (Channel 13/WNET), Massachusetts Institute of Technology, The New York Public Library, Children's Aid Society, Harlem Children's Zone, Children's Health Fund, Nurse Family Partnership, Rockefeller University, Weill Medical Center, Beth Israel Deaconess (Harvard Medical School), The After School Corporation (TASC), New Visions for Public Schools and City Harvest. (*See* Exs. 3, 5-9.) Virtually all of the assets of the Picower Foundation – totaling nearly $1 billion at one time – were invested with BLMIS. The BLMIS account statements reflected that in recent years approximately a third of the Foundation's assets purportedly were invested in low-risk U.S. Treasury instruments. As a result of Madoff's Ponzi scheme, the Picower Foundation has been forced to discontinue its operations. (*See* Ex. 4.)

The Picower Institute for Medical Research was a world-renowned nonprofit research institute formed in 1991 with a grant from the Picower Foundation. (*See* Ex. 10.) Mr. Picower was Chairman of the Picower Institute, and Mrs. Picower was a Trustee. (*See* Ex. 11.) The Picower Institute employed approximately 40 scientists and other staffers dedicated to the clinical research and development of treatments for life threatening and debilitating diseases, such as AIDS, cancer, diabetes and arthritis. (*See* Ex. 10.) The Picower Institute was dissolved in 2002, and its scientists and assets were transferred to the North Shore University Hospital, part of the North Shore-Long Island Jewish Health System ("NS-LIJ"), where they substantially strengthened NS-LIJ's research capabilities and, for the first time, afforded NS-LIJ the opportunity to offer medical graduate degrees to physicians. (*Id.*)

The Trust FBO Gabrielle H. Picower (the "Trust"), of which Mrs. Picower is the Trustee, is an irrevocable trust established for the benefit of Mr. and Mrs. Picower's daughter. (*See* Compl. ¶ 52.)  The entire Trust principal was invested with BLMIS and, as a result of Madoff's fraud, now has been entirely lost.

**The Defendants' Investments In BLMIS**

Mr. Picower, individually and through certain of his business entities, began investing with BLMIS in the 1970s.  As BLMIS grew in size and stature, and as Madoff's own reputation grew, Mr. Picower increased his investments with BLMIS and entrusted Madoff with a larger portion of the Defendants' assets.

With the exception of the account statements for one of Mr. Picower's personal BLMIS accounts, which at all times reflected positions in municipal bonds or a money market fund, the remainder of the Defendants' account statements reflected investments mostly in blue chip corporate equity securities and low-risk securities such as short-term U.S. Treasury Bills or money market funds.  The Defendants' BLMIS account statements during the years referenced in the Complaint did not reflect any options trading.

As noted, Decisions is the principal entity through which Mr. Picower transacts his investment business.  At the time of Madoff's arrest, Decisions maintained a principal account and five sub-accounts at BLMIS.  (*See id.* Ex. A.)  Decisions' principal account was designated as "Decisions Incorporated."  Each Decisions sub-account was designated by number – Decisions #2, Decisions #3, Decisions #4, Decisions #5 and Decisions #6.  (*See id.*)

Like most monthly brokerage account statements, the BLMIS monthly account statements provided to the Defendants reflected what appeared to be opening and closing cash balances in the accounts, purchases and sales of securities, dividends received or paid, margin interest assessed, and the month-end aggregate market values of the securities in the accounts

based on the closing price of the securities as of the last trading day of the month. Certain of the Defendants' BLMIS accounts outperformed the major stock market indices in certain years, while other accounts, in those same years or in different years, underperformed the market indicators. Moreover, the Defendants' BLMIS account statements did not reflect gains only; in years when the markets turned bearish, some of their BLMIS statements showed losses.

**Madoff's Reputation**

Mr. Picower's relationship with Madoff was one built on trust and respect, subject to question only in hindsight. Prior to Madoff's arrest, the Bernie Madoff that Mr. Picower believed he knew – and that the world at large perceived – was a man of intelligence and integrity, an industry pioneer and visionary, who provided dedicated service to his customers and quiet acts of kindness to those less fortunate. (*See* Exs. 12-13.) As was widely reported in the press, Madoff "was thought of as a great philanthropist, a pillar of the community, the chairman of Nasdaq – all that stuff."[4] (*See, e.g.*, Ex. 12.)

Madoff's business reputation extended far beyond his mid-Manhattan office. By the 1990s, BLMIS had become one of the largest market makers in the securities industry, reported to be responsible for 10% of all trades of NYSE-listed stocks. (*See* Ex. 14.) By 1997, BLMIS was making markets in 700 NYSE listed stocks and 175 NASDAQ stocks for 500 customers, and had grown to execute more order flow than any of its eighty competitors. (*See* Ex. 13.) By 1999, BLMIS was considered a "third market giant," making markets in nearly 1000 securities (*see* Exs. 15-16), with a sell-side volume of 270 million shares for the month of January alone (*see* Ex. 17).

---

[4] The Court may take judicial notice of the information in press articles without converting the motion into a motion for summary judgment. *See, e.g., Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir. 2008) (judicial notice is appropriate "of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents").

Prior to Madoff's arrest on December 11, 2008, it was inconceivable that Madoff's celebrated trading prowess and BLMIS' vast market-making capacity were not, in fact, used to conduct trades for BLMIS' investors, including the Defendants. It was equally inconceivable that Madoff's success, in all respects, was pure fiction.

## SUMMARY OF ARGUMENT

In this action, brought under the Securities Investor Protection Act ("SIPA") and the Bankruptcy Code, the Trustee seeks to recover transfers received by the Defendants from their own BLMIS accounts, on the ground that those transfers contained "fictitious profits" resulting from Madoff's Ponzi scheme, to which the Defendants allegedly are not entitled. (*See* Compl. ¶ 15.) In all, the Trustee asserts eleven causes of action in the Complaint, seeking to (1) avoid the transfers pursuant to various provisions of the Bankruptcy Code and New York's Debtor and Creditor Law (the "DCL"), and (2) bar the Defendants from obtaining the relief under SIPA to which they are entitled as victims of Madoff's fraud.[5]

The Trustee's Complaint far exceeds what is appropriate or permissible in an avoidance action. First, the Complaint is not limited to seeking avoidance of transfers that allegedly constitute fictitious profits. Rather, the Trustee seeks to avoid transfers received by Defendants even when such transfers constitute a return of the Defendant's principal investment.

Second, the Complaint seeks avoidance of transfers that occurred many years prior to the applicable limitations periods. The longest limitations period available under any of the statutes at issue in the Complaint is six years, for avoidance of fraudulent transfers under the

---

[5]    Specifically, Count One seeks an accounting and the immediate turnover of all of the Transfers (as defined in the Complaint) pursuant to Bankruptcy Code § 542. Counts Two through Four seek avoidance of certain of the Transfers as allegedly preferential and/or fraudulent transfers under Bankruptcy Code §§ 547 and 548. Counts Five through Ten seek avoidance of some or all of the Transfers pursuant to the DCL, made applicable by Bankruptcy Code § 544(b). And, Count Eleven requests an order disallowing any Defendant's SIPA claim.

DCL.  Yet the Trustee seeks to avoid transfers to the Defendants that were made in some cases more than thirteen years ago.

In addition, the Complaint does not seek avoidance of withdrawals only from the particular Defendant that made or received the withdrawal, as both the Bankruptcy Code and the DCL require.  Rather, the Complaint seeks to hold Mr. Picower liable personally for every single withdrawal made by an Entity Defendant simply because Mr. Picower manages the Entity Defendants' investments.  In further excess, the Complaint names as Defendants four entities that are not even alleged to have received any withdrawals from BLMIS – Favorite Fund, JMP LP, JFM Investment and Picower P.C.

Finally, in the Complaint, the Trustee repeatedly disregards the plain language of the Bankruptcy Code and SIPA.  Thus, for example, the Trustee seeks turnover and an accounting pursuant to Section 542 of the Bankruptcy Code, even though, as the Second Circuit has explicitly held, Section 542 does not apply to purportedly fraudulent transfers.  And perhaps most notably, the Trustee – a *SIPA* trustee – refuses to administer SIPA in accordance with its plain language and seeks to deny the Defendants the right to make a claim under SIPA for the return of their customer property based on the net equity reflected on their last BLMIS account statements.

As a result of the Trustee's overreaching and disregard of his statutory authority, the Complaint must be dismissed in its entirety as to some Defendants and in part as to the remaining Defendants.  Specifically, as set forth below:

- The fraud allegations in the Complaint all must be stricken for failure to comply with the pleading requirements of Rule 9(b);

- The alter ego allegation in the Complaint must be stricken for failure to provide any factual or legal basis for holding Mr. Picower liable personally for transfers made by BLMIS to the other Defendants;

- The Complaint must be dismissed in its entirety with respect to Favorite Fund, JMP LP, JFM Investment, Picower P.C., JA Primary, JA Special and the Picower Institute because there are no actionable transfers alleged against those Defendants;

- Count One of the Complaint (turnover and an accounting pursuant to Bankruptcy Code § 542) must be dismissed against all of the Defendants because it does not apply to purportedly fraudulent transfers;

- Count Two of the Complaint (preference) must be dismissed with respect to all of the Defendants except the Picower Foundation, as only that Defendant is alleged to have received a transfer within 90 days of the Filing Date[6];

- Counts Five and Nine of the Complaint (actual fraudulent intent under the DCL) must be dismissed with respect to all of the Defendants to the extent the claims seek avoidance of transfers made more than six years prior to the commencement of this Adversary Proceeding, because such transfers are not voidable under New York law;

- Counts Six through Eight of the Complaint (constructive fraudulent intent under the DCL) must be dismissed as to all of the Defendants because the Trustee has failed to allege sufficiently that any transfers were made without fair consideration. These claims also must be dismissed to the extent they seek avoidance of any transfers made more than six years prior to the commencement of the Adversary Proceeding;

- Count Ten of the Complaint (subsequent transfers) must be dismissed against all of the Defendants because the Trustee has not identified any subsequent transfers allegedly made to them;

- Count Eleven of the Complaint (disallowance of SIPA claims) must be dismissed against the Picower Foundation, Capital Growth, JF, JEMW, JLN, JAB, JA Special and Mr. and Mrs. Picower because they are entitled to recover under SIPA their net equity reflected on their last BLMIS account statement, and against the remaining Defendants because they did not file SIPA claims; and

- The Trustee's requests for a constructive trust and assignment of Defendants' tax refunds must be dismissed because the Trustee has no entitlement to such relief.

---

[6] The "Filing Date" for purposes of this action is December 11, 2008, the date on which the SEC commenced an action against BLMIS and Madoff. *See* 15 U.S.C. § 78*lll*(7)(B).

**ARGUMENT**

In considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), made applicable here by Fed. R. Bankr. P. 7012(b), the Court must accept as true all of the well-pleaded factual allegations in the Complaint, and draw all reasonable inferences in favor of the plaintiff. *See Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

Nonetheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Where a complaint fails to allege a sufficient factual basis for a claim, or the claim is precluded as a matter of law, "dismissal can and should be granted." *Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563, 572 (Bankr. S.D.N.Y. 2003).

As the Supreme Court has explained:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief.

*Ashcroft v. Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949-50 (2009) (quoting *Bell Atlantic Corp.*, 550 U.S. at 556-557) (internal quotation marks and citations omitted).

Here, the Complaint is dedicated to vilifying Mr. Picower in order to justify the pursuit of funds from the Defendants. But behind the hyperbole, there is scarce factual or legal basis for the claims asserted. At its core, the Complaint is little more than pleading by "labels

and conclusions," and the "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp.*, 550 U.S. at 555. As demonstrated herein, "dismissal can and should be granted." *In re Hampton Hotel Investors, L.P.,* 289 B.R. at 572.

## I. THE CONCLUSORY AND SPECULATIVE ALLEGATIONS OF MR. PICOWER'S PURPORTED PARTICIPATION IN MADOFF'S FRAUD MUST BE DISMISSED.

Throughout the Complaint, the Trustee relies on baseless conclusions and idle speculation to allege that Mr. Picower was a participant in Madoff's fraud. He asserts that Mr. Picower knew or should have known of Madoff's Ponzi scheme because the Defendants received "implausibly high" rates of return, and losses, on their BLMIS investments that could "only" be the product of fraudulent activity. (Compl. ¶¶ 3, 63(c), 63(e).) He further alleges, "on information and belief," that the allegedly implausible returns "were a form of compensation by Madoff to [Mr.] Picower for perpetuating the Ponzi scheme by investing and maintaining millions of dollars in BLMIS." (*Id.* ¶ 63(a).) These allegations are all belief with no information to support the claims.[7]

Rule 9(b), made applicable to bankruptcy cases by Fed. R. Bankr. P. 7009, requires a plaintiff to set forth "'[a]n ample factual basis'" for claims of fraud. *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 406 (S.D.N.Y. 2001) (alteration in original) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). One of the principal reasons for this requirement is the recognition that allegations of fraud have significant adverse effects on a defendant's reputation. *See Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990). Thus, as the Second Circuit has explained, "conclusory averments of the

---

[7]    The Trustee also alleges that Mr. Picower knew or should have known of Madoff's fraud because Mr. Picower "has reportedly known Madoff for decades" (Compl. ¶ 58), and purportedly "enjoyed an unusually close relationship with Madoff" (*id.* ¶ 59). Neither allegation pleads facts that indicate knowledge of Madoff's Ponzi scheme, or even permits the inference that Mr. Picower had such knowledge, and neither allegation satisfies the pleading requirements of Rule 9(b). *See Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989).

existence of fraud made on information and belief and unaccompanied by a statement of clear and convincing probative facts which support such belief do not serve to raise the issue of the existence of fraud." *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (internal quotation marks and citation omitted). Here, the Trustee has not provided "ample" factual basis in support of his sweeping fraud allegations against Mr. Picower, and therefore the Trustee's fraud allegations must be dismissed. *See Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.)*, 32 B.R. 199 (Bankr. S.D.N.Y. 1983) (dismissing Section 544(b) claim where trustee – as here – failed to allege facts supporting his assertions of fraud) (Lifland, J.).

Although the Trustee's allegations must be taken as true for purposes of this motion to dismiss, it should be noted that numerous alleged "facts" in the Complaint are contradicted by the very account records on which the Complaint presumably is based. For example, the Trustee alleges that one account – Decisions #2 – "purported to earn *over 950%* in 1999." (Compl. ¶ 63(a).) However, as the account statements in the Trustee's possession reflect, the Decisions #2 account reportedly earned a return of 37.6% in 1999 – less than one-twenty-fifth the return alleged in the Complaint, and far below the 85% gain reported by the NASDAQ Composite Index that year (*see* Ex. 18). Likewise, the Trustee alleges that the Decisions #3 and Decisions #4 accounts purportedly earned "annual rates of return over 100% for four consecutive years, from 1996-1999, inclusive." (Compl. ¶ 63(a).) Yet the account statements for those accounts show that *neither* account earned an annual return of over 100% in *any* year from 1996 through 1999. Those (and other) misstatements of fact are not the subject of this motion and will be addressed later in this case. Nonetheless, they exemplify the gross overreaching in the Complaint.

What is more, as related to this motion, the Trustee has not alleged "an ample factual basis" that supports the assertion that Decisions' (or any other Defendant's) returns were implausible when viewed over time or in the context of the market as a whole. The Complaint also is entirely devoid of any allegation regarding the Defendants' investment strategies or the securities purportedly held in their accounts, beyond asserting that one of the Decisions accounts "reflected little trading activity and relatively few holdings." (*Id.* ¶ 63(d).) Without providing the requisite context for the Defendants' alleged investments and returns, it is impossible to draw any inference as to whether the returns reported in the Defendants' accounts were plausible or not; it is the equivalent of trying to determine whether a product is "expensive" without knowing what it is made of, where it is made, or what it typically sells for in a given market.

When considered alongside the returns reported by other notable market investors, the purported returns from the Defendants' BLMIS accounts, even as alleged by the Trustee, are unremarkable. For example, the Trustee alleges that the Defendants earned average annual returns of approximately 22% during the twelve years from 1996 through 2007. (*Id.* ¶¶ 3, 64(c).) Yet Warren Buffett, probably the most well-known buy-and-hold investor, has averaged annual returns at Berkshire Hathaway in excess of 20% for the past *forty-three years*, after taxes (*see* Ex. 19 at 2); James Simons has averaged annual returns in his Medallion Fund in excess of 35% since 1989, after fees (*see* Ex. 20); George Soros has averaged annual returns of 30% in his Quantum Fund for *thirty years*, from 1970 through 2000 (*see* Ex. 21); and Bruce Kovner of Caxton Associates, LLC has averaged annual returns of *87%* over one ten-year period (*see* Ex. 22). Nor is it noteworthy if Decisions had some years of significant positive returns at BLMIS. John Paulson's Paulson & Co. reported that in 2007 four different funds he managed achieved returns in excess of 100% – one earning *589.67%*. (*See* Ex. 23.)

Further, the Trustee has not alleged "an ample factual basis" that could support his assertion that the Defendants were being compensated by Madoff for "investing and maintaining millions of dollars in BLMIS." (Compl. ¶ 63(a).) That Mr. Picower and the Defendants invested and maintained large sums at BLMIS shows only that they were investors, not participants, in Madoff's Ponzi scheme. Similarly, the fact that the Defendants withdrew funds from BLMIS over the years does not support the Trustee's compensation claim; presumably, the Defendants' withdrawals placed a substantial strain on Madoff's Ponzi scheme and forced Madoff to raise huge sums of money elsewhere on short notice. It is illogical to suggest that Mr. Picower would have been compensated for making Madoff's scheme more difficult.

In fact, the Defendants' ability to withdraw large sums from BLMIS over many years could only have reinforced Mr. Picower's belief – shared by countless other investors, business and financial leaders, and the SEC – that BLMIS was a legitimate business engaged in *bona fide* securities transactions. The Defendants' ability to withdraw funds from BLMIS certainly did not make Mr. Picower and the Defendants complicit in Madoff's Ponzi scheme, any more than it made any other investors who withdrew funds from BLMIS participants with Madoff in that scheme.

Finally, the Trustee alleges that the Defendants were aware of Madoff's scheme due to what the Trustee refers to as Madoff's "backdating" of certain trades in 2005, 2006 and 2007. (*See, e.g.,* Compl. ¶ 63(f).) As with the Trustee's other unsupported fraud allegations, he pleads no facts to support his rank speculation that the Defendants believed those trades to be fictitious and concluded, based on those trades, that Madoff was running a Ponzi scheme. No facts have been alleged to support the Trustee's groundless conclusions, and the Court need not,

and should not, accept them as true. *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (charges of fraud cannot be based on "speculation and conclusory allegations").

Moreover, the Trustee's conclusions about what the Defendants believed are completely implausible given, among other things, the Defendants' trust in Madoff and BLMIS that was built up over decades of investing, Madoff's impeccable reputation prior to December 11, 2008, BLMIS' own reputation as a market leader and regulated broker-dealer, the absence of any known complaints from Madoff investors, Defendants' ability to withdraw funds freely from their BLMIS accounts, the relatively few withdrawals made in recent years (which is the opposite of what could be expected had the Defendants been alerted to Madoff's Ponzi scheme), and the tremendous losses the Defendants suffered – including the complete loss of the Picower Foundation – by continuing to remain invested with BLMIS.

Thus, despite a host of conclusory allegations, the Trustee has not alleged "ample facts" to support his claims of complicity. The law is clear that without such factual allegations, the Trustee cannot satisfy the requirements of Rule 9(b) for alleging fraud against Mr. Picower or any other Defendant. *See In re Livent*, 151 F. Supp. 2d at 406. Accordingly, the Trustee's fraud allegations against Mr. Picower and the Defendants should be stricken.

## II. THE TRUSTEE HAS FAILED TO ALLEGE AN ALTER EGO CLAIM AGAINST MR. PICOWER.

The Trustee attempts to hold Mr. Picower individually liable, on an alter ego theory, for every single transfer made to every single Entity Defendant during the past thirteen years. Once again, the Trustee has provided no facts that could justify such extraordinary relief, but simply asserts, in conclusory terms, that the Defendants "in dealing with BLMIS have been dominated by and used merely as the instrument of [Mr.] Picower to advance his personal interests rather than corporate ends." (Compl. ¶ 53.)

17

Like the other claims in the Complaint, the Trustee's alter ego claim provides "labels and conclusions," but is devoid of either factual foundation or legal merit and must be dismissed. *Bell Atlantic Corp.*, 550 U.S. at 555.

A.    **Delaware Law Applies To The Trustee's Alter Ego Theory.**

In determining the sufficiency of an alter ego claim, New York courts look to the law of the state of incorporation of the entity whose veil is sought to be pierced. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993); *see also In re Alper Holdings*, No. 07-12148, 2008 WL 160203, at *5 n.7 (Bankr. S.D.N.Y. Jan. 15) (Lifland, J.), *aff'd*, 398 B.R. 736 (S.D.N.Y. 2008). Since all of the entities as to which the Complaint alleges the state of incorporation are Delaware entities (*see* Compl. ¶¶ 37, 39, 40, 46), Delaware law should be used to evaluate, and reject, the Trustee's alter ego claim.[8]

As the Delaware Chancery Court has noted, "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (internal quotation marks omitted). "[M]ere allegations of domination or control by one entity over another are insufficient . . . . Rather, [t]he extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own." *Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004) (applying Delaware law) (internal quotation marks and citation omitted; second alteration in original). Therefore, a plaintiff must plead some combination of factors that would permit an inference that the corporate entity effectively has no independence, including (1) undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends;

---

[8]    Even under New York or Florida law, the result would be the same. *See William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir. 1991) (Florida and New York veil piercing law are "virtually identical"); *R.F.M.A.S., Inc. v. So*, No. 06 Civ. 13114, 2009 WL 1395947, at *20 (S.D.N.Y. May 13, 2009) (same); *see Robertson-Ceco Corp. v. Cornelius*, No. 3:03cv475, 2007 WL 1020326, at *7 n.7 (N.D. Fla. Mar. 30, 2007) ("Delaware and Florida law are the same on veil-piercing.").

(4) insolvency of the corporate entity; (5) siphoning of the corporation's funds; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operation of the dominant stockholder or stockholders. *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528-529 (D. Del. 2008). The Complaint pleads none of those factors.

In addition, "[t]o survive a motion to dismiss, a plaintiff must allege facts . . . that the corporation [is] a sham and exist[s] for no other purpose than as a vehicle for fraud." *In re Ticketplanet.com*, 313 B.R. at 70; *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."). The plaintiff then must link the purported disregard of the corporate identity with the underlying alleged harm – *i.e.*, the plaintiff must show that the "corporate structure *cause*[*d*] fraud or similar injustice." *Wallace*, 752 A.2d at 1184. The Trustee has not alleged facts supporting those inferences as to any of the Defendants.

**B.** **The Trustee Has Not Alleged Any Basis To Pierce The Corporate Veil With Respect To The Picower Foundation Or The Trust.**

The Picower Foundation and the Trust lost everything to Madoff's fraud. Nonetheless, the Trustee has chosen to sue those entities to aid in his pursuit of funds from Mr. Picower. Piercing the corporate veil as to the Picower Foundation and the Trust is unwarranted, as no basis has been alleged for disregarding the corporate form of either entity.

As a preliminary matter, the Trustee has not alleged any facts demonstrating that Mr. Picower dominated or controlled either the Picower Foundation or the Trust. For instance, he has not pleaded that Mr. Picower used either entity to pay personal obligations or investments. He has not pleaded that the corporate form of either entity has been disregarded. He has not

pleaded that either entity lacked a legal or independent significance of its own; that either lacked appropriate records; that either was undercapitalized or insolvent; or that either entity was a sham.

At best, all the Trustee has alleged is that Mr. Picower made investment decisions on behalf of the Picower Foundation and the Trust.  (*See* Compl. ¶¶ 34, 53, 60 (alleging that Mr. Picower "dominated" the entities and "directed purported purchases and sales of securities within [their] accounts").)  However, investment control, standing alone, is not a basis upon which the corporate veil may be pierced.  *See, e.g.*, *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 322 B.R. 509, 522 (Bankr. S.D.N.Y. 2005) ("[M]erely showing that an individual officer or director was charged with the 'managerial responsibility with respect to operation of the business . . . will not be sufficient to pierce the corporate veil.'") (applying Delaware law).

Nor has the Trustee alleged any facts that could support a claim, if made, that the Picower Foundation or the Trust was a sham, or was formed for an illegitimate purpose.  Indeed, the opposite is the case, as public records amply demonstrate.  For instance, tax records, of which the Court may take judicial notice, *see, e.g.*, *Nord Serv., Inc. v. Palter*, 548 F. Supp. 2d 366, 369 n.4 (E.D. Tex. 2008), reflect that the Picower Foundation was created and maintained as a charitable entity pursuant to I.R.C. § 501(c)(3); that Mrs. Picower served as Executive Director of the Picower Foundation; and that Mr. Picower was only one of six Foundation Trustees.  (*See, e.g.*, Ex. 3.)  Tax records further show that between 2002 and 2007, the Picower Foundation distributed more than $163.9 million in grants to various organizations, including The Educational Broadcasting Company (Channel 13/WNET), Massachusetts Institute of Technology, The New York Public Library, Children's Aid Society, Harlem Children's Zone, Children's Health Fund, Nurse Family Partnership, Rockefeller University, Weill Medical

Center, Beth Israel Deaconess (Harvard Medical School), The After School Corporation (TASC), New Visions for Public Schools and City Harvest. (*See* Exs. 3, 5-9.) The $163.9 million the Picower Foundation granted from 2002-2007 corresponds almost identically to the $164.1 million the Trustee alleges BLMIS transferred to the Foundation during that period (*see* Compl. Ex. B), and belies any suggestion that BLMIS' transfers to the Foundation served anything but legitimate purposes.

Such a demonstrated, undisputed record of philanthropy over many years, with no contrary facts alleged to support the empty claim that the Picower Foundation was used "merely as the instrument of Picower to advance his personal interests rather than corporate ends" (*Id.* ¶ 53), requires dismissal of that baseless claim.

Similarly, dismissal is required of the Trustee's claim to pierce the corporate veil with respect to the Trust for the benefit of Mr. and Mrs. Picower's daughter, as the Complaint does not allege, nor could it, that the Trust was created, managed or intended for an improper purpose, or that Mr. Picower could or did receive any transfers himself from the Trust. In fact, the Complaint concedes that Mrs. Picower – not Mr. Picower – was the Trustee of the Trust. (*Id.* ¶ 35.)

**C.      The Trustee Has Not Alleged Any Basis To Pierce The Corporate Veil With Respect To The Entity Defendants.**

As with the Picower Foundation and the Trust, the Trustee also has failed to allege any facts that could support piercing the corporate veil as to the remaining Entity Defendants. There are no allegations with respect to those Defendants that corporate formalities have been disregarded or that corporate records have not been maintained. There are no allegations that any of the entities are insolvent or undercapitalized. Nor are there any factual

allegations – as opposed to conclusory assertions – that the entities have been used as a façade, or that Mr. Picower has been taking funds from them improperly.

The Complaint contains only conclusory allegations of control, which are not enough to pierce the corporate veil as to the Entity Defendants. *See, e.g.*, *In re Adelphia*, 322 B.R. at 522; *Gosconcert v. Hillyer*, No. 92 CIV. 7152, 1993 WL 106117, at *1 (S.D.N.Y. Apr. 5, 1993) ("[T]he simple assertion of defendant's 'domination and control' of Hillyer International, Inc. [does not] render defendant liable."); *see also Scarborough v. Perez*, 870 F.2d 1079, 1084 (6th Cir. 1989) ("[O]wner-operators of closely held corporations do not subject themselves to personal liability for the corporations' obligations merely by participating actively in the running of the business."). As in *In re Ticketplanet.com*, the Trustee's failure to back up his corporate veil claim related to the Entity Defendants with specific factual allegations renders that claim insufficient. 313 B. R. at 71 (no basis to pierce veil where complaint alleged that "[d]ebtor merely served as a tool to further [d]efendants' interests")

What is more, it is clear from the Complaint itself, as well as from facts of which the Court may take judicial notice, that the Entity Defendants were not created or operated as vehicles for fraud. The Trustee himself concedes that Mr. Picower "transacted business" through the Entity Defendants. (Compl. ¶¶ 38-49.) In addition, filings with the SEC reflect that Decisions and various other Entity Defendants have been involved in a range of substantial investment activities outside of BLMIS for many years, including investments in public companies such as Alaris Medical Systems Inc. ("Alaris") (*see* Ex. 2), Physicians Computer Network, Inc. (*see* Ex. 24) and Advanced Medical, Inc. (*see* Ex. 25).

Finally, to support a finding of alter ego liability, a complaint must allege a connection between the purported harm to creditors and an abuse of the corporate form, *see*

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 465 (Bankr. S.D.N.Y. 2006) (applying Delaware law); *Giordano v. Thomson*, 438 F. Supp. 2d 35, 48 (E.D.N.Y. 2005), which the Complaint fails to allege. The wrong identified by the Trustee here is that Mr. Picower and the Entity Defendants allegedly were complicit in Madoff's scheme and used their complicity to obtain "other people's money." (*See, e.g.*, Compl. ¶ 2.) That allegation has nothing to do with abuse of the corporate form; that same harm could arise even if Mr. Picower had invested in BLMIS solely in his individual capacity, and not through any corporation or partnership. Consequently, even if the allegations of complicity are accepted as true for purposes of this motion, such conduct still would not support veil piercing.

In the final analysis, the Trustee has not alleged any facts that establish any element of his alter ego theory against Mr. Picower. There is thus no basis to pierce the corporate veil and hold Mr. Picower liable for any transfers made by BLMIS to any of the Defendants.

### III.  AVOIDANCE CLAIMS AGAINST DEFENDANTS NOT ALLEGED TO HAVE RECEIVED ANY TRANSFERS FROM BLMIS MUST BE DISMISSED.

Indicative of the Trustee's overreaching in the Complaint is his naming as fraudulent transfer defendants entities related to Mr. Picower that are not alleged to have received any transfers from BLMIS. Those entities include Defendants Favorite Fund, JFM Investment, JMP LP, and Picower P.C. (collectively, the "Non-Transferee Defendants"). Beyond listing the Non-Transferee Defendants in the caption and then alleging basic biographical facts about them (*see* Compl. ¶¶ 44, 46, 48-49), the Complaint does not refer to the Non-Transferee Defendants again, nor does Exhibit B to the Complaint identify any purported transfers to them from BLMIS. Absent any allegations that the Non-Transferee Defendants were

the recipients or beneficiaries of transfers from BLMIS – and there are no such allegations in the Complaint – there can be no legal basis to sustain the Trustee's avoidance or recovery claims against the Non-Transferee Defendants.[9]  *See, e.g.*, 11 U.S.C. §§ 544(b), 547(b), 548(a), 550; N.Y. Debt. & Cred. Law §§ 273, 274, 275, 276, 276-a, 278, 279.

Similarly, the Trustee cannot establish any basis for recovery from the Non-Transferee Defendants with respect to transfers allegedly made to other Defendants.  Section 550 of the Bankruptcy Code permits the Trustee to recover transfers avoided under Sections 544, 547 and 548 from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."  Yet, as noted above, the Non-Transferee Defendants are not alleged to be transferees of any sort.  Nor is any Non-Transferee Defendant alleged to be the beneficiary of any transfer.  Accordingly, the Complaint does not identify any legal basis supporting recovery from the Non-Transferee Defendants.

For the above reasons, all claims against the Non-Transferee Defendants should be dismissed, and the Non-Transferee Defendants should be dismissed from this action.[10]

---

[9]     Since the only other claims asserted in the Complaint do not apply to the Non-Transferee Defendants, dismissal of all claims against the Non-Transferee Defendants is compelled.  For instance, Count One seeks turnover and an accounting pursuant to 11 U.S.C. § 542, and Count Eleven seeks disallowance of Non-Transferee Defendants' SIPA claims.  However, Count One is based exclusively on the existence of the "Transfers" and therefore cannot apply to the Non-Transferee Defendants because they are not alleged to have received any transfers.  Count Eleven is based exclusively on the filing of a SIPA claim, and therefore cannot apply to the Non-Transferee Defendants because none of the Non-Transferee Defendants filed SIPA claims.  Consequently, all claims against the Non-Transferee Defendants must be dismissed as a matter of law.

[10]     Because the Trustee did not identify which causes of action are being asserted against which Defendants, it is unclear whether all of the claims are being asserted against all of the Defendants.  To the extent that is the case, additional causes of action also must be dismissed with regard to certain of the Defendants because no transfer has been alleged as to them.  For example, Count Two seeks to avoid preferential transfers pursuant to Section 547 of the Bankruptcy Code.  However, as reflected in Exhibit B, the only Defendant that received a transfer within ninety days of the Filing Date is the Picower Foundation.  Accordingly, Count Two must be dismissed as to all of the other Defendants.  Likewise, Counts Three and Four seek to avoid transfers pursuant to Section 548 of the Bankruptcy Code, which applies only to transfers made within two years of the Filing Date.  *See* 11 U.S.C. § 548.  However, neither JA Primary, JA Special nor the Picower Institute are alleged to have received any transfer from BLMIS during that period, and therefore Counts Three and Four should be dismissed as to them.  Finally, Counts Five

## IV. THE TRUSTEE'S TURNOVER CLAIM IS PRECLUDED AS A MATTER OF LAW BECAUSE THE TRANSFERS ARE NOT "PROPERTY OF THE ESTATE."

In Count One of the Complaint, the Trustee asserts a claim pursuant to Section 542 of the Bankruptcy Code for turnover and an accounting with respect to all BLMIS transfers purportedly made to the Defendants over the past thirteen-plus years (the "Transfers"). According to the Trustee, "[t]he Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and 15 U.S.C. § 78*fff*-2(c)(3)." (Compl. ¶ 74.) Further, the Trustee alleges that he is entitled to "the immediate payment and turnover" of any Transfers received by the Defendants, as well as an accounting of such Transfers. (*Id.* ¶¶ 75-76.) The Trustee's turnover and accounting claim is contrary to the law of this Circuit as it has stood for nearly two decades.

Section 542(a) authorizes a trustee to seek an accounting or compel the turnover of property of an estate that the trustee can use, sell or lease. *Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005). However, the Second Circuit has concluded that fraudulently transferred property is not property of the estate unless and until it has been recovered through a successful avoidance action. *See FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992). The Second Circuit reached this conclusion based on the plain language of Section 541(a)(3) of the Bankruptcy Code, which provides that property of the estate includes "[a]ny interest in property that the trustee recovers under section . . . 550." As the Circuit held, this "clearly reflects the congressional

<hr />

through Eight seek to avoid transfers made within six years of the Filing Date pursuant to the DCL and Section 544(b) of the Bankruptcy Code. As there are no transfers alleged within the Trustee's six-year period for JA Primary and the Picower Institute, Counts Five through Eight must be dismissed against those Defendants.

intent that such property is not to be considered property of the estate until it is recovered."[11]  *Id.* (internal quotation marks and citation omitted); *see also In re Teligent*, 325 B.R. at 137 (fraudulently transferred property "does not become property of the estate until after it has been recovered").

The Trustee's attempt to use the turnover mechanism of Section 542 to obtain "immediate" recovery of the Transfers is nothing more than an effort to circumvent the more rigorous requirements for avoidance under Sections 544, 547 and 548 of the Bankruptcy Code – which courts have repeatedly rejected.  *See Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*, 307 B.R. 744, 751 (Bankr. S.D.N.Y. 2004) ("The trustee cannot compel the turnover of non-estate property under 11 U.S.C. § 542, and circumvent the more restrictive fraudulent transfer claim in the process."); *In re Saunders*, 101 B.R. 303, 305 (N.D. Fla. 1989) ("Until a judicial determination has been made that the property was, in fact, fraudulently transferred, it is not property of the estate.  If it were, the trustee could simply use the turnover action under 11 U.S.C. § 542, and [defenses to avoidance actions] could be avoided.").

If the Trustee wants to recover the Transfers, he must prove his avoidance claims under Sections 544, 547 or 548, and establish a basis for recovery under Section 550.  Section 542 plays no role in that process.  *See, e.g.*, *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 554 (D. Del. 2005).  The Section 542 turnover claim in Count One therefore must be dismissed.

---

[11]     In addition to Section 541, the Trustee also cites SIPA for the proposition that the Transfers constitute property of the estate.  (*See* Compl. ¶ 74.)  The result is the same, however, as SIPA expressly applies only to recovered property in the estate.  *See* 15 U.S.C. § 78*fff*-2(c)(3) ("recovered property shall be treated as customer property").

## V. TRANSFERS MADE MORE THAN SIX YEARS BEFORE THE FILING OF THE ADVERSARY COMPLAINT ARE NOT VOIDABLE UNDER NEW YORK LAW OR SECTION 544(b) OF THE BANKRUPTCY CODE.

Relying on Section 544(b) of the Bankruptcy Code, the Trustee seeks in Counts Five through Eight to take advantage of New York's six-year statute of limitations for fraudulent conveyance claims to avoid any transfer received by the Defendants within six years of the Filing Date of the SIPA case – December 11, 2008 (the "Six Year Transfers"). (*See* Compl. ¶ 68; N.Y. C.P.L.R. § 213(8).) However, the Trustee's allegations related to the Six Year Transfers are impermissibly over-inclusive because, under New York law, the limitations period for a fraudulent transfer runs not from the Filing Date, but, rather, from the date the Trustee commenced the Adversary Proceeding, which in this case is May 12, 2009. Accordingly, under New York law, the Trustee can only seek to avoid transfers that occurred after May 12, 2003 – not after December 11, 2002, as alleged in the Complaint.

We recognize that a number of courts have held that state statutes of limitations are only relevant for Section 544(b) purposes up to the petition date (in this case, the Filing Date), and that after the petition date, the limitations period for bringing a Section 544(b) claim is governed by Section 546(a).[12] However, we submit that these decisions are contrary to the Bankruptcy Code, which plainly governs here. If all of the relevant Bankruptcy Code provisions, the history of those provisions, and the purpose of those provisions are considered – as we ask

---

[12]  Section 546(a) provides:

§ 546. Limitations on avoiding powers

(a) An action or proceeding under section 544, 545, 547, 548 or 553 of this title may not be commenced after the earlier of-

(1) the later of-

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

this Court to do, and which no prior court appears to have done – the state limitations period continues, even after the Filing Date, to identify which transfers may be avoided pursuant to Section 544(b) where avoidance otherwise is appropriate.[13]  For the reasons set forth below, all of the Trustee's avoidance claims for transfers made before May 12, 2003 must be dismissed.

A.     **Under New York Law, As Incorporated By Section 544(b), The "Six Year Transfers" Must Be Measured From The Date Of The Adversary Complaint, And Transfers Occurring More Than Six Years Before The Adversary Complaint Are Not Voidable.**

Section 544(b) states, in relevant part:  "[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is *voidable under applicable law* by a creditor holding an unsecured claim . . . ."  11 U.S.C. § 544(b) (emphasis added).  Section 544(b) "contains no original substantive provisions to determine when a transfer is voidable; instead it incorporates and makes applicable nonbankruptcy law." *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 171 (Bankr. S.D.N.Y. 1998) (Lifland, J.).  Where, as here, state law provides the basis for a Section 544(b) claim, the state law statute of limitations is considered part of the "applicable law" for purposes of determining the viability of the claim.  *See, e.g.*, *Fink v. Graven Auction Co. (In re Graven)*, 64 F.3d 453, 456 n.5 (8th Cir. 1995); *Dzikowski v. Friedlander (In re Friedlander Capital Mgmt.)*, Adv. No. 05-

---

[13]    We do not dispute that Section 546(a) governs the timeliness of the filing of an adversary proceeding, nor do we dispute that the instant Adversary Proceeding was timely filed under Section 546(a).  However, the issue here is not the procedural question of whether the Trustee timely filed this Adversary Proceeding, but, rather, the substantive question of whether the alleged transfers are "voidable under applicable law" within the meaning of Section 544(b).  Courts addressing this issue frequently – and erroneously – conflate the procedural question of timeliness with the substantive question of voidability, which has led many courts to the unwarranted conclusion that the state statute of limitations and Section 546(a) either are mutually exclusive, *see, e.g.*, *First Union Nat'l Bank v. Gibbons (In re Princeton-N.Y. Investors, Inc.)*, 219 B.R. 55, 66 (D.N.J. 1998) (state limitation period preempted by Section 546(a)), or that some reconciliation of the two must be contrived, *see, e.g.*, *Sears Petroleum & Trans. Co. v. Burgess Constr. Servs., Inc.*, 417 F. Supp. 2d 212, 225 (D. Mass. 2006) (state limitation period is operative only until petition date, even though "Section 546 does not explicitly state that").  Yet application of the state limitation period to Section 544(b) claims is no different than application of a two-year look-back period to a Section 548 claim or a 90-day look-back period to a Section 547 claim; the window for avoidance may move temporarily under the state limitation period, but once the adversary proceeding is commenced, the state statute of limitations provides a concrete look-back period no different from the look-back period that exists under Section 548 or Section 547.

03088-PGH, 2009 WL 1231085, at *3 n.1 (Bankr. S.D. Fla. Apr. 29, 2009); *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D. Ill. 1998); *Mahoney, Trocki & Assocs. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.)*, 111 B.R. 914, 917 (Bankr. S.D. Cal. 1990); *Old Orchard Bank & Trust Co. v. Josefik (In re Josefik)*, 72 B.R. 393, 397 n.4 (Bankr. N.D. Ill. 1987); *In re O.P.M. Leasing Servs., Inc.*, 32 B.R. at 201.

Under New York law, fraudulent transfer claims are subject to the six-year statute of limitations set forth in CPLR § 213.  For both actual and constructive fraudulent transfer claims, the timeliness of the claim is determined as of the commencement of the action challenging the transfer.  *See, e.g.*, *Avalon LLC v. Coronet Prop. Co.*, 306 A.D.2d 62, 63 (1st Dep't 2003); *see also Seligson v. N.Y Produce Exch.*, 378 F. Supp. 1076, 1106-7 (D.C.N.Y. 1974) (applying New York law to give trustee six-year lookback).  Accordingly, any transfer the Trustee challenges as "voidable" under New York law must have occurred within six years of the commencement of the Adversary Proceeding, *i.e.*, after May 12, 2003.  Any transfer occurring prior to that date is not subject to avoidance under Section 544(b).  *See Bash v. Cunningham (In re Cunningham)*, Adv. No. 07-01146, 2008 WL 2746023, at *8 (Bankr. N.D. Ohio July 11, 2008); *Baldi v. Samuel Son & Co. (In re McCook Metals, LLC)*, No. 05 C 2990, 2007 WL 4287507, at *3 n.7 (N.D. Ill. Dec. 4, 2007).

**B.    There Is No Statutory Support For Measuring The "Six Year Transfers" From The Filing Date, As the Trustee Has Done.**

There is no dispute at any level that the state statute of limitations is relevant to Section 544(b) claims.  However, rather than give state limitations periods their full due, a number of courts have truncated the relevance of state limitations periods by holding that, "when analyzing the timeliness of a § 544 avoidance action, the applicable state limitations periods are only relevant in analyzing whether the claim was time-barred *prior to the bankruptcy filing*.  If

the fraudulent transfer action was not time-barred as of the petition date, then § 546(a) supersedes the state statute of limitations period since it provides a specific time within which a § 544 claim can be brought." *Mancuso v. Cont'l Bank Nat'l Ass'n Chicago (In re Topcor, Inc.)*, 132 B.R. 119, 124 (Bankr. N.D. Tex. 1991) (emphasis added).[14] Thus, in the view of these courts, if the state statute of limitations expires after the bankruptcy petition is filed, Section 546(a) operates to extend or toll that limitations period to afford a trustee the full term provided under Section 546(a) to bring an avoidance action. *See, e.g.*, *In re Mahoney, Trocki & Assocs., Inc.*, 111 B.R. at 917-18. (state statute of limitations is "tolled by application of § 546(a) to actions brought under § 544").

The Second Circuit has never adopted the Trustee's interpretation of Sections 546(a) and 544(b), nor is there any statutory support at all for it. In fact, even courts relegating the state statute of limitations to pre-petition significance acknowledge that the language of Sections 546(a) and 544(b) does not support the Trustee's interpretation. *See Sears Petroleum*, 417 F. Supp. 2d at 225 ("Section 546 does not explicitly state that the operative date is the filing of the bankruptcy proceeding."); *Orr v. Bernstein (In re Bernstein)*, 259 B.R. 555, 558 (Bankr. D.N.J. 2001) ("Section 544(b) does not specify the date upon which the transaction must be voidable.").

As set forth below, although state law-based avoidance actions previously were afforded the benefit of such tolling under Section 11(e) of the now repealed Bankruptcy Act of 1898 (the "Act"), under the plain language of Section 546(a), the Bankruptcy Code provisions to which Section 546(a) applies, and Section 108(a) of the Code – which is derived directly from

---

[14]     *See also Bloom v. Fry (In re Leach)*, 380 B.R. 25, 29-30 (Bankr. D.N.M. 2007); *Sears Petroleum*, 417 F. Supp. 2d at 225; *O'Connell v. Shallo (In re Die Fleidermaus LLC)*, 323 B.R. 101, 107 (Bankr. S.D.N.Y. 2005); *In re Spatz*, 222 B.R. at 164; *Bay State Milling Co. v. Martin (In re Martin)*, 142 B.R. 260, 265-66 (Bankr. N.D. Ill. 1992); *Rosania v. Haligas (In re Dry Wall Supply, Inc.)*, 111 B.R. 933, 936-37 (D. Colo. 1990).

Section 11(e) of the Bankruptcy Act and indisputably is a tolling provision – no such tolling is contemplated or provided for in connection with a Section 544(b) claim. Rather, with a Section 544(b) claim, a trustee steps into the shoes of an actual creditor, taking the creditor's claim subject to all defenses to it. There is nothing in the Bankruptcy Code that permits a trustee to change shoes along the way.

### 1. The Bankruptcy Act Provided For Tolling Of State Statutes Of Limitation In Connection With Creditor *And* Debtor-Based Claims.

The principal defect in decisions holding that claims asserted pursuant to Section 544(b) need only be timely under state law as of the petition date is that they are grounded in a scheme that existed under the Act, but which the Bankruptcy Code manifestly rejected. Prior to enactment of the Bankruptcy Code, Section 11(e) of the Bankruptcy Act gave trustees:

> two years subsequent to the [petition date,] or within such further period of time as the Federal or State law may permit, [to] institute proceedings on behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law *had not expired at the time of the filing of the petition in bankruptcy*.

11 U.S.C. § 29(e) (repealed 1978) (emphasis added).

Section 11(e) of the Bankruptcy Act applied to creditors' claims and debtors' claims alike, including avoidance claims under state law. *See, e.g.*, *Feldman v. First Nat'l City Bank*, 511 F.2d 460, 463 (2d Cir. 1975); *Halpert v. Engine Air Serv., Inc.*, 116 F. Supp. 13, 15 (E.D.N.Y. 1953); *MacLeod v. Kapp*, 81 F. Supp. 512, 513 (S.D.N.Y. 1948). Section 11(e) required timeliness only as of the petition date, *see* 11 U.S.C. § 29(e) (repealed 1978), in order to provide a trustee "a minimum two-year period in which to sue notwithstanding earlier expiration of other limitation provisions." *Lawler v. RepublicBank Dallas (In re Lawler)*, 53 B.R. 166, 171 (Bankr. N.D. Tex. 1985) (citation omitted); *see also T.C.I. Ltd. v. Sears Bank & Trust Co. (In re T.C.I. Ltd.)*, 21 B.R. 876, 879 (Bankr. N.D. Ill. 1982).

### 2. The Bankruptcy Code Does Not Provide For Tolling Of State Statutes Of Limitations In Connection With Creditor-Based Claims.

Congress substantially altered the tolling scheme of Section 11(e) when it enacted the Bankruptcy Code in 1978. Indeed, Congress effectively recodified Section 11(e) as Section 108(a) of the Bankruptcy Code, entitled "Extension of time," *see* S. Rep. No. 95-989, at 30 (1978), which provides in relevant part:

> If applicable nonbankruptcy law . . . fixes a period within which *the debtor* may commence an action, *and such period has not expired before the date of the filing of the petition*, the trustee may commence such action only before the later of – (1) the end of such period . . . ; or (2) two years after the order for relief.

11 U.S.C. § 108(a) (emphasis added). Code Section 108(a) materially tracks Act Section 11(e), with one major exception: Congress expressly limited the reach of Section 108(a) to debtors' claims only, thereby making Code Section 108(a) inapplicable to creditor-based avoidance claims such as fraudulent transfers. *See, e.g.*, *Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558, 2006 WL 2212776, at *6 (S.D.N.Y. Aug. 3, 2006); *Rosania v. Haligas (In re Dry Wall Supply, Inc.)*, 111 B.R. 933, 935 n.2 (D. Colo. 1990).

With respect to creditor-based avoidance claims, Congress enacted Section 546(a), entitled "Limitations on avoiding powers," which provides, in relevant part:

> An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of – (1) the later of-(A) 2 years after the entry of the order for relief, or (B) 1 year after the appointment or election of the first trustee . . . ; or (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a). Section 546(a), on its face, is dramatically different from both Act Section 11(e) and Code Section 108(a) and, contrary to the case law, cannot be read to limit the relevance of state limitations periods to determining the viability of a Section 544(b) claim as of the petition date.

First, unlike both Act Section 11(e) and Code Section 108(a), which explicitly provide a trustee two years to commence an action if the state statute of limitations has not expired as of the filing of the petition, there is no such language in Section 546(a). Courts cannot simply read tolling language into Section 546(a), as they have done, consistent with the basic maxim of statutory interpretation that "where Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted); *see also Moreno-Bravo v. Gonzales*, 463 F.3d 253, 261-62 (2d Cir. 2006); *Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d 719, 725 (4th Cir. 2005) ("In the absence of equivalent language in § 544 [of the Bankruptcy Code], the presence of the phrase 'for the benefit of the estate' in § 550 merely highlights the fact that Congress knew how to include such a limitation when it wanted to.").

Even more to the point, that creditor-based avoidance actions were previously covered by Act Section 11(e) – and thus were subject to a timeliness analysis under state law as of the petition date – but then were excised from that scheme upon the enactment of the Bankruptcy Code, makes clear that Congress did not intend in the Bankruptcy Code for the relevance of state limitations periods to be tied to the petition date. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Bianchi v. United States*, 46 Fed. Cl. 363, 367 (Ct. Cl. 2000) ("It is well recognized that where Congress amends a statute, it is presumed to be aware of the original enactment and to intend to alter it."). Indeed, if Congress intended avoidance claims to continue to fall within the ambit of Act Section 11(e), Congress simply could have enacted Code Section 108(a) without limiting it to debtor's claims. However, Congress did not do so,

and courts cannot interpret Section 108(a) or Section 546(a) as if it had. *See Pierce County v. Guillen*, 537 U.S. 129, 145 (2003); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 168-69 (5th Cir. 2000) (where Congress removed language from a statute, "we must assume Congress meant what it said in the amendment"); *Nyhuis v. Reno*, 204 F.3d 65, 72-73 (3d Cir. 2000).

Moreover, in contrast to Section 108(a) (and Act Section 11(e)), Section 546(a) is not a tolling statute in either word or operation. On its face, there is nothing in the plain language of Section 546(a) that extends or tolls the state statute of limitations for claims brought pursuant to Section 544(b) – or pursuant to any other Code provision. Rather, Section 546 is exactly as it is titled, a "Limitation[] on avoiding powers." Thus, where Section 108(a) *expands* the avoidance powers of a trustee by giving the trustee the "later of" either the state limitations period or two years from the order for relief, Section 546(a) *restricts* the avoidance powers of a trustee by limiting avoidance actions to the "*earlier of*" the time the case is closed or two years from the order for relief (or one year from the appointment of a trustee), even if the state statute of limitations expires *after* either of those periods. *See, e.g.*, *Global Crossing,* 2006 WL 2212776, at *5-6 ; *Barr v. Charterhouse Group Int'l, Inc. (In re Everfresh Beverages, Inc.)*, 238 B.R. 558, 571-73 (Bankr. S.D.N.Y. 1999); *Steege v. Lyons (In re Lyons)*, 130 B.R. 272, 279 (Bankr. N.D. Ill. 1991); *Hansen v. Hansen (In re Hansen)*, 114 B.R. 927, 932-34 (Bankr. N.D. Ohio 1990). In other words, and consistent with its title, Section 546(a) is the exact *opposite* of a tolling provision, which courts often have failed to consider.

### 3. When The Avoidance Provisions To Which Section 546(a) Applies Are Examined, The "Look Back" Period Under Section 544(b) Is Not Meant To Run From The Petition Date.

Beyond the manifest differences between Sections 546(a) and 108(a), the plain language of the avoidance provisions subject to Section 546(a) shows that the date of the filing of the petition is irrelevant in determining whether a transfer is "voidable under applicable law."

As noted above, Section 546(a) applies, *inter alia*, to claims under Sections 544, 547 and 548 of the Bankruptcy Code. With only one exception – claims under Section 544(b) – the avoidance claims to which Section 546(a) applies are directly linked to the petition date or commencement of the bankruptcy case by their express language. Thus,

- Section 544(a) gives the trustee the rights and powers of a judicial lien creditor "as of the commencement of the [bankruptcy] case";

- Section 547 allows the trustee to avoid certain transfers made 90 days before "the date of the filing of the petition"; and

- Section 548 allows the trustee to avoid certain transfers made two years before "the date of the filing of the petition."

Unlike the provisions listed above, however, Section 544(b) does not give the Trustee rights or powers "as of the commencement of the case," nor does it indicate that the "look back" period for determining voidable transfers runs from "the date of the filing of the petition." Courts cannot simply read those phrases into Section 544(b) where they do not exist. *See Russello*, 464 U.S. at 23; *Moreno-Bravo*, 463 F.3d at 261-62; *In re Coleman*, 426 F.3d at 725.

Had Congress intended for transfers voidable under state law to be determined as of the petition date – as the Trustee erroneously suggests – it would have specified that look-back methodology *somewhere* in either Section 544(b) or Section 546(a). Congress did not do so. Congress left the matter to "applicable law" – New York state law in this case – and it is New York law that dictates which transfers are subject to avoidance. *See In re Cunningham*, 2008 WL 2746023, at *8. As discussed *supra* Part V.A., under New York law, a transfer is not voidable as a matter of law if it was made more than six years prior to the commencement of the action, regardless of when the petition was filed.

4. **By Its Nature, Section 544(b) Requires The Trustee To Step Into The Shoes Of An Actual Creditor, Subject To The Same Defenses As That Creditor, Which Is Inconsistent With Freezing The Statute Of Limitations As Of The Petition Date.**

In bringing a claim under Section 544(b), a trustee stands in the shoes of an actual creditor and takes that creditor's claim subject to all defenses that could have been asserted against that creditor, including the statute of limitations. *See, e.g.*, *Silverman v. Sound Around, Inc. (In re Allou Distrib., Inc.)*, 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008); *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 633 (Bankr. D.N.J. 2004); *Buchman v. Am. Foam Rubber Corp.*, 250 F. Supp. 60, 71 (S.D.N.Y. 1965).

Here, the Trustee purportedly stepped into the shoes of an (unidentified) actual creditor and filed his Complaint against the Defendants on May 12, 2009. It is indisputable that, had an actual creditor filed suit against the Defendants on that same date, that creditor's claim to avoid transfers that were made before May 12, 2003 – six years before the filing of the Complaint – would have been dismissed as untimely – *i.e.*, the transfers would not have been voidable.

If the Trustee truly were stepping into the shoes of the creditor, as courts hold, the Trustee likewise should not be able to avoid transfers made before May 12, 2003. However, the Trustee has artificially determined that he steps into the creditors' shoes as of the petition date and then, for statute of limitations purposes, the defenses to that creditor's claims are frozen in time as of that date. But that is not stepping into the shoes of the creditor. That is taking the creditor's claim and then being afforded rights over and above the rights the creditor had – namely, tolling of the applicable statute of limitations. Yet there is no statutory basis for giving the Trustee *greater rights* under Section 544(b) than an actual creditor would have had under applicable state law.

36

Indeed, had Congress intended to afford trustees *greater* rights under Section 544(b) than the rights of an actual creditor, Congress could have done so, as it did with respect to Section 544(a). Under Section 544(a), a trustee steps into the shoes of a *hypothetical* creditor to assert certain claims "without regard to any knowledge of the trustee or of any creditor." One court has described Section 544(a) "as allowing the trustee to become the ideal creditor, irreproachable and without notice, armed cap-a-pie with every right and power which is conferred by the law of the state upon its most favored creditor who has acquired a lien by legal or equitable proceedings." *Hill v. Gibson Dunn & Crutcher, LLP (In re MS55, Inc.)*, No. 06-cv-01233, 2008 WL 2358699, at *2 (Bankr. D. Colo. June 6, 2008) (quoting *In re Kravitz*, 278 F.2d 820, 822 (3d Cir. 1960)). Thus, Congress plainly knew how to expand a trustee's rights vis-à-vis an actual creditor's rights and, where it intended, it did so. Congress having included no language in either Section 544(b) or Section 546(a) that can be read to expand a trustee's rights under Section 544(b), a court should not undertake to enlarge those rights *sua sponte*. *See, e.g.*, *Russello*, 464 U.S. at 23.

Section 544(b) must be read as giving the Trustee the same rights as an actual creditor. And, because an actual creditor cannot avoid a transfer that was made more than six years before the filing of the Complaint, the Trustee cannot avoid such transfers either.

C.    **The Policy Arguments Advanced In Support Of Limiting The Applicability Of State Limitations Periods To The Date Of The Petition Are Contrary To The Intent Of Congress.**

Because there is no textual support in the Bankruptcy Code for limiting the relevance of state limitations periods to determine whether a trustee has a viable claim to pursue as of the petition date, courts often rely on purported policy concerns. These policy concerns generally fall into two categories: (1) the need to give trustees "breathing room" to investigate and assert claims; and (2) support for the broad powers of trustees to recover estate property. *See,*

*e.g.*, *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 677-78 (S.D. Tex. 2007); *Union Nat'l Bank v. Gibbons (In re Princeton-N.Y. Investors, Inc.)*, 219 B.R. 55, 65 (D.N.J. 1998); *Bay State Milling Co. v. Martin (In re Martin)*, 142 B.R. 260, 266 (Bankr. N.D. Ill. 1992); *In re Dry Wall Supply, Inc.*, 111 B.R. at 936-37.

However, as the Supreme Court has counseled, "it is not for us to substitute our view of . . . policy for the legislation which has been passed by Congress." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, – U.S. –, 128 S. Ct. 2326, 2339 (2008) (ellipsis in original; internal quotation marks omitted); *see also United Parcel Serv., Inc. v. U.S. Postal Serv.*, 604 F.2d 1370, 1381 n.16 (3d Cir. 1979) ("Our function as jurists is to require compliance with those statutes enacted by Congress. In this case it is not for us to substitute our view of postal policy for the legislation which has been passed by Congress.").

As discussed above, under the plain language of Sections 544(b) and 546(a), and New York law, the state statute of limitations applies here until the filing of the Complaint, not the Filing Date. No matter how compelling the policy reasons may be for giving a trustee more time than state law provides, courts are bound by the letter of the Bankruptcy Code, and no policy considerations can supersede its actual text. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."). Thus, as one court has stated, "[i]f [Section] 546(a)'s plain meaning has led to unworkable results, it is for Congress and not the courts to remedy that problem." *In re Princeton-N.Y. Investors, Inc.*, 219 B.R. at 66.

Even if it were appropriate to consider policy in interpreting Section 544(b) or Section 546(a), Congress' intent in enacting Section 546(a) was to *limit* a trustee's extraordinary avoidance powers, not to give a trustee "breathing room" or to otherwise *broaden* the trustee's

power to avoid transfers.  Here, the Trustee already has enormous authority to avoid transfers.

The Bankruptcy Code empowers the Trustee to avoid preferential transfers made within 90 days

of the filing of the petition, 11 U.S.C. § 547; fraudulent transfers made within two years of the

filing of the petition, 11 U.S.C. § 548; and transfers under any other theory for avoidance under

any "applicable law," whether federal or state, 11 U.S.C. § 544(b).  Congress sensibly sought to

put some limitations on a trustee's extraordinary avoidance powers by enacting Section 546,

which is aptly entitled "*Limitations* on avoiding powers."  *See* S. Rep. 95-989, at 86 (1978)

(trustee's "avoiding powers are *limited* by Section 546") (emphasis added).

      The evolution of Section 546(a) is also consistent with Congress' intent to foster a

speedy resolution of avoidance claims, and not to provide "breathing room" or expand trustee

powers.  When Section 546(a) first was enacted in 1978, it set the trustee-appointment-based

limitations period at "two years after the appointment of a trustee."  11 U.S.C. § 546(a)

(amended 1994).  In 1994, however, Congress amended Section 546(a) by *shortening* that

limitations period to "1 year after the appointment or election of the first trustee."  11 U.S.C.

§ 546(a).  When Congress' intent in amending Section 546(a) to shorten the limitations period is

coupled with the fact that Section 546(a) acts to cut off avoidance actions not brought within the

limitations period of Section 546(a), even if such actions are still timely under state law, *see, e.g.*,

*Global Crossing*, 2006 WL 2212776, at *5-6, it is clear that Congress' concern with respect to

Section 546(a) plainly was not that trustees did not have sufficient "breathing room" to

investigate claims.  Rather, Congress expressed an intent to *limit* trustees' enormous powers and

to encourage *speedier* resolutions of bankruptcy cases.

      In light of Congress' intent to limit a trustee's "avoiding powers" in Section

546(a) and to encourage the speedy resolution of bankruptcy cases, there simply is no legal basis

for ignoring the plain language of Section 546 and the statutory scheme in which it resides, which requires that state limitations periods be applied in Section 544(b) actions to determine whether, *as of the commencement of the adversary proceeding*, the transfers at issue are "voidable under applicable law." Accordingly, the Trustee's claims to avoid transfers that were made before May 12, 2003 – before the commencement of this adversary proceeding – should be dismissed because such transfers are not voidable as a matter of law.

## VI. THE TRUSTEE CANNOT RELY ON THE DISCOVERY RULE TO REACH TRANSFERS THAT OCCURRED MORE THAN SIX YEARS FROM THE COMMENCEMENT OF THE ADVERSARY PROCEEDING.

Unsatisfied with reaching back the six-year statutory maximum to claw back withdrawals from the Defendants, the Trustee also asserts a cause of action, pursuant to DCL § 276 and Section 544(b) of the Bankruptcy Code, to avoid "undiscovered transfers" dating back to December 1995 – more than thirteen years prior to the Filing Date. (*See* Count Nine.) In this way, the Trustee seeks to reach (1) Defendants such as the Picower Institute and JA Primary that closed their BLMIS accounts more than six years ago; and (2) transfers that by every calculation fall outside the limitations period mandated by New York law.

The Trustee apparently grounds his thirteen-year claw-back claim in the so-called "discovery rule," which permits a plaintiff under limited circumstances that do not exist here to assert a fraud claim within two years from when the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); *see also* N.Y. C.P.L.R. § 203(g). In invoking the discovery rule, the Trustee asserts in conclusory terms that there is at least one unsecured creditor who never could have discovered Madoff's fraud, in order to avail himself of the discovery rule and toll indefinitely the six-year limitations period applicable to BLMIS transfers made to the Defendants. The Complaint, however, is completely devoid of any factual allegation that could support an inference that there was some creditor who could not

have discovered Madoff's fraud.  To the contrary, the facts alleged in the Complaint – if accepted as true, as they must be on this motion – point to the exact opposite inference:  every investor in BLMIS should have known of Madoff's fraud.  Based on the Complaint itself, it would be inappropriate to rely on the discovery rule to expand the Trustee's avoidance powers.  Therefore, claims seeking to avoid transfers outside of New York's six-year limitations period should be rejected.

### A.    The Trustee's "Undiscovered Transfers" Claim Is Insufficient On Its Face.

Under applicable law, the Trustee may assert a claim for "undiscovered transfers" only if (1) the Trustee has standing through an unsecured creditor with an allowable claim as of the Filing Date who also was an unsecured creditor of BLMIS as of December 1995, *see In re Allou Distrib., Inc.*, 392 B.R. at 32-34 (setting forth standing requirement under Section 544(b)); and (2) *that* creditor was not aware of facts from which "a person of ordinary intelligence" reasonably could have inferred the Madoff fraud, *Satterwhite v. The Image Bank, Inc.*, No. 01 Civ. 7097, 2002 WL 31098496, at *2 (S.D.N.Y. Sept. 19, 2002) (citations omitted).  In an effort to satisfy those requirements, the Trustee asserts in the barest of terms that "[a]t all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS."  (Compl. ¶ 120.)  The Trustee further alleges, in equally conclusory terms, that "[a]t all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable."  (*Id.* ¶ 121.)

The Trustee's "naked assertions" are not sufficient to satisfy even the minimal pleading requirements of Fed. R. Civ. P. 8.  As the Supreme Court recently explained in *Ashcroft v. Iqbal*, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than unadorned . . . accusation," and a complaint does not "suffice if it

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" – U.S. –, 129 S. Ct. at

1949 (quoting *Bell Atlantic Corp.*, 550 U.S. at 555, 557). Thus, "[w]hile legal conclusions can

provide the framework of a complaint, they must be supported by factual allegations" in order to

state a claim for relief. *Id.* at 1950. In other words, the Trustee cannot simply plead the

conclusion that an investor exists who was not reasonably able to discover the fraud at the time

of the Transfers; he must provide some factual basis to give substance to that "naked assertion."

      The factual basis that is required is some identification of the investor(s) whose

claim(s) the Trustee is asserting – either by name or by category – and some factual basis for

why that investor or category of investors could not have discovered Madoff's fraud. As one

court has noted, it is "imperative" that the trustee identify the creditor whose claim he is

asserting in order to provide the defendant sufficient notice so that it "might confirm or deny the

validity of that [creditor's] claim." *See Kaliner v. Load Rite Trailers, Inc. (In re Sverica

Acquisition Corp.),* 179 B.R. 457, 465 (Bankr. E.D. Pa. 1995). Such notice "provide[s] the

defendant with a basis for assessing the initial strength of the plaintiff's claim, for preserving

relevant evidence, for identifying any related counter- or cross-claims, and for preparing an

appropriate answer." *Nielson v. Union Bank of Cal., N.A.,* 290 F. Supp. 2d 1101, 1148 (C.D. Cal.

2003) (citation omitted); *see also Giacometti v. Arton Bermuda Ltd.* (*In re Sia*), 349 B.R. 640,

651 (Bankr. D. Haw. 2006).

      Courts in this District have been reluctant to require trustees to identify the

creditor(s) giving rise to the trustee's claims. Thus, although one court has held that a trustee

"must name an actual unsecured creditor who would have standing to challenge the transfer,"

*Young v. Paramount Comm's Inc. (In re Wingspread Corp.)*, 178 B.R. 938, 946 (Bankr. S.D.N.Y.

1995), other courts have been unwilling to go that far, *see Musicland Holding Corp. v. Best Buy*

*Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 778 (Bankr. S.D.N.Y. 2008); *Global*

*Crossing*, 2006 WL 2212776, at *11. Yet even the estate representatives in *In re Musicland* and

*Global Crossing* – unlike the Trustee here – at least had identified the categories of creditors

whose claims they were pursuing. *See In re Musicland Holding Corp.*, 398 B.R. at 781; *Global*

*Crossing*, 2006 WL 22122776, at 11. It would be unjust and unprecedented to allow the Trustee

to seek to avoid transfers made more than a dozen years ago, well outside the fraudulent transfer

limitations period recognized anywhere, based simply on "naked assertions" that the so-called

discovery rule applies.[15]

> **B.**      **The Trustee's Own "Red Flags" Allegations Preclude Any Inference That An Investor Exists Who Could Not Have Discovered The Fraud.**

To the extent the Trustee's "undiscovered transfers" claim is not dismissed due to

insufficient pleading, it must be dismissed because the Trustee's own allegations preclude him

from establishing that investors could not have discovered Madoff's fraud with reasonable due

diligence.

In this Complaint, as in each of the other complaints the Trustee has filed against

BLMIS investors, the Trustee has identified a series of generic red flags that, he contends, put

BLMIS investors "on notice" of Madoff's fraudulent scheme. (*See* Compl. ¶ 64.) Those

"indicia of irregularity and fraud" include:

- two articles published in the mainstream financial press, including a May 27, 2001 *Barron's* article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," and a May, 2001 article in MAR/Hedge, entitled "Madoff Tops Charts; Skeptics Ask How" (*id.* ¶ 64(a));

---

[15]   Were the Trustee permitted to pursue the avoidance of stale transfers, the result would be longer, more costly and more complex litigation, particularly given the added difficulties inherent in locating documents and testimony related to transfers that occurred so long ago.

- the fact that BLMIS functioned as both investment manager and custodian of securities, and had a "lack of transparency . . . to other investors, regulators and outside parties" (*id.* ¶ 64(b));

- BLMIS' high rates of return (*id.* ¶ 64(c));

- the fact that BLMIS was audited by Friehling & Horowitz, an accounting firm with three employees (*id.* ¶ 64(d)); and

- the fact that many banks and industry advisors purportedly refused to deal with BLMIS "because they had serious concerns that [Madoff's] IA Business operations were not legitimate" (*id.* ¶ 64(f)).

Based on the Trustee's own pleadings, those same purported red flags, if discoverable by the Defendants, would have been equally discoverable by all BLMIS investors.

For example, the two 2001 articles identified in Paragraph 64(a) of the Complaint were published in widely circulated financial industry publications. While the defendants do not agree that these articles put them on notice of Madoff's Ponzi scheme,[16] the Trustee makes precisely that contention. The Trustee cannot have it both ways. If these articles were sufficient to put Mr. Picower and the Defendants on notice of Madoff's fraud, as the Trustee alleges, necessarily they were sufficient to put every BLMIS investor on notice of the fraud as well. And, according to the Trustee, they put every investor on notice of the fraud in 2001, well more than two years before either the Filing Date or the commencement of the Adversary Proceeding.

Similarly, every BLMIS investor would have had equal opportunity to discover that BLMIS was both the investment manager and custodian of securities. Every investor could have discovered the alleged lack of transparency at BLMIS. Every investor could have learned the identity of BLMIS' accountants. Every BLMIS investor could have concluded that BLMIS'

---

[16]    Neither the *Barron's* article nor the MAR/Hedge article come anywhere close to suggesting that Madoff was operating a Ponzi scheme. In fact, the articles alternately attribute Madoff's strong results as being the product of subsidization of the investment advisory business from the bid-ask spreads related to Madoff's market-making business, or that Madoff was "using other stocks and options rather than only those in the S&P 100." (*See* Exs. 26-27.)

investment returns were consistent and strong (presumably, that is why they were investing).  In the Trustee's own words, these "red flags" are derived from the "general manner in which BLMIS operated."  (*Id.* ¶ 64.)  To the extent they indicated to the Defendants that Madoff was running a Ponzi scheme, they would have indicated the same thing to every single other BLMIS investor.

Finally, the Trustee alleges that "banks and industry advisors" refused to invest with BLMIS because they did not believe BLMIS was legitimate.  (*Id.* ¶ 64(f).) Yet, if that were true, it would demonstrate only that information was available that could have put every investor on notice of Madoff's fraud, which contradicts the very premise of the discovery rule that the Trustee relies upon to reach even more Transfers from the Defendants.

Simply put, if the so-called red flags identified by the Trustee were sufficient to put an investor on inquiry notice of Madoff's fraud, as the Trustee has alleged in each of his avoidance complaints, then every single investor necessarily was on the same inquiry notice of the fraud.  As a matter of logic, based on the Trustee's own allegations, no investor exists who could not reasonably have discovered the fraud, requiring rejection of the discovery rule as a basis for avoiding transfers that were made more than six years before this case was commenced.

## VII.    THE CONSTRUCTIVE FRAUD CLAIMS MUST BE DISMISSED BECAUSE THE TRUSTEE HAS FAILED TO PLEAD A LACK OF FAIR CONSIDERATION.

In Counts Six, Seven and Eight of the Complaint, the Trustee asserts constructive fraudulent transfer claims against the Defendants in connection with the Six Year Transfers pursuant to DCL §§ 273, 274 and 275, respectively.  Common to each of these claims is the requirement that the Trustee allege facts demonstrating that each of the Six Year Transfers was made without fair consideration passing to BLMIS.  *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005); *Atlanta Shipping Corp. v.*

*Chem. Bank*, 818 F.2d 240, 248 (2d Cir. 1987) ("An essential element of a claim pursuant to DCL §§ 273, 273-a, 274, 275 is lack of fair consideration."). Yet, as is the case throughout the Complaint, the Trustee fails to do any more than simply recite the statutory requirement. (Compl. ¶ 111 ("BLMIS did not receive fair consideration for the Six Year Transfers." ); *id.* ¶ 116 (same); *see id.* ¶ 106 ("BLMIS did not receive fair consideration for the portion of the Six Year Transfers.").) As discussed above, such conclusory allegations are insufficient to state a claim. *See Bell Atlantic Corp.*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). However, beyond its insufficiency as a matter of pleading, the Trustee's allegation that none of the Six Year Transfers was made with fair consideration is belied by other allegations in the Complaint and impermissibly ignores the Defendants' own claims against BLMIS.

A.    **The Complaint Itself Demonstrates That The Six Year Transfers Were Made For Fair Consideration.**

Although the Trustee asserts in conclusory terms that the Six Year Transfers to the Defendants lacked fair consideration, other allegations in the Complaint directly contradict that assertion. For instance, the Complaint expressly alleges that a transfer made to the Picower Foundation in November 2008 "was made on account of an antecedent debt owed by BLMIS before such transfer was made" (Compl. ¶ 81), and further alleges that the applicable Defendant "received payment of such debt" (*id.* ¶ 84(iii)). Allegations related to an antecedent debt are not isolated assertions but have been incorporated by reference into each of Counts Six, Seven and Eight of the Complaint. (*Id.* ¶¶ 104, 109, 114.)

Under the DCL, payment of an antecedent debt is considered to be fair

consideration. *See* N.Y. Debt. & Cred. Law § 272(a).[17]  No distinction is or could be drawn between the above-referenced November 2008 transfer to the Picower Foundation, and any other transfer identified on Exhibit B.  Thus, if the November 2008 transfer to the Picower Foundation was a payment of an antecedent debt, as the Trustee alleges, then there is no principled reason why every other transfer challenged by the Trustee should not likewise be considered payment of an antecedent debt, and, thus, a transfer for fair consideration.  As alleged, the Trustee's constructive fraudulent transfer claims are insufficient under the DCL and must be dismissed.

**B.      The Trustee's Allegation That The Six Year Transfers Were Not Made For Value Ignores Defendants' Claims Against BLMIS.**

In addition, because a legal or equitable claim against a debtor constitutes an antecedent debt, any payment that reduces the amount of that claim necessarily is an exchange for fair value.[18]  *See Wyle v. C.H. Rider & Family (United Energy Corp.)*, 944 F.2d 589, 595 (9th Cir. 1991).  In light of Madoff's admitted fraud in connection with the management of all BLMIS investment accounts, the Defendants have legal and equitable claims against BLMIS and Madoff which provide additional fair consideration for the Six Year Transfers.  When the Defendants' legal and equitable claims against BLMIS and Madoff are considered, they provide further grounds for dismissing the Trustee's constructive fraud claims against the Defendants.

In a Ponzi scheme, an investor has a restitution claim against the perpetrator of the scheme for deposits made to the perpetrator, provided the investor has not received payments in excess of the investor's principal investment.  *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).  However, where the Ponzi scheme operator is a broker-dealer, investors should

---

17      DCL § 272(a) defines "fair consideration" as being given for property "[w]hen in exchange for such property, or obligation, as a fair equivalent therefore, and in good faith, property is conveyed or an antecedent debt is satisfied."

18      Courts typically use the terms "fair consideration," as used in the DCL, and "reasonably equivalent value," as used under the Bankruptcy Code, "interchangeably."  *Geron v. Palladin Overseas Fund, Ltd. (In re Applied Theory Corp.)*, 323 B.R. 838, 840 (Bankr. S.D.N.Y.), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005).

not be limited to such "out-of-pocket damages," because in the broker-dealer context that measure of damages is "improper – and wholly inadequate." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007).

In *Visconsi*, the plaintiffs invested approximately $21.3 million with a broker Ponzi scheme operator. Rather than invest the funds, the broker used the money for his own purposes and issued false account statements to conceal his theft. Over time, the plaintiffs withdrew approximately $31.3 million – $10 million more than they had invested – which the broker paid from other people's money. Defendant Lehman Brothers argued that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested, but the Sixth Circuit rejected that argument. As the Sixth Circuit explained,

> Plaintiffs gave $21 million to [the broker-dealer], not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope – indeed a reasonable expectation – that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages.

*Id.*

Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id.* As here, the investors' expectations were reflected in the investors' final account statements, which established the damages to which the investor was entitled in its action against the broker. *Id.* In the context of an avoidance action, therefore, the final account statement would set the baseline against which transfers fairly are to be measured to determine whether they are reducing the amount of the claim – and therefore constitute fair consideration – or whether they exceed the claim and therefore may be avoidable. *Id.*

48

Congress provided for this same expectancy measure of damages in the SIPA statute. Under SIPA, broker-dealer customers are entitled to recover their "net equity," which is calculated as "'the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer' corrected for 'any indebtedness of such customer to the debtor on the filing date.'" *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 72 (2d Cir. 2004) (quoting 15 U.S.C. § 78*lll*(11)). Further, as SIPC itself has explained, under SIPA,

> reasonable and legitimate claimant expectations on the filing date *are controlling even where inconsistent with transactional reality*. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase.

Brief of Appellant SIPC at 23-24, *Stafford v. Giddens (In re New Times Sec. Servs., Inc.),* No. 05-5527 (2d Cir. filed Dec. 27, 2005) (emphasis added).

Accordingly, in order for the Trustee to allege that the Defendants received transfers from BLMIS without giving fair consideration – as he must under New York law – the Trustee must allege that the Defendants' transfers exceeded the value of the securities reflected on their last BLMIS account statements. Absent such an allegation – and none is in the Complaint – there is no factual basis to support an inference that the transfers should not be treated as a reduction in the amount of the Defendants' indisputable legal and equitable claims against BLMIS, which as a matter of law constitutes fair consideration, *see, e.g.*, *United Energy*

*Corp.*, 944 F.2d at 595.  As such, the Trustee has not pleaded a lack of fair consideration, and his constructive fraudulent conveyance claims under the DCL therefore must be dismissed.

## VIII.  THE TRUSTEE'S CLAIM TO AVOID SUBSEQUENT TRANSFERS MUST BE DISMISSED BECAUSE THE TRUSTEE HAS NOT ALLEGED ANY SUBSEQUENT TRANSFERS.

As demonstrated above, pleading by parroting statutory language without alleging supporting facts falls short even of basic notice pleading requirements.  (*See supra* at 12-13.) For this reason, Count Ten of the Complaint related to subsequent transfers must be dismissed.

Count Ten seeks avoidance of purported subsequent transfers that are nowhere identified.  Count Ten simply alleges:  "On information and belief, some or all of the Transfers were subsequently transferred by one or more Defendants to other Defendants in the form of transfers from one account to another or other means."  (Compl. ¶ 126.)  The Complaint then claims that the estate is entitled to recover those subsequent transfers because "[o]ne or more Defendants are immediate or mediate transferees of the Subsequent Transfers from Defendant Picower and/or other Defendants."  (*Id.* ¶¶ 128-29.)  Plainly, the Trustee cannot state a claim for subsequent transfers he cannot even identify.

Moreover, to the extent the Trustee is seeking to avoid purported subsequent transfers on an actual intent fraud theory, he was required, but failed, to "specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, [and] the consideration paid."  *Official Comm. of Unsecured, Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 734 (Bankr. S.D.N.Y. 2008) (citations omitted); *see also Silverman v. K.E.R.U. Realty Corp. (In re Allou Distrib., Inc.)*, 379 B.R. 5, 31 (Bankr. E.D.N.Y. 2007).

Here, the Complaint does not identify (1) when any of the purported subsequent transfers occurred; (2) the amount of any of the purported subsequent transfers; (3) the identity

of any transferor of any of the purported subsequent transfers; or (4) the identity of any transferee of any of the purported subsequent transfers.[19]  More importantly, the Trustee cannot identify any injury from purported subsequent transfers that remained in Madoff accounts and never were withdrawn.  Accordingly, the Trustee's generic subsequent transfer allegations cannot provide a basis for either avoidance or recovery.

## IX.    THE DEFENDANTS' SIPA CLAIMS SHOULD BE ALLOWED.

In Count Eleven of the Complaint, the Trustee seeks an order disallowing any claim filed by any Defendant under SIPA.  However, the Trustee has not pleaded – and cannot plead – a legal basis for disallowing the Defendants' SIPA claims.

According to the Trustee, "Defendants' claims . . . are not supported by the books and records of BLMIS nor the claim materials submitted by Defendants, and, therefore, should be disallowed."  (Compl. ¶ 132.)  As a preliminary matter, the Trustee's position that the Defendants are precluded from recovery under SIPA has nothing to do with "materials submitted by Defendants," since no Defendant had submitted any materials or filed any SIPA claim as of the date of the Complaint.  Nor does the Trustee's position have anything to do with "the books and records of BLMIS," as the only record that matters under the SIPA statute is a Defendant's last account statement that reflects its reasonable expectation of the securities held in its account. *See* 15 U.S.C. § 78*lll*(11).

The Trustee's request to disallow the Defendants' SIPA claims appears to be based on the Trustee's own personal policy determination that SIPA should favor "later

_____

[19]    The Trustee's attempt to plead the Subsequent Transfers on "information and belief" (s*ee, e.g.*, Compl. ¶ 126) is insufficient.  To the extent the purported Subsequent Transfers were made "from one account to another" (*Id.* ¶ 126), the Trustee has account records related to Defendants' BLMIS accounts and can figure out whether any such transfers occurred.  As the information is not "peculiarly within [Defendants'] knowledge," the Trustee is not permitted to rely upon "information and belief" pleading in any event.  *See, e.g.*, *In re Musicland Holding Corp.*, 398 B.R. at 774.  Even if such pleading were permissible, the Trustee "must nonetheless allege facts upon which the belief is based," which he has not done.  *Id.*

investors" over "early investors."  (*See* Ex. 1.)  The Trustee would accomplish that result by erroneously calculating the amount which each investor is due under SIPA – *i.e.*, customer "net equity" – based on a netting of all deposits and withdrawals by the customer over the life of the customer's BLMIS account.  (*See id.*)  The Trustee's approach is directly contrary to and violates the plain language of SIPA, the legislative intent behind the statute, binding authority in this Circuit, and the methodology used historically by other SIPA trustees.

Under SIPA, a Trustee is obligated to "satisfy net equity claims of customers."  15 U.S.C. § 78*fff*(a)(1)(B).  SIPA defines "net equity" as the value of the securities positions in a customer's account as of the SIPA filing date – here, December 11, 2008 – minus any amount the customer owes the debtor.  Specifically:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by–
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78*lll*(11).

The Second Circuit, following the express language of SIPA, likewise has held that net equity for SIPA purposes is calculated as of the SIPA filing date.  As the Second Circuit has explained, "[e]ach customer's 'net equity' is 'the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer' corrected for 'any indebtedness of such customer to the debtor on the filing date.'"  *In re New Times*, 371 F.3d at 72 (quoting 15 U.S.C. § 78*lll*(11)).

The justification given by the Trustee for ignoring both the plain language of SIPA and the binding authority in this Circuit is that it would be unfair to pay out fictitious profits where no trading took place. (*See* Ex. 1.) However, both Congress and the Second Circuit have considered precisely this situation and determined it is not unfair.

The Senate and House reports reflect that, in connection with the enactment of SIPA, Congress was well aware of the possibility of fictitious trading, and explicitly elected to protect the legitimate expectations of customers, even where no securities were actually purchased. As the Senate Report stated:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations . . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added). Likewise, the House Report explained that

> [a] customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, that is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746, at 21 (1977) (emphasis added).

The Second Circuit specifically addressed the situation where no securities were purchased by the broker in *In re New Times*, and reached the same conclusion as that dictated by the legislative history cited above. The Circuit Court held that net equity claims for nonexistent "fictitious" securities – which never existed and the market value of which could not be obtained or verified independently – were properly valued based on the amount of money that the

claimants initially provided to the debtor. *In re New Times*, 371 F.3d at 88. In contrast, where the securities at issue were "real" and had publicly verifiable values, SIPC and the SIPC trustee gave customers the full benefit of the SIPA remedy, calculating "net equity" as the value of "real" securities reflected in a customer's account statements on the filing date. *See id*. at 74, 87.

The Trustee is not permitted to ignore the plain language of the SIPA statute, or the binding authority of the Second Circuit, in order to satisfy his own sense of justice. Until SIPA is amended, the Trustee is required to apply it as written, which obligates him to allow the Defendants' SIPA claims. The Trustee's request to disallow the SIPA claims of those Defendants who filed them therefore should be denied.

## X.  THE TRUSTEE IS NOT ENTITLED TO A CONSTRUCTIVE TRUST OR ASSIGNMENT OF DEFENDANTS' TAX REFUNDS

In addition to overreaching with respect to legal claims arising under SIPA or purportedly within his authority as SIPA Trustee, the Trustee also seeks relief in connection with claims totally outside the scope of his authority as SIPA Trustee. In this regard, the Trustee seeks the "establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate." (Compl. Prayer subset. xiii.) The Trustee also requests an "assignment of Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme." (*Id.* subset. xiv.) The Trustee offers and has no legal authority or statutory entitlement to either form of relief.

### A.  The Trustee Has No Entitlement To A Constructive Trust.

A constructive trust is not a remedy provided for under SIPA, the DCL or the Bankruptcy Code. *See* N.Y. Debt. & Cred. Law § 278; 11 U.S.C. § 550. Thus, even if the Trustee were able to prove any of his avoidance claims, he would not be entitled to a constructive trust unless he also proved the additional elements of a constructive trust. *See Pfohl*

*Bros. Landfill Site Steering Comm. v. Allied Waste Sys., Inc.*, 255 F. Supp. 2d 134, 168 (W.D.N.Y. 2003) (fraudulent conveyance claim is "alternative basis for relief" from claim for constructive trust); *FDIC v. Marke Painting Co.*, No. 88 Civ. 8675, 1992 WL 212372, at *5 (S.D.N.Y. Aug. 25, 1992) (constructive trust "is not a remedy provided by section 278 [of the DCL]").

Under New York law, a plaintiff seeking a constructive trust must establish "(1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment." *Bankers Sec. Life Ins. Soc'y v. Shakerdge*, 49 N.Y.2d 939, 940 (1980). Here, the Trustee has not alleged a confidential or fiduciary relationship between any of the Defendants and any of BLMIS' creditors on whose behalf the Trustee seeks avoidance. Nor has the Trustee alleged that any of the Defendants made a promise to any of BLMIS's creditors or that any transfer was made in reliance on such a promise. The Trustee has failed to state a claim for a constructive trust, and his request for such relief should be denied. *See SL v. CD*, No. XX-07, 2007 WL 4198248, at *2 (N.Y. Sup. Ct. Nov. 28, 2007).

### B. The Trustee Is Not Entitled to Defendants' Income Tax Refunds.

In prayer for relief subsection xiv of the Complaint, the Trustee seeks an "assignment of Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme." There is no authority under the Code for such relief. In fact, the Code precludes it.

Section 550 of the Bankruptcy Code prescribes the relief that a trustee may recover when a transfer is avoided. Section 550(a) states, in relevant part: "[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, *the property transferred*, or, if the court so orders, *the value of such property* . . . ." 11 U.S.C. § 550(a) (emphasis added). As courts have

recognized, the purpose of Section 550 is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *In re Centennial Textiles*, 220 B.R. at 176. Courts do not permit further recovery, as the Trustee seeks here, when an avoided transfer puts "the estate back into the financial condition Debtors enjoyed prior to the transfer." *Schnittjer v. Linn Area Credit Union (In re Sickels)*, 392 B.R. 423, 427 (Bankr. N.D. Iowa 2008).

The Trustee's attempt to recover the Defendants' tax refunds, if such refunds are obtained, is simply an effort to enlarge his already outsized authority, obtain a windfall not permitted under the Bankruptcy Code, and further penalize the Defendants. In the event the Trustee proves that any transfer to a Defendant is voidable, the Trustee's recovery would be limited under Section 550 to the dollar amount of the transfer, and nothing more. Accordingly, prayer for relief subsection xiv should be denied.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court enter an Order:

(1) dismissing the Complaint in its entirety, with prejudice, against Favorite Fund, JMP LP, JFM Investment, Picower P.C., JA Primary, JA Special and the Picower Institute because there are no actionable transfers alleged against those Defendants;

(2) dismissing Count One of the Complaint (Section 542 Turnover and Accounting), with prejudice, against all Defendants because Section 542 does not apply to purportedly fraudulent transfers;

(3) dismissing Count Two of the Complaint (Section 547 Preferential Transfers), with prejudice, against all Defendants except the Picower Foundation because no transfers are alleged to have been made to those Defendants within 90 days of the Filing Date;

(4) dismissing Count Five of the Complaint (DCL § 276 Actual Intent Fraudulent Conveyance), with prejudice, against all Defendants to the extent the claim seeks avoidance of transfers made more than six years prior to the commencement of this Adversary Proceeding, because such transfers

are not voidable under New York law;

(5)     dismissing Counts Six, Seven and Eight of the Complaint (Constructive Fraudulent Conveyance under the DCL), with prejudice, against all Defendants because the Trustee has failed to allege sufficiently that any transfers were made without fair consideration;

(6)     dismissing Count Nine of the Complaint (Undiscovered Fraudulent Transfers), with prejudice, against all Defendants because the Trustee has failed to allege a basis for application of the "discovery rule" to extend the applicable statute of limitations beyond six years under New York law;

(7)     dismissing Count Ten of the Complaint (Recovery of Subsequent Transfers), with prejudice, against all Defendants because the Trustee has not identified any subsequent transfers allegedly made to the Defendants;

(8)     dismissing Count Eleven of the Complaint (Objection to Defendants' SIPA Claims), with prejudice, against all Defendants because the Picower Foundation, Capital Growth, JF, JEMW, JLN, JAB, JA Special and Mr. and Mrs. Picower are entitled to recover under SIPA their net equity reflected on their last BLMIS account statement, and the Trustee's claim is moot as against the remaining Defendants because they did not file SIPA claims;

(9)     dismissing the Trustee's requests for a constructive trust and an assignment of any tax refunds against all Defendants, with prejudice, because the Trustee has no entitlement to such relief; and

(10)    dismissing, with prejudice, all claims against Mr. Picower alleging fraud, for failure to plead fraud in accordance with Rule 9(b), and all claims against him based on an "alter ego" theory, because none of the factors that could support piercing the corporate veil have been alleged.

Dated:  New York, New York
        July 31, 2009

SCHULTE ROTH & ZABEL LLP

By: /s/ Marcy R. Harris
William D. Zabel
Michael L. Cook
Marcy Ressler Harris
Frank J. LaSalle
919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for the Defendants*