**Schulte Roth & Zabel LLP**
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
William D. Zabel
Email: william.zabel@srz.com
Michael L. Cook
Email: michael.cook@srz.com
Marcy Ressler Harris
Email: marcy.harris@srz.com
Frank J. LaSalle
Email: frank.lasalle@srz.com

*Attorneys for the Defendants*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>        JEFFRY M. PICOWER, individually and as trustee for the Picower Foundation;<br><br>        BARBARA PICOWER, individually and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation;<br><br>        CAPITAL GROWTH COMPANY;<br><br>        FAVORITE FUNDS; | Adv. Pro. No. 09-1197 (BRL) |

JA PRIMARY LIMITED PARTNERSHIP;

JA SPECIAL LIMITED PARTNERSHIP;

JAB PARTNERSHIP;

JEMW PARTNERSHIP;

JF PARTNERSHIP;

JFM INVESTMENT COMPANY;

JLN PARTNERSHIP;

JMP LIMITED PARTNERSHIP;

JEFFRY M. PICOWER SPECIAL CO.;

JEFFRY M. PICOWER, P.C.;

DECISIONS INCORPORATED;

THE PICOWER FOUNDATION;

THE PICOWER INSTITUTE FOR
MEDICAL RESEARCH;

THE TRUST FBO GABRIELLE H.
PICOWER; and DOES 1-25.

Defendants.

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' MOTION
TO DISMISS UNDER FED. R. BANKR. P. 7012(b) AND 7009**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT..........................................................................................................................2

I.      THE TRUSTEE CANNOT RELY ON THE DISCOVERY RULE TO
        REACH TRANSFERS THAT OCCURRED MORE THAN SIX YEARS
        FROM THE COMMENCEMENT OF THE ADVERSARY PROCEEDING.............2

        A.      The Trustee Cannot Reach Decades-Old Transfers Based On The Bare
                Claim That A Creditor Exists That Could Not Have Discovered The Fraud .......3

        B.      The "Red Flags" Alleged By The Trustee Preclude Any Inference That
                An Investor Exists Who Could Not Have Discovered Madoff's Fraud................7

II.     THE COURT SHOULD DISMISS THE COMPLAINT'S CONCLUSORY
        AND GRATUITOUS ALLEGATIONS OF FRAUD ...............................................11

III.    THE TRUSTEE HAS FAILED TO ALLEGE AN ALTER EGO CLAIM OR
        ANY OTHER BASIS UPON WHICH TO RECOVER FROM MR. PICOWER
        ALLEGED FRAUDULENT TRANSFERS HE DID NOT RECEIVE......................13

        A.      The Trustee Has Failed To Allege Sufficient Facts To Impose Alter Ego
                Liability Upon Mr. Picower...............................................................................14

                1.      Merely Alleging That Mr. Picower Managed The Entities'
                        Investments Is Insufficient To Warrant Veil Piercing ...............................14

                2.      The Alter Ego Claim Must Be Dismissed Because It Does Not
                        Plead That Mr. Picower Dominated The Entities To Such A
                        Degree That Their Corporate Forms Were Mere Shams ...........................16

                3.      The Alter Ego Claim Must Be Dismissed Because The "Overall
                        Element Of Injustice Or Unfairness" Prong Is Not Satisfied....................19

        B.      There Is No Basis To Recover From Mr. Picower On An Agency Or Tort
                Theory Transfers Mr. Picower Did Not Receive ................................................20

IV.     THE TRUSTEE CANNOT ASSERT AVOIDANCE CLAIMS IN HIS
        RESPONSE FOR TRANSFERS NOT IDENTIFIED IN THE COMPLAINT.........22

V.      FOR CLAIMS UNDER § 544(b), THE STATE LIMITATIONS PERIOD
        APPLIES UNTIL THE ADVERSARY PROCEEDING COMMENCES .................24

i

A.  There Is No Statutory Basis For The Trustee's Erroneous Contention That State Law Limitations Periods Cease To Have Effect As Of The Filing Date ...........................................................................................................24

B.  Congressional Silence Provides No Indication As To The Meaning Of §§ 544(b) and 546(a) Of The Bankruptcy Code .................................................28

C.  CPLR § 204(a) Provides No Basis To Toll The State Statute Of Limitations For Fraudulent Conveyance Claims .................................................29

D.  Section 108(c) Cannot Toll The State Statute Of Limitations For Avoidance Actions Brought Against A Non-Debtor ..........................................31

VI.  THE TURNOVER CLAIM MUST BE DISMISSED BECAUSE THE SUBJECT TRANSFERS ARE NOT "PROPERTY OF THE ESTATE"...................33

VII.  THE CONSTRUCTIVE FRAUD CLAIMS MUST BE DISMISSED BECAUSE THE TRUSTEE HAS FAILED TO PLEAD A LACK OF FAIR CONSIDERATION.............................................................................................36

A.  The Defendants' Claim For Expectation Damages Is An Antecedent Debt Against BLMIS And Thus Constitutes Fair Consideration ........................37

B.  The Trustee Has Not Alleged Bad Faith................................................................40

VIII.  NO CLAIM TO AVOID SUBSEQUENT TRANSFERS HAS BEEN ALLEGED...41

IX.  THE DEFENDANTS' SIPA CLAIMS SHOULD BE ALLOWED ...........................43

X.  THE TRUSTEE IS NOT ENTITLED TO A CONSTRUCTIVE TRUST OR ASSIGNMENT OF DEFENDANTS' TAX REFUNDS ...........................................45

CONCLUSION.....................................................................................................................47

# TABLE OF AUTHORITIES

## CASES

Page

*Allen v. Westpoint-Pepperell, Inc.,*
   945 F.2d 40 (2d Cir. 1991)..........................................................................................22

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez*
   *Constr. Inc.),* 373 B.R. 262 (Bankr. S.D.N.Y. 2007)...............................................35

*Aniero Concrete Co., Inc. v. N. Y. City Constr. Auth.,*
   No. 94 Civ. 3506, 2000 WL 863208 (S.D.N.Y. June 27, 2000)................................23

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009)........................................................................................3, 42

*In re Asia Global Crossing, Ltd.,*
   333 B.R. 199 (Bankr. S.D.N.Y. 2005)......................................................................44

*Belford v. Martin-Trigona (In re Martin-Trigona),*
   763 F.2d 503 (2d Cir. 1985)..............................................................................32, 33

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................................3, 11

*Bertrum v. Laughlin (In re Laughlin),*
   18 B.R. 778 (Bankr. W.D. Mo. 1982)......................................................................46

*Bianchi v. United States,*
   46 Fed. Cl. 363 (Fed. Cl. 2000) ..............................................................................27

*Brown v. General Elec. Capital Corp. (In re Foxmeyer Corp.),*
   290 B.R. 229 (Bankr. D. Del. 2003) ..................................................................19, 20

*CDS Recoveries LLC v. Davis,*
   715 N.Y.S.2d 517 (3d Dep't 2000) .................................................................... 29-30

*Campbell v. United States (In re Davis),*
   889 F.2d 658 (5th Cir. 1989) ..................................................................................45

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver,*
   511 U.S. 164 (1994)................................................................................................29

*Collins v. Prime Table Restaurant & Lounge, Inc. (In re Lake States
Commodities, Inc.)*, 271 B.R. 575 (Bankr. N.D. Ill. 2002), *aff'd sub nom.
Fisher v. Page*, No. 02 C 1588, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002)............................7

*Crews v. Carwile (In re Davis)*,
138 B.R.106 (Bankr. M.D. Fla. 1992) ..........................................................................................26

*Crosse v. BCBSD, Inc.*,
836 A.2d 492 (Del. 2003) ....................................................................................................14, 16

*Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*,
921 F. Supp. 1100 (S.D.N.Y. 1996)................................................................................................5

*Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp.
(In re Adelphia Commc'ns Corp.)*, 322 B.R. 509 (Bankr. S.D.N.Y. 2005)........................15, 18

*Doyle v. Paolino (In re Energy Sav. Ctr., Inc.)*,
61 B.R. 732 (E.D. Pa. 1986) ......................................................................................................35

*Dzikowski v. Friedlander (In re Friedlander Capital Mgmt.)*,
Adv. No. 05-03088-PGH, 2009 WL 1231085 (Bankr. S.D. Fla. Apr. 29, 2009)...............25, 26

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
980 F.2d 125 (2d Cir. 1992)..........................................................................................32, 34, 35

*FDIC v. Marke Painting Co.*,
No. 88 Civ 8675, 1992 WL 212372 (S.D.N.Y. Aug. 25, 1992) ................................................46

*FDIC v. Porco*,
75 N.Y.2d 840 (1990) ..................................................................................................................21

*Fink v. Graven Auction Co. (In re Graven)*,
64 F.3d 453 (8th Cir. 1995) .........................................................................................................25

*In re First State Sec. Corp.*,
34 B.R. 492 (Bankr. S.D. Fla. 1983)............................................................................................43

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995)..................................................................................................13, 19

*GMAC Mortgage LLC v. Blitz Holdings Corp. (In re IFS Fin. Corp.)*,
Adv. No. 08-03047, 2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008).................................44

*Geren v. Quantum Chem. Corp.*,
832 F. Supp. 728 (S.D.N.Y. 1993)...............................................................................................21

*Geron v. Valeray Realty Co. (In re Hudson Transfer Group, Inc.),*
    245 B.R. 456 (Bankr. S.D.N.Y. 2000) ........................................................................28

*Giuliano v. Fairfield Group Health Care Ctrs. L.P. (In re Lexington*
    *Health Group, Inc.)*, 363 B.R. 713 (Bankr. D. Del. 2007) ......................................35

*Global Crossing Estate Representative v. Winnick,*
    No. 04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006) ................................4

*Goplen v. 51Job, Inc.,*
    453 F. Supp. 2d 759 (S.D.N.Y. 2006).........................................................................23

*Great Am. Ins. Co. v. Bally Total Fitness Holding Corp. (In re Bally*
    *Total Fitness of Greater N.Y., Inc.)*, Adv. No. 09-01023,
    2009 WL 1116587 (Bankr. S.D.N.Y. Mar. 27, 2009) .................................................3

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,*
    530 U.S. 1 (2000).................................................................................................. 37-38

*Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.),*
    32 B.R. 199 (Bankr. S.D.N.Y. 1983)..........................................................................25

*Hazen First State Bank v. Speight,*
    888 F.2d 574 (8th Cir. 1989) ......................................................................................32

*Helprin v. Harcourt, Inc.,*
    277 F. Supp. 2d 327 (S.D.N.Y. 2003)................................................................... 45-46

*Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bressler & Schulman, Inc.),*
    94 B.R. 817 (D.N.J. 1989) ..........................................................................................34

*Hirsch v. Gersten (In re Centennial Textiles, Inc.),*
    220 B.R. 165 (Bankr. S.D.N.Y. 1998)........................................................................25

*Hoggarth v. Kaler (In re Midwest Agri. Devel. Corp.),*
    387 B.R. 580 (B.A.P. 8th Cir. 2008)...........................................................................44

*Holloway v. IRS (In re Odom Antennas, Inc.),*
    340 F.3d 705 (8th Cir. 2003) ...............................................................................44, 45

*Johnson v. Rivera,*
    272 F.3d 519 (7th Cir. 2001) ......................................................................................30

*Krygoski Constr. Co. v. Flanders Indus.,*
    No. 2:08-CV-202, 2009 WL 722611 (W.D. Mich. Mar. 17, 2009) ...........................5

*Kulzer v. Pittsburgh-Corning Corp.,*
  942 F.2d 122 (2d Cir. 1991)...................................................................................................25

*Lerner v. Forster,*
  240 F. Supp. 2d 233 (E.D.N.Y. 2003) ...................................................................................22

*Levit v. Spatz (In re Spatz),*
  222 B.R. 157 (N.D. Ill. 1998) ...............................................................................................25

*M.K. Moore & Sons, Inc. v. Slutsky (In re WM. Cargile Contractor, Inc.),*
  No. 96-4353, 1998 WL 211753 (6th Cir. Apr. 21, 1998).......................................................27

*Madonna v. United States,*
  878 F.2d 62 (2d Cir. 1989)............................................................................................12, 42

*Mahoney, Trocki & Assocs., Inc. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.),*
  111 B.R. 914 (Bankr. S.D. Cal. 1990) ...................................................................................25

*McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.),*
  31 B.R. 827 (Bankr. W.D. Wash. 1983)..................................................................................32

*Mendelsohn v. Jacobowitz (In re Jacobs),*
  394 B.R. 646 (Bankr. E.D.N.Y. 2008)....................................................................................35

*Mendelsohn v. Sequa Fin. Corp. (In re Frank Santora Equip. Corp.),*
  231 B.R. 486 (E.D.N.Y. 1999) ..............................................................................................27

*Mercury Capital Corp. v. Shepherds Beach, Inc.,*
  723 N.Y.S.2d 48 (2d Dep't 2001) ..........................................................................................29

*In re Mid Atlantic Fund, Inc.,*
  60 B.R. 604 (Bankr. S.D.N.Y. 1986)......................................................................................44

*Mobil Oil Corp. v. Linear Films, Inc.,*
  718 F. Supp. 260 (D. Del. 1989)............................................................................................20

*Morton v. Nat'l Bank of N.Y. City (In re Morton),*
  866 F.2d 561 (2d Cir. 1989)..................................................................................................32

*Nat'l W. Life Ins. v. Lynch,*
  175 F. Supp. 2d 489 (S.D.N.Y. 2000).....................................................................................36

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC,*
  537 F.3d 168 (2d Cir. 2008)......................................................................................16, 17, 18

vi

*In re New Times Sec. Servs., Inc.*,
    371 F.3d 68 (2d Cir. 2004)........................................................................................39

*OBG Technical Servs., Inc. v. Northrup Grumman Space & Mission Sys. Corp.*,
    503 F. Supp. 2d 490 (D. Conn. 2007)..........................................................................5

*O'Brien v. Nat'l Prop. Analysts Partners*,
    719 F. Supp. 222 (S.D.N.Y. 1989)..............................................................................22

*Official Comm. of Unsecured Creditors of 360Networks (USA) Inc. v. Pirelli
    Commc'ns Cables & Sys. USA LLC (In re 360Networks (USA) Inc.)*,
    367 B.R. 428 (Bankr. S.D.N.Y. 2007).........................................................................23

*Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan
    Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008).........................................................................23

*Official Comm. of Unsecured Creditors of Verestar Inc. v. Am. Tower Corp. (In re
    Verestar, Inc.)*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006)...............................................17

*Old Orchard Bank & Trust Co. v. Josefik (In re Josefik)*,
    72 B.R. 393 (Bankr. N.D. Ill. 1987) ..................................................................... 25-26

*Onanuga v. Pfizer, Inc.*,
    No. 03 Civ 5405, 2003 WL 22670842 (S.D.N.Y. Nov. 7, 2003) ...............................45

*Orr v. Bernstein (In re Bernstein)*,
    259 B.R. 555 (Bankr. D.N.J. 2001) ...........................................................................26

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990)....................................................................................................29

*Pereira v. Kaiser (In re Big Apple Scenic Studio, Inc.)*,
    63 B.R. 85 (Bankr. S.D.N.Y. 1986)............................................................................32

*Peskin v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
    413 B.R. 137 (Bankr. S.D.N.Y. 2009)......................................................... 3-4, 5, 42

*Pfohl Bros. Landfill Site Steering Comm. v. Allied Waste Sys., Inc.*,
    255 F. Supp. 2d 134 (W.D.N.Y. 2003)........................................................................46

*Podany v. Robertson Stephens, Inc.*,
    350 F. Supp. 2d 375 (S.D.N.Y. 2004).........................................................................43

*R.A. Hatch Co. v. Am. Ins. Co.*,
    728 F. Supp. 1499 (D. Or. 1990) ........................................................................ 30-31

*In re RCM Global Long Term Capital Appreciation Fund, Ltd.*,
200 B.R. 514 (Bankr. S.D.N.Y. 1996) ..................................................................................4

*Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland
Holding Corp.)*, 398 B.R. 761 (Bankr. S.D.N.Y. 2008) ........................................4, 42

*Richardson v. Huntington Nat'l Bank (In re Cyberco Holdings, Inc.)*,
382 B.R. 118 (Bankr. W.D. Mich. 2008)..............................................................35

*Russello v. United States*,
464 U.S. 16 (1983)..........................................................................................28

*SETA Corp. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*,
173 B.R. 858 (S.D.N.Y. 1994).........................................................................44

*Salisbury v. Mirage Resorts, Inc. (In re Mizuno)*,
223 F.3d 1050 (9th Cir. 2000) ........................................................................27

*Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*,
325 B.R. 134 (Bankr. S.D.N.Y. 2005)............................................................ 34-35

*Scarborough v. Perez*,
870 F.2d 1079 (6th Cir. 1989) ....................................................................15, 18

*Scholastic, Inc. v. Stouffer*,
124 F. Supp. 2d 836 (S.D.N.Y. 2000)...............................................................22

*Scholes v. Lehmann*,
56 F.3d 750 (7th Cir. 1995) ...........................................................................37

*Sears Petroleum & Transp. Corp. v. Burgess Constr. Servs., Inc.*,
417 F. Supp. 2d 212 (D. Mass. 2006) ..............................................................26

*Sender v. Buchanon (In re Hedged-Invs. Assocs., Inc.)*,
84 F.3d 1286 (10th Cir. 1996) ........................................................................37

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005)..........................................................................40, 41

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distrib., Inc.)*,
379 B.R. 5 (Bankr. E.D.N.Y. 2007)...............................................................23, 42

*Slone-Stiver v. Sol Tick & Co. (In re Tower Metal Alloy)*,
183 B.R. 502 (S.D. Ohio 1995) ......................................................................27

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*,
    335 B.R. 539 (D. Del. 2005) ........................................................................................................35

*Stone v. I.N.S.*,
    514 U.S. 386 (1995) ....................................................................................................................27

*Stride Rite Children's Group, Inc. v. Siegel*,
    703 N.Y.S.2d 642 (4th Dep't 2000) .............................................................................................7

*Taylor v. N.Y.S. Dep't of Corrections*,
    No. 03 Civ. 1929, 2004 WL 2979910 (S.D.N.Y. Dec. 22, 2004) ...............................................30

*Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*,
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) ...................................................................................passim

*Trefny v. Bear Stearns Sec. Corp.*,
    243 B.R. 300 (S.D. Tex. 1999) .............................................................................................34, 35

*Trevino v. Merscorp, Inc.*,
    583 F. Supp. 2d 521 (D. Del. 2008) .......................................................................13, 14, 16, 21

*In re U.S. Lines, Inc.*,
    199 B.R. 476 (Bankr. S.D.N.Y. 1996) .......................................................................................38

*United States Lines (S.A.), Inc. v. United States (In re McLean Indus.)*,
    30 F.3d 385 (2d Cir. 1994) ........................................................................................................44

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ....................................................................................................................19

*Visconsi v. Lehman Bros., Inc.*,
    No. 06-3304, 2007 WL 2258827 (6th Cir. Aug. 8, 2007) .........................................................37

*Wallace v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999) ...........................................................................................13, 14

*Willey v. J.P. Morgan Chase, N.A.*,
    No. 09 Civ. 1397, 2009 WL 1938987 (S.D.N.Y. July 7, 2009) .................................................23

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
    933 F.2d 131 (2d Cir. 1991) ......................................................................................................18

*Wyle v. C.H. Rider & Family (In re United Energy Corp.)*,
    944 F.2d 589 (9th Cir. 1991) .....................................................................................................37

*Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.),*
  178 B.R. 938 (Bankr. S.D.N.Y. 1995) ......................................................................4

*Zuckerman v. 234-6 W. 22 St. Corp.,*
  645 N.Y.S.2d 967 (Sup. Ct. N.Y. Co. 1996) ..........................................................30

## STATUTES

11 U.S.C. § 29(e) (repealed 1978) ..............................................................................26

11 U.S.C. § 101(5)(A) (2009) ......................................................................................37

11 U.S.C. § 101(12) (2009) ..........................................................................................37

12 U.S.C. § 108(a) (2009) ......................................................................................26, 27

12 U.S.C. § 108(c) (2009) ......................................................................................31, 32

11 U.S.C. § 362 (2009) ................................................................................................32

11 U.S.C. § 502(d) (2009) ..............................................................................43, 44, 45

11 U.S.C. § 541(a)(3) (2009) ......................................................................................36

11 U.S.C. § 542 (2009) ..........................................................................................33, 35

11 U.S.C. § 544(a) (2009) ......................................................................................27, 28

11 U.S.C. § 544(b) (2009) ....................................................................................passim

11 U.S.C. § 546(a) (2009) ....................................................................................passim

11 U.S.C. § 546(a) (amended 1994) ..........................................................................27

11 U.S.C. § 547 (2009) ................................................................................................27

11 U.S.C. § 548 (2009) ................................................................................................27

11 U.S.C. § 550 (2009) ..................................................................................21, 33, 46

15 U.S.C. § 78*fff*-2(c)(1) (2009) ..............................................................................43

15 U.S.C. § 78*fff*-2(c)(3) (2009) ..............................................................................34

15 U.S.C. § 78*lll*(2) (2009) ......................................................................................43

Fed. R. Bankr. P. 7009.................................................................................................1, 12

Fed. R. Bankr. P. 7012(b).................................................................................................1

Fed. R. Civ. P. 9(b)................................................................................................1, 12, 42

Fed. R. Civ. P. 12(b)(6).................................................................................................1

Or. Rev. Stat. § 12.210 (2009)..........................................................................................30

N.Y. C.P.L.R. § 203(g)......................................................................................................7

N.Y. C.P.L.R. § 204(a).........................................................................................29, 30, 31

N.Y. C.P.L.R. § 213(8)......................................................................................................7

## MISCELLANEOUS

Brief of Appellant SIPC, *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463
    F.3d 125 (2d Cir. 2006) (No. 05-5527-bk), 2005 WL 5338148 ...............................................38

H.R. No. 95-595, 95th Cong., 2d Sess. 318 (1978), U.S. Code Cong.
    & Admin. News 1978, p. 5787 ..............................................................................................32

Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the Securities
Investor Protection Act and Their Impact on Securities Transfers*, 12 Cardozo L. Rev.
    509 (Dec. 1990) ...................................................................................................................38

S.R. Rep. No. 95-989, 95th Cong., 2d Sess. 30 (1978) ....................................................32

Securities Investor Protection: Hearing on H.R. 13308, H.R. 17585, H.R. 18081, H.R.
    18109, and H.R. 18458 Before the Subcomm. on Commerce and Finance of the H.
    Comm. on Interstate and Foreign Commerce, 91st Cong. 149-150 (1970) (statement
    of Hamer H. Budge, Chairman, SEC).................................................................................39

The Defendants submit this reply memorandum of law in further support of their motion to dismiss the Complaint in its entirety, pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b), with respect to Defendants Favorite Fund, JFM Investment Company ("JFM Investment"), JMP Limited Partnership ("JMP LP"), Jeffry M. Picower, P.C. ("Picower P.C."), JA Primary Limited Partnership ("JA Primary"), JA Special Limited Partnership ("JA Special") and the Picower Institute for Medical Research (the "Picower Institute"), and to dismiss the Complaint in part, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and Fed. R. Bankr. P. 7009 and 7012(b), with respect to the remaining Defendants.[1]

## PRELIMINARY STATEMENT

In responding to the Defendants' Motion to Dismiss, as in this entire SIPA liquidation, the Trustee of Bernard L. Madoff Investment Securities, LLC ("BLMIS") has attempted to rewrite the law and revise the facts in order to recover maximum assets for the victims of Bernard L. Madoff's Ponzi scheme. But while a monumental fraud understandably leads to an enlarged appetite for recovery, not even the Madoff fraud affords the Trustee the outsized powers he has assumed.

The Complaint in this case, as demonstrated in the Defendants' moving brief, reflects gross overreaching on the Trustee's part and is filled with baseless and legally unsustainable claims. The Trustee's response compounds rather than corrects the excesses of the Complaint. Among other things, the Trustee now seeks to hold Mr. Picower and other Defendants liable for an additional $2 billion in transfers from BLMIS, based on the bare assertion that the transfers were made. The Trustee also now seeks to avoid transfers going back more than 25 years, based on nothing but the conclusory claim that *someone* exists who could

---

[1] References herein to the Defendants' moving brief will be cited as "Def. Mem. at ___." References to the Trustee's memorandum in opposition to the Defendants' motion will be cited as "Tr. Mem. at ___."

1

not have discovered Madoff's fraud. It is the law, not the Trustee, that defines the permissible scope of the Trustee's avoidance powers in this case. Here, the law does not support the sweeping powers the Trustee has assumed for himself.

We urge the Court to decide the Defendants' motion and dismiss the baseless claims in the Complaint, based not on the Trustee's view of the equities, but on the law set out by Congress in the statutory provisions of SIPA and the Bankruptcy Code. Those provisions require dismissal of the Trustee's legally deficient claims for the reasons demonstrated in the Defendants' moving brief, and for the supplemental reasons discussed below.

## ARGUMENT

## I. THE TRUSTEE CANNOT RELY ON THE DISCOVERY RULE TO REACH TRANSFERS THAT OCCURRED MORE THAN SIX YEARS FROM THE COMMENCEMENT OF THE ADVERSARY PROCEEDING.

The greatest excess of the Complaint is the Trustee's unprecedented attempt, in Count Nine, to set aside the six-year statutory limitations period that governs fraudulent transfer actions and attempt to recover decades-worth of alleged transfers based on nothing more than the conclusory claim that Madoff's Ponzi scheme "was not reasonably discoverable by at least one unsecured creditor of BLMIS."[2] (Compl. ¶ 120.) As demonstrated in the Defendants' moving brief, the Trustee's attempt to use the so-called "discovery rule" to circumvent the statutory limits imposed on his authority by New York law fails for two reasons.

First, it fails because the Complaint contains no facts that support the naked assertion that Madoff's fraud was "reasonably undiscoverable" by at least one BLMIS investor, thereby violating the pleading standards the Supreme Court announced in *Ashcroft v. Iqbal*. Second, the so-called "red flags" allegations in the Complaint, and in other complaints against

---

[2]     The Complaint purports to avoid transfers allegedly made as many as thirteen years prior to the Filing Date. (Compl. Ex. B.) The Trustee's "Supplement to Exhibit B," improperly submitted with his opposition to this motion, indicates that the Trustee may seek to avoid transfers going as far back as *twenty-five years or longer*.

2

BLMIS customers, preclude application of the discovery rule as a matter of law. For those reasons, the Trustee has no legal grounds to avoid transfers beyond six years.

### A. The Trustee Cannot Reach Decades-Old Transfers Based On The Bare Claim That A Creditor Exists That Could Not Have Discovered The Fraud.

Under the so-called discovery rule, the Trustee must prove, at a minimum, that there exists a creditor of BLMIS who (1) was a creditor of BLMIS as of the date of the transfer at issue, (2) has an allowable claim as of the Filing Date, and (3) was not on inquiry notice of Madoff's fraud more than two years prior to the Filing Date (*i.e.*, prior to December 11, 2006).[3] The Trustee cannot invoke the discovery rule and extend the statutory limitations period simply by announcing that such a creditor exists. Absent factual allegations that could support that bare claim – and none are alleged in the Complaint – the Trustee's effort to avoid transfers is limited to the six-year statutory period under New York law.

The Supreme Court made clear in *Ashcroft v. Iqbal* that a claim must be rejected unless the "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." – U.S. –, 129 S. Ct. 1937, 1950 (2009). That standard demands more than "unadorned . . . accusation." *Id.* at 1949. Thus, "the plaintiff cannot merely plead 'labels and conclusions' and provide a 'formulaic recitation of a cause of action's elements.'" *Great Am. Ins. Co. v. Bally Total Fitness Holding Corp. (In re Bally Total Fitness of Greater N.Y., Inc.)*, Adv. No. 09-01023, 2009 WL 1116587, at *2 (Bankr. S.D.N.Y. Mar. 27, 2009) (Lifland, J.) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), *aff'd*, 2009 WL 1684022 (S.D.N.Y. June 15, 2009). Rather, the plaintiff must plead facts "sufficient to raise a right to relief above the

---

[3] If the Defendants prevail on their argument that the limitations period for purposes of the Trustee's § 544(b) claim must be calculated as of the commencement of the Adversary Proceeding (*see* Section V *infra*), the Trustee also will have to prove that the creditor was not on inquiry notice of Madoff's fraud prior to May 12, 2007.

speculative level." *Peskin v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 413 B.R. 137, 143 (Bankr. S.D.N.Y. 2009) (Lifland, J.).

Whether an investor should be charged with inquiry notice of Madoff's fraud requires an investor-specific "examination of the totality of the facts and circumstances relating to that individual investor." (Tr. Mem. at 56.) Thus, before there can be any assessment of the plausibility of the Trustee's discovery rule claim, the investors upon whom the Trustee is relying in asserting the claim first must be identified. Put simply, the propriety of invoking the discovery rule cannot be determined in a vacuum; unless the investor is known, it is impossible to identify "the facts and circumstances relating to that individual investor," let alone examine the sufficiency of the claim.

The Trustee does not dispute the relevance of the investors' identities in determining the applicability of the discovery rule, nor does he offer any explanation as to how the requirements of *Iqbal* can be met without identification, by name or at least by category, of the investors on whose behalf he would be proceeding. Instead, the Trustee cites four pre-*Iqbal* decisions – none of which even concerns the discovery rule, and only one of which discusses pleading standards – that he claims permit him to invoke the discovery rule in this case even without identifying a single creditor or category of creditor who could not have discovered Madoff's fraud. (Tr. Mem. at 52-55 (citing *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514 (Bankr. S.D.N.Y. 1996); *Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761 (Bankr. S.D.N.Y. 2008); *Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558, 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006); *Young v. Paramount Commc'ns Inc. (In re Wingspread Corp.)*, 178 B.R. 938 (Bankr. S.D.N.Y. 1995).)

4

However, *Iqbal* instructs that merely alleging that "at least one unsecured creditor" exists (Compl. ¶ 120) is not sufficient to toll the statute of limitations; it is precisely the type of conclusory, "formulaic recitation" of the legal standard that the Supreme Court expressly proscribed. Rather, "[i]t is the plaintiff's burden to plead *facts* sufficient to toll the statute of limitations by means of the discovery rule." *Cumis Ins. Soc'y, Inc. v. Citibank, N.A.*, 921 F. Supp. 1100, 1111 (S.D.N.Y. 1996) (emphasis added) (dismissing claim under Pennsylvania's discovery rule); *Krygoski Constr. Co. v. Flanders Indus.*, No. 2:08-CV-202, 2009 WL 722611, *4 (W.D. Mich. Mar. 17, 2009) ("Where, as here, defendants have highlighted the apparent untimeliness of the complaint, plaintiffs may not simply rely on the bare assertion that they were unaware of the facts underlying their cause of action."); *OBG Technical Servs., Inc. v. Northrup Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 504 (D. Conn. 2007). Here, the Complaint contains no facts sufficient to raise a plausible inference that the statute of limitations should be tolled by means of the discovery rule.[4]

Moreover, because of the profound implications of applying the discovery rule in this case, even greater vigilance in enforcing the pleading requirements is necessary. Triggering the discovery rule based on a single bare claim would impose extraordinary burdens on the Defendants, on hundreds of other BLMIS investors who would be dragged into discovery, and on the Court. Unlike issues of standing, such as those at issue in the cases cited by the Trustee, the principal focus of discovery is not simply on the creditor's status as a creditor, but, rather, on

---

[4]    Indicative of the cavalier approach the Trustee has taken in this case, in his response the Trustee glibly identifies "the customers of BLMIS" as the category of creditors upon which his standing to assert the discovery rule purportedly is founded. (Tr. Mem. at 54.) Patently, "the customers of BLMIS" is not a legally sufficient category that identifies purported investors who could not have discovered Madoff's fraud. Indeed, "the customers of BLMIS" includes the Defendants in this case, as well as defendants in other adversary proceedings whom the Trustee expressly has alleged knew or should have known of Madoff's fraud. Thus, simply identifying "the customers of BLMIS" as a category supporting invocation of the discovery rule is not "sufficient to raise a right to relief above the speculative level." *In re Bernard L. Madoff Inv. Sec. LLC*, 413 B.R. at 143 (internal quotation marks and citation omitted).

5

what the identified BLMIS customers knew or should have known, as well as the reasonableness of any diligence they may have undertaken. Discovery, therefore, would target the customers' BLMIS investments, their diligence in monitoring their BLMIS investments, their other investments and related diligence, their communications with others relating to their BLMIS investments and their other investments, and, generally, everything that could relate to whether those customers reasonably could have discovered Madoff's fraud. The Court should not permit the Trustee to inflict such invasive and expansive discovery on hundreds or even thousands of BLMIS customers simply because the Trustee cannot identify any single customer on whose behalf he expects to be able to proceed.

In addition, application of the discovery rule in this case, as noted previously, would extend the period subject to discovery by *at least twenty-five years*. (*See* Def. Mem. 40-43.) Such an unjustified, unprecedented and unfair extension of the statute of limitations, by decades, would massively increase the volume of material to review and produce on both sides, resulting in staggering additional costs and delays.

Finally, beyond enlarging the temporal scope of discovery by decades, and multiplying its costs exponentially, application of the discovery rule also would dramatically increase its substantive scope. Most notably, as the Trustee reaches back farther in time to avoid transfers made in the early 1990s, 1980s or even in the 1970s, the duration of Madoff's Ponzi scheme becomes a paramount issue. Yet its length, at the present time, appears to be in dispute. (*Compare* Madoff Allocution Trans. at 25 (stating that scheme "began in the early 1990s") *with* DiPascali Allocution Trans. at 46 (stating that scheme began "[i]n the late '80s or early '90s")).[5]

---

[5] Although the Trustee and others have asserted that BLMIS has always been operated as a Ponzi scheme (*see, e.g.*, Compl. ¶ 24), there are no factual allegations in the Complaint – or anywhere – to support an inference that BLMIS was operated as a Ponzi scheme any earlier than the late 1980s. Given the absence of such allegations,

6

Consequently, significant additional effort, including the use of experts, would be required for the Trustee to prove when the Ponzi scheme began. *See Collins v. Prime Table Restaurant & Lounge, Inc. (In re Lake States Commodities, Inc.)*, 271 B.R. 575, 584 (Bankr. N.D. Ill. 2002) (trustee has burden of proving existence of Ponzi scheme to take advantage of Ponzi scheme presumptions regarding intent and insolvency), *aff'd sub nom. Fisher v. Page*, No. 02 C 1588, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002).

**B.** **The "Red Flags" Alleged By The Trustee Preclude Any Inference That An Investor Exists Who Could Not Have Discovered Madoff's Fraud.**

Beyond failing to identify the creditor(s) upon which his discovery rule claim is based, the Trustee also has failed to allege any facts to support an inference that Madoff's fraud was "undiscoverable," as he must to establish a plausible basis for avoiding transfers beyond six years. At most, the Trustee has alleged that Madoff's fraud simply was undiscovered, but that is an insufficient trigger for application of the discovery rule, which turns not on when the fraud was discovered but on when it reasonably could have been discovered. *See Stride Rite Children's Group, Inc. v. Siegel*, 703 N.Y.S.2d 642, 643 (4th Dep't 2000) ("The two year period [for discovery] does not commence from the date that plaintiff has positive knowledge of the fraud, but from the date that plaintiff becomes aware of enough operative facts so that, with reasonable diligence, [plaintiff] could have discovered the fraud.") (internal quotation marks and citation omitted)); *see also* N.Y. C.P.L.R. §§ 203(g), 213(8).

There is no basis alleged in the Complaint for plausibly concluding that Madoff's fraud was not reasonably discoverable more than two years before the commencement of this liquidation proceeding or this adversary proceeding. To the contrary, the Complaint itself, and at

---

the Trustee's attempt to avoid transfers dating from the *early* 1980s, as reflected in the Trustee's improperly submitted Supplement to Exhibit B, is facially invalid.

7

least a dozen avoidance pleadings the Trustee already has filed, assert that "the customers of BLMIS" each "knew or should have known" of Madoff's fraud based on a variety of so-called "red flags" that, according to the Trustee, long ago purportedly put "the customers of BLMIS" on inquiry notice of the fraud. (*See, e.g.*, Compl. ¶ 64.) Those alleged "indicia of irregularity and fraud" that the Trustee alleges were apparent "from the general manner in which BLMIS operated" (*see id.*), include the following:

- BLMIS reported returns that were too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and amount (*see, e.g.*, (Compl. ¶ 64(c); Compl. at 13-14, *Picard v. Primeo Fund et al.*, Adv. Pro. No. 09-1366 (BRL) (Bankr. S.D.N.Y. July 15, 2009) ("Primeo Compl."));

- Madoff consistently hit stock highs and lows in any given month and he frequently went to cash at quarter-end and before any significant downturns in the market (*see, e.g.*, Compl. at 15, *Picard v. Harley Int'l (Cayman) Ltd*, Adv. Pro. No. 09-1187 (BRL) (Bankr. S.D.N.Y. May 12, 2009) ("Harley Compl."));

- BLMIS was audited by an accounting firm with three employees (*see, e.g.*, Compl. ¶ 64(d); Compl. at 18, *Picard v. Merkin et al.*, Adv. Pro. No. 09-1182 (BRL) (Bankr. S.D.N.Y. May 6, 2009) ("Merkin Compl."));

- BLMIS did not provide its customers with electronic real-time online access to their accounts (*see, e.g.*, Harley Compl. at 12);

- BLMIS also utilized outmoded technology, including paper trading confirmations, despite Madoff's history of being in the forefront of computer-based trading (*see, e.g.*, Compl. at 14, *Picard v. Thybo Asset Management Ltd. et al.*, Adv. Pro. No. 09-1365 (BRL) (Bankr. S.D.N.Y. Aug. 25, 2009) ("Thybo Compl."));

- Despite its size, BLMIS was substantially a family-run operation, employing many of Madoff's relatives and virtually no outside professionals (*see, e.g.*, Compl. at 16, *Picard v. Herald Fund SPC et al.*, Adv. Pro. No. 09-1359 (BRL) (Bankr. S.D.N.Y. July 14, 2009) ("Herald Compl."));

- Financial industry press reports, including a May 27, 2001 article in *Barron's* and a May, 2001 article in *MAR/Hedge*, allegedly raised serious questions about the legitimacy of BLMIS (*see, e.g.*, Compl. ¶ 64(a); Compl. at 13-14, *Picard v. Alpha Prime Fund Ltd. et al.*, Adv. Pro. No. 09-1364 (BRL) (Bankr. S.D.N.Y. July 15, 2009) ("Alpha Compl."));

- BLMIS functioned as both investment manager and custodian of securities (*see, e.g.*, Compl. ¶ 64(b); Compl. at 19, *Picard v. Fairfield Sentry Ltd. et al.*, Adv. Pro. No. 09-1239 (BRL) (Bankr. S.D.N.Y. May 18, 2009) ("Fairfield Compl."));

- Many banks, industry advisors and insiders who made an effort to conduct reasonable due diligence refused to deal with BLMIS and Madoff (*see, e.g.*, Compl. ¶ 64(f); Compl. at 38, *Picard v. Chais et al.*, Adv. Pro. No. 09-1172 (BRL) (Bankr. S.D.N.Y. May 1, 2009));

- The compensation system utilized by BLMIS was atypical in that BLMIS, the entity purportedly employing the hugely-successful and secret proprietary trading system, was compensated only for the trades that it executed (*see, e.g.*, Compl. at 51, *Picard v. Cohmad Sec. Corp. et al*, Adv. Pro. No. 09-1305 (BRL) (Bankr. S.D.N.Y. Jun. 22, 2009));

- At times, the customer's monthly account statements reflected trades purchased or sold on behalf of the customer's account in certain securities that were allegedly executed at prices outside the daily price range of prices for such securities traded in the market on the days in question (*see, e.g.*, Herald Compl. at 14);

- The volume of options Madoff would have traded if he in fact had utilized the split-strike conversion strategy was not available on the CBOE (*see, e.g.,* Fairfield Compl. at 17-18);

- BLMIS had purportedly told its investors that it purchased these options in the over-the-counter ("OTC") market. Trading options in the OTC market would have likely been more expensive than trading over the CBOE, yet those costs did not appear to be passed on to BLMIS' investors (*see, e.g.*, Alpha Compl. at 16);

- The type of options BLMIS purported to purchase and sell was counter-intuitive (*see, e.g.*, Merkin Compl. at 17);

- BLMIS purported to convert all of its holdings to cash immediately before each quarterly report, a strategy that had no practical benefit but which had the effect of shielding BLMIS' purported trading activities from scrutiny (*see, e.g.*, Thybo Compl. at 18,);

- Madoff avoided questions about his investment advisory business operations, was consistently vague in responding to any such questions, and operated with no transparency (*see, e.g.*, Primeo Compl. at 13).

Those alleged "red flags," if they existed for any of the Defendants, would have existed for all of "the customers of BLMIS." Thus, the Trustee's own claims eliminate any possibility of invoking the discovery rule on the basis that any one creditor of BLMIS could not have discovered Madoff's fraud.

In order to avoid the inherent contradiction between his general "red flags" allegations and his discovery rule claim, the Trustee argues that Mr. Picower, as a "sophisticated investor," was better able to recognize and investigate the warning signs of fraud and, therefore, should be held to a higher standard than other customers of BLMIS. (Tr. Mem. at 57-59.) Even if Mr. Picower were held to a higher standard of knowledge, it would not change the fact that, as pleaded in the Complaint and in other complaints, all of the other BLMIS investors allegedly were on sufficient inquiry notice of the fraud to trigger the running of the statute of limitations long before this liquidation proceeding was commenced. In other words, Mr. Picower's purported sophistication only relates to the degree of his alleged knowledge. It does nothing to refute the inference of knowledge on the part of the rest of BLMIS' investors that necessarily flows from the Trustee's allegations of so-called "red flags" that purportedly were apparent "from the general manner in which BLMIS operated."

The Trustee's "sophistication" argument is misplaced in any event. The recent report issued by the Office of Inspector General of the SEC (the "OIG Report")[6] confirms that sophistication is no guarantee of knowledge of a Ponzi scheme. Indeed, the OIG Report demonstrates that even the most sophisticated lawyers and investigators at the SEC repeatedly failed to uncover any fraud at BLMIS, despite six different examinations or investigations over a 14-year period. The OIG Report further demonstrates the awareness of an extraordinary amount of information known by multiple SEC divisions and offices – none of which was known by Mr. Picower or the Defendants – that effectively revealed the entire scheme. For example:

- The SEC received three detailed submissions from Henry Markopolos alleging that Madoff was running a massive fraud. One of the submissions identified 30 "red flags" that indicated that Madoff was likely operating a Ponzi scheme. OIG Report at 238.

---

[6]    The OIG Report is available at http://www.sec.gov/news/studies/2009/oig-509.pdf.

10

- The SEC received a detailed complaint from a respected hedge fund manager that raised many of the concerns about Madoff's trading that were raised by Mr. Markopolos and that which, in the SEC's own view, raised issues that were "indicia of a Ponzi scheme." *Id.* at 79-80.

- The SEC obtained internal e-mails from another hedge fund that was indirectly invested with BLMIS. The e-mails strongly suggested that Madoff was not conducting the options transactions that were an integral part of Madoff's strategy. *Id.* at 149.

- During the course of one examination, the SEC requested BLMIS trading data from Barclays to verify some entries regarding transactions with Barclays that were referenced in Madoff's books. Barclays responded that *there was no trading activity* in the account. *Id.* at 189.

- During a 2006 investigation, the SEC asked the NASD for trading records for a particular day for which Madoff's records reflected options trading activity. The NASD reported that Madoff's accounts showed *no options trading* on that day. *Id.* at 307-308.

- During a 2006 investigation, Madoff testified that all of the trades for his investment advisory clients were cleared in segregated accounts at DTC. Yet, when the SEC investigator contacted DTC, she was told *there were no such segregated accounts. Id.* at 312.

In part, the SEC based its stunning failure to identify fraud that was directly and repeatedly brought to its attention on Madoff's reputation, and the fact that he did not "fit the profile of a Ponzi schemer." *Id.* at 261. The SEC's explanation, though insufficient, is entirely believable. It underscores why simply alleging that the fraud could not have been discovered does not "raise a right to relief above the speculative level" that the discovery rule can be invoked to set aside the six-year statute of limitations in this case. *Twombly*, 550 U.S. at 555.

## II.     THE COURT SHOULD DISMISS THE COMPLAINT'S CONCLUSORY AND GRATUITOUS ALLEGATIONS OF FRAUD.

The Complaint is filled with sensational but false accusations that Mr. Picower was a participant in Madoff's Ponzi scheme. Unable to support those baseless accusations, the Trustee now has belatedly clarified that "[t]he fraud at issue in this case is the fraud committed by Bernard Madoff and BLMIS." (Tr. Mem. at 11-12.) Likewise, the Trustee has been forced to

acknowledge that he "has not brought a claim seeking damages from [Mr.] Picower as a co-conspirator of BLMIS." (*Id.* at 16.)

Instead, the Trustee falls back on the empty assertion that Mr. Picower "knew or should have known" of Madoff's Ponzi scheme. (*Id.*) Such a conclusory claim falls far short of the particularized pleading required for fraud allegations under Rule 9(b), applicable to this case through Fed. R. Bankr. 7009. (Def. Mem. at 13-17.) Perhaps for this reason, the Trustee repeats certain false foundational "facts" in his opposition, and asserts additional false "facts" for the first time.[7] (*See, e.g.,* Tr. Mem. at 4.) As demonstrated previously, even if true – which they are not – the Trustee's foundational factual allegations cannot sustain any fraud claims against Mr. Picower or the other Defendants, as they do not support any plausible inference of fraud.

It is easy, with hindsight, to speculate as the Trustee does about what people knew over the course of their dealings with Madoff. Speculation, however, cannot sustain fraud claims under Rule 9(b) and Bankruptcy Rule 7009. *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989). Even industry experts, such as the highly sophisticated money managers who conducted repeated due diligence on BLMIS, and trained SEC regulators who had repeated access to BLMIS' books and records, failed to figure out that BLMIS never conducted trading for investors such as the Defendants. *See* OIG Report at 388 (acknowledging "inherent bias towards the sort of people who are seen as reputable members of society"). The suggestion that Mr. Picower knew that BLMIS was engaged in the fraud of the century, yet kept his wife's, his

---

[7] For example, the Trustee continues to assert that the Defendants experienced "implausible rates of return" in their BLMIS accounts (Tr. Mem. at 9-10), even though the Defendants demonstrated in their moving brief that the rates of return alleged in Complaint are false (Def. Mem. at 14). Also, in an effort to refute the fact that the Defendants were freely able to withdraw funds from their BLMIS accounts, the Trustee asserts for the first time in his response, without alleging any supporting facts, that "as early as 2003 . . . BLMIS could not pay Picower the quarterly sums that he was demanding." (Tr. Mem. at 4.) The Trustee's unsupported claim is contradicted by records in the Trustee's possession, which make clear that at no time did BLMIS ever fail to satisfy the Defendants' withdrawal requests.

daughter's, his foundation's and his own money invested through BLMIS, belies reason and common sense, and is unsupported by the facts. Such speculation cannot sustain the fraud claims in the Complaint.

## III.   THE TRUSTEE HAS FAILED TO ALLEGE AN ALTER EGO CLAIM OR ANY OTHER BASIS UPON WHICH TO RECOVER FROM MR. PICOWER ALLEGED FRAUDULENT TRANSFERS HE DID NOT RECEIVE.

As with the Trustee's fraud claims against Mr. Picower, the Trustee's attempt to hold Mr. Picower personally liable for every transfer made to every Defendant under an alter ego theory falls far short of pleading a legally cognizable claim. The Court should not hesitate to dismiss the alter ego claim where, as here, there is a "lack of sufficient evidence to place the alter ego issue in dispute." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995); *see also Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46 (Bankr. S.D.N.Y. 2004) (dismissing veil piercing claim on motion to dismiss); *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521 (D. Del. 2008) (same); *Wallace v. Wood*, 752 A.2d 1175 (Del. Ch. 1999) (same).

As the Defendants have demonstrated, the Trustee has not pleaded a legally sustainable alter ego claim against Mr. Picower for three independent reasons. First, the Trustee has alleged merely that Mr. Picower and his staff managed the Defendants' investments, yet common management does not justify veil piercing as a matter of law. Second, the Trustee has pleaded no facts to suggest that the Defendants were mere instrumentalities of Mr. Picower or were formed or operated for anything but legitimate purposes. Third, the Trustee has pleaded no facts that connect any purported fraud or injustice with any alleged abuse of the corporate form, which is required for a finding of alter ego liability. Under the well-settled law of Delaware – which concededly governs (Tr. Mem. at 28) – the Trustee has not stated a claim for veil piercing, nor has he established any other basis for holding Mr. Picower individually liable for the Defendants' purported transfers.

13

## A. The Trustee Has Failed To Allege Sufficient Facts To Impose Alter Ego Liability Upon Mr. Picower.

For good reason, "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace*, 752 A.2d at 1183 (internal quotation marks and citation omitted). To make that task easier, the Trustee contends that the legal standard for veil piercing "cannot be reduced to a single formula," and that there is "no talismanic set of factors for determining when it is appropriate to pierce the corporate veil." (Tr. Mem. at 30-31.)

In fact, Delaware authorities provide clear requirements for pleading an alter ego claim, which the Trustee has not satisfied. For instance, the plaintiff must allege "(1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino*, 583 F. Supp. 2d at 528. More specifically, a plaintiff must come forward with more than "mere allegations of dominance and control," and must allege facts supporting an inference that "[t]he extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own." *In re Ticketplanet.com*, 313 B.R. at 70 (citation omitted). Moreover, a plaintiff "must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003). Finally, in order to raise an inference of "injustice or unfairness," the plaintiff must allege, among other things, facts raising a plausible inference that the purported fraud or injustice arises from the use of the corporate form. *Wallace*, 752 A.2d at 1184. The Complaint does not contain any of those requisite allegations.

### 1. Merely Alleging That Mr. Picower Managed The Entities' Investments Is Insufficient To Warrant Veil Piercing.

The essence of an alter ego claim is that the individual exercised dominance and control over the entity whose veil is sought to be pierced, for an improper purpose. Such

14

dominance and control does not exist simply as a result of the fact that the individual operated and ran the business of the entity. *See, e.g.*, *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 322 B.R. 509, 520-22 (Bankr. S.D.N.Y. 2005) (applying Delaware law); *In re Ticketplanet.com*, 313 B.R. at 70; *see also Scarborough v. Perez*, 870 F.2d 1079, 1084 (6th Cir. 1989) ("[O]wner-operators of closely held corporations do not subject themselves to personal liability for the corporations' obligations merely by participating actively in the running of the business."). As the court in *In re Adelphia* explained, "merely showing that an individual officer or director was charged with the managerial responsibility with respect to operation of the business . . . will not be sufficient to pierce the corporate veil." 322 B.R. at 522 (internal quotation marks and citation omitted) (applying Delaware law).

It is clear that the Complaint, even as re-framed by the Trustee in his opposition brief, alleges no more than that Mr. Picower exercised operational control and investment management over the Defendants. The only facts it alleges in support of veil piercing are that Mr. Picower was a general partner or director of certain of the Defendants (*see* Compl ¶¶ 34, 38-49); that he was a Trustee of the Picower Foundation (*id.* at ¶ 34); that he (or his associate), in connection with the Defendants' BLMIS investments, directed purchases and sales of securities, withdrawals and deposits, and executed relevant account agreements (*id.* ¶ 60); and that Mr. Picower maintained a coordinated system to monitor the Defendants' investments (*id.* at ¶ 61).

At best, those allegations reflect operational control sufficient to support a claim that Mr. Picower was operating investment businesses. Such a claim offers insufficient grounds to pierce the corporate veil.

**2.      The Alter Ego Claim Must Be Dismissed Because It Does Not Plead That Mr. Picower Dominated The Entities To Such A Degree That Their Corporate Forms Were Mere Shams.**

As the Defendants established in their moving brief, the level of dominance and control that is required to warrant piercing the corporate veil is control that "preclude[s] the controlled entity from having legal or independent significance of its own." *In re Ticketplanet.com*, 313 B.R. at 70 (citation omitted); *see NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008) ("[T]he inquiry initially focuses on whether 'those in control of a corporation' did not 'treat[ ] the corporation as a distinct entity.'" (citation omitted) (alteration in original)). In other words, the requisite domination and control must be to such an extent that the corporate form is essentially a sham or façade. *See In re Ticketplanet.com*, 313 B.R. at 70 ("To survive a motion to dismiss, a plaintiff must allege facts . . . that the corporation [is] a sham and exist[s] for no other purpose than as a vehicle for fraud." (internal quotation marks and citations omitted)); *Crosse*, 836 A.2d at 497 ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." (citation omitted)).

Here, the Complaint fails to allege facts that could support an inference that any Defendant was a mere sham, without separate identity. It does not allege an absence of corporate formalities, siphoning of funds, or other such factors that could lead to the conclusion that Mr. Picower used the Defendants as mere instrumentalities to further his own personal interests. *See Trevino*, 483 F. Supp. 2d at 528-29; *see also NetJets*, 537 F.3d at 177. It does not allege that the Defendants were created and used for illegitimate purposes, nor could it; it is undisputed that the Picower Foundation, for instance, distributed more than $160 million in charitable grants in the six years prior to Madoff's arrest, amounts almost identical, according to Exhibit B of the Complaint, to the amounts the Foundation withdrew from BLMIS during that period, and that

Decisions made substantial investments outside of BLMIS. (Def. Mem. at 20, 22.) Indeed, the facts alleged in the Complaint support the conclusion that the Defendants were vehicles through which Mr. Picower transacted business, not shams. (*See* Compl. ¶¶ 38-49.)

To salvage his defective veil piercing claim, the Trustee tries to compare the conclusory alter ego allegations in the Complaint to the evidence adduced after discovery in *NetJets*, in which the Second Circuit reversed an award of summary judgment that had dismissed a veil piercing claim where a shareholder "completely dominated [the corporation] and . . . essentially treated [its] bank account as one of his pockets." 537 F.3d at 182. The comparison to *NetJets* only highlights the insufficiency of the Trustee's alter ego claim against Mr. Picower.

For example, there was evidence in *NetJets* that the shareholder repeatedly siphoned funds, used the entities as vehicles for solely personal investments, and advanced personal money to the entities for business expenses. *See NetJets*, 537 F.3d at 179-182. There was evidence that the shareholder bought a Bentley for \$350,210.95 during the same year his corporate entity was unable to pay \$340,810.39 due a creditor. *Id.* at 184.

Here, in sharp contrast, the Trustee has not alleged a single instance in which Mr. Picower ever used the other Defendants as his "incorporated pocketbook," *see Official Comm. of Unsecured Creditors of Verestar Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 465 (Bankr. S.D.N.Y. 2006) (key to finding alter ego liability is that controlling owners operated corporation as "incorporated pocketbook"); *In re Ticketplanet.com*, 313 B.R. at 70; siphoned corporate assets; or used corporate assets to pay his personal expenses. Nor does the Trustee allege that Mr. Picower operated the Defendants in a manner such that they were undercapitalized while conducting business. Absent allegations of this type, which predominated in *NetJets*, the Trustee has not provided any allegations to support an inference

17

that the Defendants were shams, shells, façades, or in any way lacking separate corporate identities.

The Trustee's clumsy comparison of the *NetJets* shareholder's "heavy margin and debt positions" to Mr. Picower's alleged margin use also provides no basis for piercing the corporate veil. (*See* Tr. Mem. at 33.) The Trustee's argument ignores that it was not the use of margin, a common investment tool, that constituted abuse of the corporate form in *NetJets;* it was the fact that the shareholder was taking funds from his business account to satisfy margin calls in his *personal* accounts. 537 F.3d. at 181. No such abuse is or can be alleged against Mr. Picower.

Similarly misplaced is the Trustee's comparison of the "cash management and withdrawal systems" in *NetJets* to allegations that Mr. Picower "personally managed and supervised" withdrawals for the benefit of all of the Defendants. (Tr. Mem. at 33.) In *NetJets,* the critical factor was that the individual was withdrawing the funds for his own *personal* benefit – not that the individual exercised managerial control by "personally manag[ing] and supervis[ing] such withdrawals," as is alleged here. So, too, the Trustee's comparison of "collective accounting methods and lack of arm's length dealing" in *NetJets* to Mr. Picower's purported "opening of accounts for and manage[ment] of the investments of Defendants" likewise fails. (*See* Tr. Mem. at 33.) As discussed above and in Defendants' moving brief, investment control alone is insufficient to warrant veil piercing.[8] *See, e.g., Scarborough,* 870 F.2d at 1084; *In re Adelphia Commc'ns Corp.*, 322 B.R. at 522; *In re Ticketplanet.com*, 313 B.R. 46 at 70.

---

[8] The Trustee also comes up with an illusory analogy to compare the "severe undercapitalization" in *William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991), to "[Mr.] Picower's purported borrowings from BLMIS on behalf of defendants." (Tr. Mem. at 33.) The Trustee's leap from debt load to "severe undercapitalization" ignores that the Defendants' account statements reflected millions or even billions of dollars of securities in each Defendant's account.

18

Nor do shared office space, shared mailing addresses, and a centralized portfolio appraisal system improperly "fuse the corporations," *United States v. Bestfoods*, 524 U.S. 51, 69 (1998), where, as here, corporate formalities are maintained. *See Brown v. General Elec. Capital Corp. (In re Foxmeyer Corp.)*, 290 B.R. 229, 243-45 (Bankr. D. Del. 2003) (shared office space, addresses and telephone numbers insufficient to establish single economic unit where corporate formalities are maintained); *In re Ticketplanet.com* 313 B.R. at 71 ("An overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible."); *Fletcher*, 68 F.3d at 1459 ("cash management system is consistent with sound business practice and does not show undue domination or control" (citation omitted)).

In the end, all that is left of the Trustee's so-called "alter ego indicia" are a handful of immaterial allegations of common management which do not provide any basis for veil piercing as a matter of law.

### 3. The Alter Ego Claim Must Be Dismissed Because The "Overall Element Of Injustice Or Unfairness" Prong Is Not Satisfied.

Even if the Trustee had satisfied the first prong of the alter ego analysis, the Complaint cannot satisfy the second prong – the "overall element of injustice or unfairness" prong. In order to allege an "overall element of injustice or unfairness," the Trustee must allege that there was "fraud *or something like it.*" *In re Foxmeyer Corp.*, 290 B.R. at 236 (citations omitted). Here, only two fraud or fraud-like allegations are made in the Complaint: (1) Madoff's fraud, and (2) purported trading irregularities in certain of the Defendants' accounts. Neither is the type of alleged fraud or wrongdoing that warrants veil piercing.

First, neither Madoff's fraud nor the Defendants' purported trading practices flows from or has any relationship to an abuse of the corporate form. *See, e.g., Bestfoods,* 524 U.S. at 52 ("[T]he corporate veil may be pierced . . . when, *inter alia*, the corporate form would

19

otherwise be misused to accomplish certain wrongful purposes . . . ."). Second, neither Madoff's fraud nor the Defendants' alleged trading practices are in need of being "remedied" at this time, which similarly is required to pierce the corporate veil. *See, e.g., In re Foxmeyer Corp.*, 290 B.R. at 236-237 ("[T]hat fraud or similar injustice . . . will not constitute that which is required to pierce a corporate veil, if such fraud or injustice has already been remedied."); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 267 (D. Del. 1989) (dismissing an alter ego claim on summary judgment where there was no "use of the corporate form [that] would, if left unchecked, work as a fraud or something in the nature of a fraud.").

Finally, the fraud at issue in this case – which, by the Trustee's own acknowledgement, "is the fraud committed by Bernard Madoff and BLMIS" (Tr. Mem. at 11-12) – cannot "supply the necessary fraud or injustice" sought to be remedied through veil piercing. *See, e.g., Mobil Oil,* 718 F. Supp. at 268 ("The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping."). Absent any allegation of "injustice or unfairness" related to Mr. Picower's use of the corporate form – and the Complaint contains no such allegation – the Trustee's veil piercing claim must be dismissed.

### B. There Is No Basis To Recover From Mr. Picower On An Agency Or Tort Theory Transfers Mr. Picower Did Not Receive.

In his response, the Trustee strains to establish personal liability on the part of Mr. Picower based on agency and general tort theories, perhaps recognizing the futility of his veil piercing claim. Although those claims are not pleaded in the Complaint, even if they had been asserted, they would not entitle the Trustee to the relief he seeks.

For example, the Trustee argues that, under principles of agency law, Mr. Picower's acts and knowledge are imputed to the other Defendants, and therefore the Defendants

20

cannot "retain the fruits" of Mr. Picower's conduct. (Tr. Mem. at 34.) However, the Trustee's argument relates to whether the other Defendants themselves can be held responsible for transfers they received, which is irrelevant to whether the Trustee can recover from Mr. Picower personally for those transfers. In order to hold Mr. Picower liable for transfers to other Defendants, the Trustee must have alleged that Mr. Picower was the principal – not the agent. Since the Trustee has alleged the opposite, he has no agency claim against Mr. Picower. *See Trevino,* 483 F. Supp. 2d at 531.

   In addition, the Trustee argues that Mr. Picower is personally liable for transfers made to the other Defendants because of "his own participation in fraudulent or tortious conduct." (Tr. Mem. at 34.) However, the tortious conduct at issue here is the receipt of fraudulent transfers, which is not a tort where liability is assessed. Rather, "[t]he creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance, and requiring that it be restored to the debtor's possession." *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 736 (S.D.N.Y. 1993) (internal quotation marks and citations omitted). As such, the Trustee can only recover from the transferee or beneficiary; there is no recovery from a third party to the transfer. *See* 11 U.S.C. § 550; *see also Geren*, 832 F. Supp. at 737 ("[The action for fraudulent conveyance does not create an independent remedy of money damages against third parties who aided the debtor's transfer at all."); *FDIC v. Porco*, 75 N.Y.2d 840, 842 (1990) ("[T]he traditional rule in this State rejects any cause of action for mere participation in the transfer of a debtor's property prior to the creditor's obtaining judgment or a lien on that property.").

   The Trustee has not cited any authority to support holding a non-transferee liable for fraudulent transfers under general tort principles, because doing so is plainly contrary to well-

settled law. Accordingly, the Trustee's belated efforts to hold Mr. Picower responsible for the other Defendants' purported transfers on a tort theory must be rejected.

## IV.    THE TRUSTEE CANNOT ASSERT AVOIDANCE CLAIMS IN HIS RESPONSE FOR TRANSFERS NOT IDENTIFIED IN THE COMPLAINT.

As set forth in the Defendants' moving brief, the Trustee improperly asserted fraudulent transfer claims against four Defendants not alleged in the Complaint to have received any transfers from BLMIS – Defendants Favorite Fund, JFM Investment, JMP LP, and Picower P.C. (collectively, the "Non-Transferee Defendants"). (*See* Def. Mem. at 23-24.) Acknowledging that deficiency, the Trustee appended to his response a "Supplement" to Exhibit B to the Complaint, purporting to provide the "particulars" of transfers to the Non-Transferee Defendants made between 1983 and 1995. (Tr. Mem. at 36.) Similarly, without providing any particulars, the Trustee announced in his response that he is now seeking to avoid an additional $2 billion in alleged transfers to the Defendants. (*See* Tr. Mem. at 1, 20.)

The Trustee cannot use his response to add facts or identify additional transfers. The law is well settled that "[i]n determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to the facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Those facts cannot be amended or supplemented through an opposition memorandum. *See, e.g.*, *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 851 n.16 (S.D.N.Y. 2000); *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).

Nor may new claims be asserted through an opposition memorandum. *See, e.g.*, *Lerner v. Forster*, 240 F. Supp. 2d 233, 241 (E.D.N.Y. 2003) ("New claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss.").

The sufficiency of the claims asserted against the Non-Transferee Defendants, and the scope of the claims asserted against all of the Defendants, must stand or fall on the allegations in the Complaint. The Trustee's newly-added transfers – all of which are time-barred – "are not properly before the court on a motion to dismiss."[9] *Goplen v. 51Job, Inc.*, 453 F. Supp. 2d 759, 774 (S.D.N.Y. 2006) (citation omitted); *Aniero Concrete Co., Inc. v. N. Y. City Constr. Auth.*, No. 94 Civ. 3506, 2000 WL 863208, at \*31 (S.D.N.Y. June 27, 2000).

For the foregoing reasons, the Complaint should be dismissed in its entirety, with prejudice, against the Non-Transferee Defendants, and the Trustee's claims with respect to the remaining Defendants should be limited to those transfers listed in Exhibit B to the Complaint. Moreover, the Trustee should not be granted leave to amend the Complaint to add the newly-alleged transfers, as any claim related to those transfers would be time-barred because all the transfers occurred more than six years ago. *See Official Comm. of Unsecured Creditors of 360Networks (USA) Inc. v. Pirelli Commc'ns Cables & Sys. USA LLC (In re 360Networks (USA) Inc.)*, 367 B.R. 428, 432-35 (Bankr. S.D.N.Y. 2007) (denying leave to amend to add additional transfers for fraudulent transfer claim where claim was time barred); *see also Willey v. J.P. Morgan Chase, N.A.*, No. 09 Civ. 1397, 2009 WL 1938987, at \*4-\*7 (S.D.N.Y. July 7, 2009) (dismissing Fair Credit Reporting Act claim with prejudice where amendment would be futile because claim was time barred).

---

[9]  In another instance of overreaching, the Trustee asserts that he has free license to add transfers to the Complaint because the Complaint indicates that the list of transfers the Trustee identified was not exhaustive. (Tr. Mem. at 36.) That argument is a non-starter. Because each of the newly asserted transfers are more than six years old, the only count in the Complaint that possibly could cover them is Count Nine for "Undiscovered Fraudulent Transfers" under New York's Debtor and Creditor Law (the "DCL"). However, that claim is based on an actual intent fraudulent transfer theory (*see* Compl. ¶¶ 119-23), which requires a particularized identification of the transfers at issue, *see Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 734 (Bankr. S.D.N.Y. 2008) (citations omitted); *see also Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 31 (Bankr. E.D.N.Y. 2007). The Trustee's open-ended "non-exhaustive list" is the antithesis of particularity and is insufficient to plead a cause of action under an actual intent fraudulent transfer theory.

23

## V.     FOR CLAIMS UNDER § 544(b), THE STATE LIMITATIONS PERIOD APPLIES UNTIL THE ADVERSARY PROCEEDING COMMENCES.

In Counts Five through Eight of the Complaint, the Trustee asserts a series of claims under the DCL, pursuant to Bankruptcy § 544(b), intended to reach transfers purportedly made to the Defendants within six years of the Filing Date of the SIPA liquidation. However, as demonstrated in the Defendants' opening memorandum, the relevant period for the Trustee's § 544(b) claims is the commencement of the adversary proceeding – not the Filing Date – because § 544(b) only permits avoidance of transfers "voidable under applicable law" and, under New York law, transfers are only voidable if they occurred less than six years before the commencement of the avoidance action. (Def. Mem. at 28-29.) Since this adversary proceeding was commenced on May 12, 2009, the only transfers that are voidable under the DCL and § 544(b) are transfers that were made after May 12, 2003. The Trustee's arguments in support of using the Filing Date for calculating the relevant six-year period are contrary to New York law and the Bankruptcy Code, and must be rejected.

### A.     There Is No Statutory Basis For The Trustee's Erroneous Contention That State Law Limitations Periods Cease To Have Effect As Of The Filing Date.

The central, though misguided, premise of the Trustee's reliance on the Filing Date for calculating the relevant six-year period is that, because § 544(b) is a federal cause of action, the only limitations period relevant to his claims is the federal limitations period in Bankruptcy Code § 546(a). (Tr. Mem. at 40.) Under the Trustee's theory, New York's limitations period is operative only up *until* the Filing Date, after which it becomes irrelevant because § 546(a) then prescribes the applicable limitations period within which the Trustee must assert his claim. (*See id.*) The Trustee, like the "twenty-five years of case law" misanalyzing the issue that he relies upon, is only focused on the timeliness of the avoidance action; he ignores the substantive question of the voidability of the transfers at issue under state law.

Since § 544(b) does not contain any original substantive provisions, it is dependent upon the "applicable law" at issue to establish when a transfer is voidable. *See Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 171 (Bankr. S.D.N.Y. 1998) (Lifland, J.). Where state law provides the basis for a Section 544(b) claim, the "applicable law" necessarily includes the state statute of limitations, *see, e.g., Dzikowski v. Friedlander (In re Friedlander Capital Mgmt.)*, Adv. No. 05-03088-PGH, 2009 WL 1231085, at *3 n.1 (Bankr. S.D. Fla. Apr. 29, 2009); *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D. Ill. 1998); *Mahoney, Trocki & Assocs., Inc. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.)*, 111 B.R. 914, 917 (Bankr. S.D. Cal. 1990); *Old Orchard Bank & Trust Co. v. Josefik (In re Josefik)*, 72 B.R. 393, 397 n.4 (Bankr. N.D. Ill. 1987); *Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.)*, 32 B.R. 199, 201-02 (Bankr. S.D.N.Y. 1983). Thus, as even the Trustee's authorities recognize, if the state limitations period has run prior to the Filing Date, the Trustee would not have a viable claim to assert because there would be no voidable transfer.[10] *See, e.g., In re Josefik*, 72 B.R. at 397 n.4 ("Section 544(b) of the Bankruptcy Code incorporates by reference the forum state's law of fraudulent conveyances . . . Since the bankruptcy court is applying the forum state's substantive law of fraudulent conveyance in actions brought under Section 544(b), the bankruptcy court is required to apply the forum state's statute of limitations governing

---

[10] The Trustee mistakenly argues that the state limitations period is not related to the voidability of a transfer because it is procedural and can be waived. (Tr. Mem. at 41 n.13.) However, the procedural nature of statutes of limitation does not alter the fact that, if the limitations period expires before a claim is brought, and there is no waiver, the claim is lost. *Kulzer v. Pittsburgh-Corning Corp.*, 942 F.2d 122, 125 (2d Cir. 1991). If the statute of limitations does not bear on voidability, it would not even have a pre-petition effect on a trustee's ability to assert a claim under § 544(b), and a trustee could bring suit on even the stalest of fraudulent transfer claims as long as the claim were asserted within the time period provided under § 546(a). The law holds otherwise. *See, e.g., Fink v. Graven Auction Co. (In re Graven)*, 64 F.3d 453, 456 n.5 (8th Cir. 1995) (noting that "the statute of limitations from the state or applicable non-bankruptcy law applies" to a claim under Section 544); *In re Friedlander Capital Mgmt.*, 2009 WL 1231085, at *3 n.1 ("The applicable state law limitations period applies to actions brought under section 544(b)" (citation omitted)); *In re Spatz*, 222 B.R. at 164 ("[S]ection 544(b) specifically contemplates that the action will be brought pursuant to state law. The relevant state law . . . has its own limitations provision.").

25

fraudulent conveyances."); *Crews v. Carwile (In re Davis)*, 138 B.R. 106, 108 (Bankr. M.D. Fla. 1992) (same).

The Trustee has not provided any statutory basis for eliminating the state limitations period for voidability purposes as of the Filing Date, nor does the case law the Trustee relies upon provide any such basis. In fact, cases the Trustee cites concede that neither § 544(b) nor § 546(a) contains language supporting his interpretation. *See Sears Petroleum & Transp. Corp. v. Burgess Constr. Servs., Inc.*, 417 F. Supp. 2d 212, 225 (D. Mass. 2006) ("Section 546 does not explicitly state that the operative date is the filing of the bankruptcy proceeding."); *Orr v. Bernstein (In re Bernstein)*, 259 B.R. 555, 558 (Bankr. D.N.J. 2001) ("Section 544(b) does not specify the date upon which the transaction must be voidable.").

To the contrary, the Bankruptcy Code, and Congressional actions relating to it, are replete with indicia of Congressional intent that preclude the interpretation of §§ 544(b) and 546(a) advanced by the Trustee and case law. (*See* Def. Mem. at 29-40.) For example:

- prior to the enactment of the Bankruptcy Code, § 11(e) of the Bankruptcy Act provided for tolling of creditors' claims *and* debtors' claims alike. Yet, when Congress reenacted Act § 11(e) as Code § 108, Congress limited the tolling provision to apply only to claims by or against debtors – not creditor claims against other creditors;

- unlike § 108(a), which is expressly titled "Extension of time," § 546(a) has no tolling language that can be read to extend the state limitations period. Indeed, § 546 is exactly as it is titled: a "[l]imitation[] on avoiding powers." Thus, where § 108(a) *extends* the time in which a trustee can bring an avoidance action by giving the trustee the "*later of*" either the state limitations period or two years from the order for relief, § 546(a) *restricts* the avoidance powers of a trustee by limiting avoidance actions to the "*earlier of*" the time the case is closed or two years from the order for relief (or one year from the appointment of a trustee);

- unlike § 108(a), which explicitly directs that the viability of the debtor's claim is to be determined as of the petition date, § 546(a) makes no reference whatsoever to the petition date;

- all of the claims to which § 546(a) are applicable are explicitly linked to "the date of the filing of the petition" or "the commencement of the [bankruptcy] case,"

26

*except* for claims under § 544(b), which instead are linked to the "applicable law," *see* 11 U.S.C. §§ 544(a), 547, 548; and

- the evolution of § 546(a) demonstrates Congress' intent to foster a speedy resolution of avoidance claims, and not to provide "breathing room" or expand trustee powers as suggested by the Trustee. When Congress enacted § 546(a) in 1978, it set the trustee appointment-based limitations period at "two years after the appointment of a trustee," 11 U.S.C. § 546(a) (amended 1994), but in 1994 Congress *shortened* that period to "1 year after the appointment or election of the first trustee." 11 U.S.C. § 546(a).[11]

With the exception of Congress' 1994 amendment to § 546(a), the Trustee does not even acknowledge, let alone address, these indicia of Congressional intent related to § 544(b) and 546(a), nor do his cited cases analyze them in a comprehensive manner. Yet Congressional intent to apply the state limitations period for voidability purposes cannot be ignored.

That Congress omitted creditor claims from the tolling provisions of § 108(a) when the Bankruptcy Code was enacted demonstrates a clear intent not to toll creditor claims. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Bianchi v. United States*, 46 Fed. Cl. 363, 367 (Fed. Cl. 2000) ("It is well recognized that where Congress amends a statute, it is presumed to be aware of the original enactment and to intend to alter it."). Similarly, that Congress specifically indicated in §§ 108(a), 544(a),[12] 547 and 548 that the relevant date for

---

[11] The Trustee attempts to downplay the significance of the 1994 amendment by mischaracterizing the shortening of the trustee's limitation period as merely a "compromise provision" to resolve a dispute regarding the prior two-year limitation provision. He then muses that in some circumstances, the amendment actually extended a trustee's limitation period. (*See* Tr. Mem. at 45-46.) While the 1994 amendment did resolve an existing dispute, it also unquestionably shortened the time in which a trustee could bring an action because the courts that held under the pre-1994 version of Section 546(a) that the two year limitations period begins running when a debtor-in-possession files the bankruptcy petition also held that the two year limitations period *restarts* when a trustee is appointed, thereby affording the trustee a full two years to bring claims – not one year as under the amended version of the statute. *See, e.g., Salisbury v. Mirage Resorts, Inc. (In re Mizuno)*, 223 F.3d 1050, 1056 (9th Cir. 2000); *M.K. Moore & Sons, Inc. v. Slutsky (In re WM. Cargile Contractor, Inc.)*, No. 96-4353, 1998 WL 211753, at *4 (6th Cir. Apr. 21, 1998); *Mendelsohn v. Sequa Fin. Corp. (In re Frank Santora Equip. Corp.)*, 231 B.R. 486, 493 (E.D.N.Y. 1999); *Slone-Stiver v. Sol Tick & Co. (In re Tower Metal Alloy)*, 183 B.R. 502, 503-05 (S.D. Ohio 1995).

[12] The Trustee tries to distinguish subsections (a) and (b) of § 544 by noting that § 544(a) claims affect claim priority and therefore the "exact date" on which the claim arose "had to be specified exactly in the statutory

27

determining the Trustee's rights was the petition date, or the date the bankruptcy was commenced, but failed to include any such language in either § 544(b) or § 546(a), can only mean that Congress did not intend for § 544(b) claims to be tied to the petition date. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citation omitted)); *Geron v. Valeray Realty Co. (In re Hudson Transfer Group, Inc.)*, 245 B.R. 456, 460 (Bankr. S.D.N.Y. 2000) (Bernstein, C.J.) ("Section 108(b) is silent regarding the ability to extend the sixty day period, yet other provisions of the Code expressly provide for similar extensions for cause shown. Thus, Congress knew how to provide for the power to extend a statutory period for cause, and section 108(b)'s silence on this score indicates Congress's intent to withhold such authority.").

Taken individually, each Code provision or amendment identified above is strong evidence that state limitations periods are not meant to cease operating as of the Filing Date. When viewed collectively, they compel the rejection of the Trustee's position.

## B. Congressional Silence Provides No Indication As To The Meaning Of §§ 544(b) And 546(a) Of The Bankruptcy Code.

Without statutory language or any other evidence of congressional intent to freeze the effect of state limitations periods as of the petition date, the Trustee relies on what even he acknowledges is "not considered the best evidence" of congressional intent – congressional silence. (Tr. Mem. at 46.) However, congressional silence offers no interpretive guidance at all.

---

language." (Tr. Mem. 43 n.15.) Yet specifying the petition-date focus of a § 544(a) claim only further demonstrates that § 546(a) and § 544(b) – neither of which specifies that a claim is measured as of the petition date – cannot be read to impose a petition-date focus on § 544(b) claims. To the contrary, if it is self evident from § 546(a) that claims are to be determined as of the petition date, there would not have been a need to specify that date in § 544(a).

As the Supreme Court has confirmed, "[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the [courts'] statutory interpretation." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 186 (1994) (internal quotation marks and citations omitted); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction . . . ." (internal quotation marks and citation omitted)).

This Court should look to what Congress has done, not to what it has not done, to resolve the Defendants' challenges to the Complaint. What Congress has done – by express language in the Code – is to identify the petition date as the operative date for establishing the Trustee's rights with respect to every avoidance power that the Trustee has, *except for avoidance powers under § 544(b)*.

### C.    CPLR § 204(a) Provides No Basis To Toll The State Statute Of Limitations For Fraudulent Conveyance Claims.

Unable to locate any basis in the Bankruptcy Code for measuring the Six Year Transfer period from the Filing Date, the Trustee argues that CPLR § 204(a),[13] which tolls all creditors' claims as of the Filing Date, thereby preserved for the Trustee any claim that existed on the Filing Date. (Tr. Mem. at 47-48.) The Trustee's reliance on CPLR § 204(a) is misplaced.

In fact, the Trustee does not identify even a single case under § 204(a) involving an avoidance claim brought on behalf of a debtor's estate. (*See* Tr. Mem. at 47 (citing *Mercury Capital Corp. v. Shepherds Beach, Inc.*, 723 N.Y.S.2d 48 (2d Dep't 2001) (mortgage foreclosure action); *CDS Recoveries LLC v. Davis*, 715 N.Y.S.2d 517 (3d Dep't 2000) (declaratory judgment

---

[13]    CPLR § 204(a) provides: "Where the commencement of an action has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action must be commenced."

action regarding rights under tax foreclosure judgment); *Zuckerman v. 234-6 W. 22 St. Corp.*, 645 N.Y.S.2d 967 (Sup. Ct. N.Y. Co. 1996) (mortgage foreclosure action).) Nor could a single case be found where identical or analogous state tolling statutes were applied to toll the statute of limitations for state law avoidance claims brought by a bankruptcy or SIPA trustee on behalf of a debtor's estate. The reason is obvious: CPLR § 204(a), and analogous tolling statutes in other states, do not apply to creditor-based avoidance claims brought by a bankruptcy or SIPA trustee.

The purpose of a tolling statute such as CPLR § 204(a) is to protect plaintiffs who are put in the "procedural catch 22" of having a timely-filed action dismissed by operation of an automatic stay, or having the limitations period expire while the stay is in place. *See Taylor v. N.Y.S. Dep't of Corrections*, No. 03 Civ. 1929, 2004 WL 2979910, at *10-*11 (S.D.N.Y. Dec. 22, 2004); *see also Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001). However, in a situation where a bankruptcy or SIPA trustee, standing in the shoes of a creditor, brings an avoidance claim, no such "procedural catch 22" arises because the trustee's claim is not barred by the stay; the trustee simply takes over the claim from the creditor and then proceeds to prosecute it.

Indeed, in the single case in which a court addressed tolling under a statute similar to CPLR § 204(a), in the context of claims that could be pursued by a trustee, the court found that the tolling statute did not apply to those claims. *See R.A. Hatch Co. v. Am. Ins. Co.*, 728 F. Supp. 1499, 1502-04 (D. Or. 1990). In *Hatch*, the court found that Oregon Revised Statute § 12.210, a statute substantively identical to CPLR § 204(a),[14] did not operate to toll the statute of limitations for a debtor during the pendency of a bankruptcy case. Rather, the court explained,

---

[14] Or. Rev. Stat. § 12.210 provides: "When the commencement of an action is stayed by injunction or a statutory prohibition, the time of the continuance of the injunction or prohibition shall not be a part of the time limited for the commencement of the action."

> the automatic stay provision in bankruptcy does not prohibit the
> assertion of claims *on behalf of* the estate, but only claims directed
> *against* the estate. The trustee of the estate is empowered to
> pursue the claims of the estate, and the trustee may abandon claims
> of the estate to the debtor after notice to the creditors and a
> hearing.

*Id.* at 1503 (citations omitted) (emphasis added). Therefore, the tolling statute in that case, like

the tolling provision of CPLR § 204(a), did not apply to claims that could be brought by a

bankruptcy trustee *on behalf of* the estate.

Here, as in *Hatch*, the automatic stay does not operate as a "procedural catch 22"

and does not prohibit the Trustee from asserting avoidance claims on behalf of the estate, such as

the claims in the Complaint. Accordingly, CPLR § 204(a) cannot be read to extend the six-year

limitations period under New York law for the Trustee's Section 544(b) claims.[15]

### D. Section 108(c) Cannot Toll The State Statute Of Limitations For Avoidance Actions Brought Against A Non-Debtor.

Equally misplaced is the Trustee's reliance on Bankruptcy Code § 108(c) to reach

transfers that occurred more than six years before the commencement of the Adversary

Proceeding. Section 108(c) provides, in relevant part:

> [I]f applicable nonbankruptcy law . . . fixes a period for
> commencing or continuing a civil action in a court other than a
> bankruptcy court on a claim *against the debtor* . . . and such period
> has not expired before the date of the filing of the petition, then
> such period does not expire until the later of – (1) the end of such
> period . . . ; or (2) 30 days after notice of the termination or
> expiration of the stay . . . with respect to such claim.

12 U.S.C. § 108(c) (emphasis added). By its plain language, § 108(c) only applies to claims

---

[15] Even if CPLR § 204(a) were applicable to avoidance claims, the Trustee still would not benefit from any tolling because the tolling does not occur until *after* the Trustee has assumed the creditor's claim. The Trustee assumes the claims of creditors as of the Filing Date. Thus, the Trustee takes whatever claims and defenses existed immediately prior to the SIPA filing. CPLR § 204(a), on the other hand, does not become operative until the action is "stayed"; *i.e.*, not until after the SIPA filing. As a temporal matter, the Trustee assumes the creditor's claim as it existed *before* the creditor would be entitled to tolling. Indeed, it could only be that way because CPLR § 204(a), to the extent it applies at all, is meant to protect the creditor who lost his or her claim. It makes no sense to afford that protection to the Trustee who gained the claim.

31

"against the debtor," and does not apply to claims asserted against third parties.[16] *See, e.g.,*

*McCoy v. Grinnell (In re Radcliffe's Warehouse Sales, Inc.),* 31 B.R. 827, 832 (Bankr. W.D.

Wash. 1983) (citations omitted and emphasis added) (Section 108(c) does not extend statute of

limitations where action was against third party, not debtor). Because a fraudulent conveyance

action cannot be brought "against the debtor," *see Pereira v. Kaiser (In re Big Apple Scenic*

*Studio, Inc.),* 63 B.R. 85, 88 (Bankr. S.D.N.Y. 1986), § 108(c) is not applicable in this case.

           Contrary to the Trustee's assertion, the decisions he cites do not hold otherwise.

For example, the Second Circuit's decision in *FDIC v. Hirsch (In re Colonial Realty Co.)* did not

even mention § 108(c), but, rather, addressed the automatic stay that arises under 11 U.S.C.

§ 362 and held that fraudulent transfer claims are stayed because they are actions "to recover a

claim against the debtor." 980 F.2d 125, 130-31 (2d Cir. 1992). Unlike § 362, § 108(c) does not

apply to actions *"to recover* a claim against the debtor," which might be accomplished indirectly;

it applies to an actual "claim against the debtor." Similarly, the Second Circuit in *Belford v.*

*Martin-Trigona (In re Martin-Trigona),* 763 F.2d 503 (2d Cir. 1985) (per curiam), did not apply

§ 108(c) to stay a claim brought against "a non-debtor defendant," as the Trustee contends. (Tr.

---

[16] The Second Circuit has explained that the purpose of § 108(c) is to preserve claims *against a debtor* that are automatically stayed when the debtor files for bankruptcy:

> Recognizing that a petition in bankruptcy could sometimes give a debtor unfair advantage over a claimant by allowing *the debtor* to remain under the protection of the automatic stay until the limitation period governing the claimant's action had expired . . . Congress acted to solidly preserve the rights of a party "stayed from commencing or continuing an action *against the debtor* because of the bankruptcy case". S.R. Rep. No. 95-989, 95th Cong., 2d Sess. 30 (1978); H.R. No. 95-595, 95th Cong., 2d Sess. 318 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787. It did so by extending the period for "commencing or continuing a civil action" *against the debtor* to, at a minimum, 30 days after termination or expiration of the automatic stay."

*Morton v. Nat'l Bank of N.Y. City (In re Morton),* 866 F.2d 561, 566-67 (2d Cir. 1989) (emphasis added); *see also Hazen First State Bank v. Speight,* 888 F.2d 574, 577 (8th Cir. 1989) ("The purpose of section 108(c) is to prevent *a debtor* from taking advantage of the bankruptcy scheme by filing for bankruptcy and then waiting for the statute of limitations to run on the creditor's claim." (emphasis added)).

Mem. at 49.) Rather, in *Martin-Trigona*, the bankruptcy trustee was permitted to proceed with his avoidance claim *against the debtor* and a related company. 763 F.2d at 505.

By its plain language and its relevant history, the Bankruptcy Code requires consideration of state law limitations periods in determining whether a transfer is voidable under § 544(b). There is no dispute that fraudulent transfer claims under New York law are time-barred – and thus not voidable – if the transfers occurred more than six years prior to the start of the action. Accordingly, the Trustee cannot state a claim for avoidance of any transfers made before May 12, 2003 – six years prior to the start of this Adversary Proceeding.

## VI.    THE TURNOVER CLAIM MUST BE DISMISSED BECAUSE THE TRANSFERS ARE NOT "PROPERTY OF THE ESTATE."

In Count I of the Complaint, the Trustee asserts a claim for turnover and accounting pursuant to Bankruptcy Code § 542, seeking "the immediate payment and turnover from the Defendants of any and all Transfers made by BLMIS" to them. (Compl. ¶ 75.) In their moving brief, the Defendants demonstrated that, as a matter of law, the Trustee cannot state such a claim for turnover or accounting because (1) § 542 only applies to property of the estate; and (2) fraudulently transferred property does not become property of the estate until after it is recovered pursuant to Bankruptcy Code § 550. (Def. Mem. at 25-26.) Thus, the Trustee's turnover claim is nothing more than surplusage; § 550 would afford the Trustee all the remedy he needs if he were to prevail on any of his avoidance claims.

Notably, the Trustee does not dispute either of the Defendants' arguments regarding the futility of his turnover claim, nor does he contest that, under the Bankruptcy Code, he has not stated a claim for turnover. Instead, he argues that SIPA § 78*fff*-2(c)(3) renders disputed transfers property of the estate and thus subject to turnover, even before such transfers

33

are recovered. The plain language of SIPA § 78*fff*-2(c)(3) contradicts the Trustee's invented

argument. SIPA § 78*fff*-2(c)(3) provides:

> Whenever customer property is not sufficient to pay in full the claims
> set forth in subparagraphs (A) through (D) of paragraph (1), *the
> trustee may recover* any property transferred by the debtor which,
> except for such transfer, would have been customer property *if and to
> the extent that such transfer is voidable or void under the provisions
> of Title 11.* Such *recovered* property shall be treated as customer
> property. For purposes of such recovery, the property so transferred
> shall be deemed to *have been* the property of the *debtor* and, if such
> transfer was made to a customer or for his benefit, such customer shall
> be deemed to have been a creditor, the laws of any State to the
> contrary notwithstanding.

15 U.S.C. § 78*fff*-2(c)(3) (emphasis added). By its clear language, § 78*fff*-2(c)(3) simply

"operates to allow the trustee to avoid certain transfers of property so that the trustee can include

that property in the estate of the debtor for return to customers." *Trefny v. Bear Stearns Sec.

Corp.*, 243 B.R. 300, 321 n.9 (S.D. Tex. 1999).

On its face, there is nothing in § 78*fff*-2(c)(3) that provides that property

transferred by a SIPA debtor "is always property of the estate," as the Trustee asserts.[17] (Tr.

Mem. at 37.) To the contrary, the only time § 78*fff*-2(c)(3) directs that transferred property is to

be treated as customer property (*i.e.*, property of the estate) is when it is "recovered." The

treatment of transferred property under SIPA, therefore, is no different than under the

Bankruptcy Code. *In re Colonial Realty Co.*, 980 F.2d at 131 (holding that § 541(a)(3) "clearly

reflects the congressional intent that [fraudulently transferred] property is not to be considered

property of the estate until it is recovered." (citation omitted)); *see also Savage & Assocs., P.C.

v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) (fraudulently

---

[17]    Section 78*fff*-2(c)(3) does not use the phrase "property of the estate" at all, as that is a bankruptcy concept rather
than a SIPA concept. Instead, § 78*fff*-2(c)(3) refers to "customer property," which is the SIPA equivalent of
"property of the estate." *See Hill v. Spencer Sav. & Loan Ass'n (In re Bevill, Bressler & Schulman, Inc.)*, 94
B.R. 817, 826 n.6 (D.N.J. 1989).

transferred property "does not become property of the estate until it has been recovered"). Hence, the turnover provision of § 542 still is inapplicable until the transferred property is recovered. *See generally Trefny*, 243 B.R. at 320-23.

As an alternative basis for avoiding dismissal of his defective turnover claim, the Trustee argues that pairing a turnover claim with an avoidance claim promotes judicial economy. (Tr. Mem. at 38-39.) Yet pairing a turnover claim with an avoidance claim does not promote judicial economy in any way, because the turnover provision of § 542 becomes operative only *after* a transfer has been avoided *and recovered. See In re Colonial Realty Co.*, 980 F.2d at 131. Thus, § 542 becomes operative only *after* "the trustee already has in his possession whatever he is to recover on account of the transfer avoided." *Richardson v. Huntington Nat'l Bank (In re Cyberco Holdings, Inc.)*, 382 B.R. 118, 144 (Bankr. W.D. Mich. 2008). It is for this very reason that courts routinely have dismissed turnover claims asserted in fraudulent transfer actions. *See, e.g., In re Cyberco Holdings, Inc.*, 382 B.R. at 144 (Bankr. W.D. Mich. 2008); *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr. Inc.)*, 373 B.R. 262, 273 (Bankr. S.D.N.Y. 2007); *Giuliano v. Fairfield Group Health Care Ctrs. L.P. (In re Lexington Health Group, Inc.)*, 363 B.R. 713, 715-17 (Bankr. D. Del. 2007); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 554 (D. Del. 2005); *see also Trefny*, 243 B.R. at 320.[18] Since the Trustee will be unable to state a sustainable turnover claim before he has obtained the return of transfers (if any) he is able to avoid, there is no legal basis for permitting the Trustee to continue pursuing his facially insufficient turnover claim.[19]

---

[18] The Trustee asserts that "a number of cases stand for the proposition that a turnover claim may be properly paired with an avoidance claim," citing *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646 (Bankr. E.D.N.Y. 2008), and *Doyle v. Paolino (In re Energy Sav. Ctr., Inc.)*, 61 B.R. 732 (E.D. Pa. 1986), as examples. (Tr. Mem. at 38-39.) However, in neither of those cases did the court actually address the propriety of pairing the two actions or identify judicial economy as the basis for the alleged pairing.

[19] In order to minimize the significance of the Second Circuit's holding in *In re Colonial Realty*, the Trustee

35

## VII. THE CONSTRUCTIVE FRAUD CLAIMS MUST BE DISMISSED BECAUSE THE TRUSTEE HAS FAILED TO PLEAD A LACK OF FAIR CONSIDERATION.

Counts Six, Seven and Eight of the Complaint assert claims against the

Defendants for constructive fraudulent transfers pursuant to DCL §§ 273, 274 and 275,

respectively, in connection with the Six Year Transfers. As the Trustee concedes, an essential

element of each claim is that the transfer at issue must have been made without fair consideration

passing to BLMIS. (Tr. Mem. at 19.) However, the Defendants demonstrated in their moving

brief that the Trustee has not adequately pleaded a lack of fair consideration because the Trustee

has ignored that many of the Defendants have a claim for expectation damages against BLMIS,

based on the value of the securities reflected on their November 30, 2008 account statements (the

"Expectancy Defendants").[20] The Expectancy Defendants' claim for expectation damages

constitutes an antecedent debt and, thus, fair consideration.[21] (Def. Mem. at 45-50.)

The Trustee mistakenly argues that whether fair consideration was given requires

a factual determination that is not appropriate for resolution on a motion to dismiss. (*See* Tr.

Mem. at 19.) However, the Expectancy Defendants are not seeking a factual determination

regarding whether any transfer was made for fair consideration. Rather, the Expectancy

Defendants seek only a legal determination that their expectation claim against BLMIS

---

mischaracterizes the Court's holding concerning fraudulent transfers as "dicta," and further suggests that the decision is not relevant here because it involved a dispute over an automatic stay, and not turnover. (Tr. Mem. at 38.) However, the Circuit's determination of what constitutes property of the estate under § 541(a)(3) was central to its resolution of the automatic stay issues and is binding in its determination that fraudulent transfers are not property of the estate pre-recovery.

[20] The Expectancy Defendants are Mr. Picower, Mrs. Picower, Decisions Incorporated, Capital Growth Company, JF Partnership, JEMW Partnership, JLN Partnership, JAB Partnership, JA Special, Jeffry M. Picower Special Co., the Picower Foundation and the Trust f/b/o Gabrielle H. Picower. The remaining Defendants did not have active accounts as of November 30, 2008.

[21] The Defendants also established in their moving brief that the Trustee's constructive fraudulent transfer claims must fail because the Trustee incorporated by reference into each claim that the transfers were "made on account of an antecedent debt." (Compl. ¶ 81; Def. Mem. at 46-47.) While inconsistency in pleading legal claims is permissible, inconsistency in pleading the factual basis for a claim is not and requires dismissal of Counts Six, Seven and Eight of the Complaint. *See Nat'l W. Life Ins. v. Lynch*, 175 F. Supp. 2d 489, 492 (S.D.N.Y. 2000).

constitutes an antecedent debt for purposes of assessing fair consideration, and that the

Complaint fails to allege a constructive fraudulent transfer in light of those expectation claims.

Those issues are entirely appropriate for resolution on a motion to dismiss.

**A.    The Defendants' Claim For Expectation Damages Is An Antecedent Debt Against BLMIS And Thus Constitutes Fair Consideration.**

Under the Bankruptcy Code, the Defendants' claims against BLMIS and Madoff

as operators of a massive Ponzi scheme constitute an antecedent debt and, thus, fair

consideration. *See Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 595

(9th Cir. 1991); *see also* 11 U.S.C. § 101(12) (defining "debt" as, among other things, a "liability

on a claim"); 11 U.S.C. § 101(5)(A) (defining "claim" as a legal or equitable right to payment).

Included among the Defendants' claims as Ponzi scheme investors is a claim for expectation

damages based upon what they believed were the values of their BLMIS investments. *See, e.g.*,

*Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007)

(expectation damages is only appropriate remedy in broker-dealer Ponzi scheme, as "the out-of-

pocket theory, which seeks to restore to [investors] only [their original investment] less their

subsequent withdrawals, is a wholly inadequate measure of damages"); *Sender v. Buchanon (In*

*re Hedged-Invs. Assocs., Inc.)*, 84 F.3d 1286 (10th Cir. 1996) (acknowledging that investor had

claim for expectation damages under state law, but finding it against public policy in Ponzi

scheme context); *Scholes v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995) (claim for profits

would be appropriate against Ponzi scheme operator).

Without legal support, and in derogation of the plain language of the Bankruptcy

Code, the Trustee argues that Defendants' expectancy damages claims must be sacrificed in the

interest of "public policy." (Tr. Mem. at 23-24.) Ignoring Code provisions to advance "public

policy" is impermissible. *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank*,

*N.A.*, 530 U.S. 1, 13-14 (2000) ("Achieving a better policy outcome . . . is a task for Congress, not the courts."); *In re U.S. Lines, Inc.*, 199 B.R. 476, 481 (Bankr. S.D.N.Y. 1996) ("[W]hen a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code." (citation omitted)).

Even on its merits, the Trustee's public policy argument must fail, as it relies on assumptions perhaps applicable in general bankruptcy cases, but not in SIPA proceedings such as this one. As SIPC's general counsel has confirmed, a SIPA case, "because of its customer protection function . . . differs from one in ordinary bankruptcy." Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers*, 12 Cardozo L. Rev. 509, 513, 519 (Dec. 1990). Most importantly, in a SIPA case, unlike in an ordinary bankruptcy, investor expectations are the foremost concern, "even where inconsistent with transactional reality." Brief of Appellant SIPC at 23-24, *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125 (2d Cir. 2006) (No. 05-5527-bk), 2005 WL 5338148, at *12 ("SIPC Br. *New Times II*").

Accordingly, whatever may be the case in an ordinary bankruptcy, it cannot be against public policy to enforce an investor's expectation rights in a SIPA proceeding.[22] Doing so promotes, rather than subverts, the aims of SIPA, which is why SIPC itself argued in connection with the liquidation of New Times Securities, Inc. that it was "[o]f vital importance" that "reasonable and legitimate claimant expectations on the filing date are controlling." *Id.* In *New Times*, several hundred investors were duped into "investing" in mutual funds offered by

---

[22]  The Trustee attempts to sidestep the Expectancy Defendants' argument by casting it as an impermissible attempt to raise the "net equity" issue being addressed in separate consolidated briefing. (Tr. Mem. at 25-26.) What the Trustee ignores is that the Defendants' claim to expectation damages is not narrowly about "net equity," but is broadly about SIPA, which recognizes "[t]he centrality of claimant filing-date expectations." SIPC Br. *New Times II*, 2005 WL 5338148, at *13. In fact, it was due to the interrelation between "net equity" and the Trustee's fraudulent transfer claims that both SIPC and the Trustee recently devoted substantial portions of their "net equity" briefs to a discussion of avoidance issues.

bona fide investment companies. *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 71 (2d Cir. 2004). Those investors, like the Expectancy Defendants, believed they were invested in real securities, having relied on false account statements and confirmations. SIPC, the SEC and the trustee took the position that the *New Times* investors' legitimate expectations should be honored. *See id.* at 87. "Public policy" did not deter them simply because the investors unknowingly had invested in a Ponzi scheme.

If anything, public policy compels rejection of the Trustee's position. As the then-Chairman of the SEC explained as one of the purposes behind the original enactment of SIPA, "[i]t is vital to the operation of our national securities markets that . . . investors retain confidence in the industry's ability to safeguard such customer funds and securities." *Securities Investor Protection: Hearing on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce*, 91st Cong. 149-150 (1970) (statement of Hamer H. Budge, Chairman, SEC). Investors cannot have confidence in the safety of their funds or securities if courts refuse to honor their legitimate expectations that in fact they hold the securities reflected on their account statements. If investors' account statements are not honored as proof of the underlying investments, investor confidence will be lost and investors may insist on personal receipt of all their securities.

Disregarding the Defendants' expectancy claims, as the Trustee urges, will erode investor confidence still further. Those claims constitute valid antecedent debts, and transfers made by BLMIS below the value of those claims are for fair consideration as a matter of law. (*See* Def. Mem. at 45-46.) Because the Trustee does not even acknowledge the Defendants' expectancy claims, he has not pleaded facts that would permit a plausible inference that transfers

to the Expectancy Defendants lacked fair consideration. Therefore, the Trustee's constructive fraudulent transfer claims are insufficient as a matter of law and must be dismissed.

### B.    The Trustee Has Not Alleged Bad Faith.

As an alternative to his contention that he has alleged a lack of fair consideration, the Trustee also argues that he has "alleged that the specified Transfers were made for less than fair consideration because [Mr.] Picower failed to act in good faith." (Tr. Mem. at 21.) To the extent the Defendants have established an antecedent debt based on their expectancy claim against BLMIS, they also have established good faith as a matter of law.

This case falls squarely within the Second Circuit's holding in *Sharp International Corp. v. State Street Bank and Trust Co. (In re Sharp International Corp.)*, 403 F.3d 43, 54-55 (2d Cir. 2005), which established that, even if there is knowledge that funds were fraudulently obtained, a non-insider accepting repayment of an antecedent debt does not lack good faith unless he is shown to have participated in the fraud. There, State Street Bank and Trust Co. ("State Street") held an antecedent debt owed by Sharp International Corp. ("Sharp") in the form of a $15 million loan. After discovering that Sharp was engaging in fraudulent accounting practices, State Street demanded that Sharp secure new financing to repay the loan. With State Street's knowledge, Sharp secured the additional financing from noteholders unaware of Sharp's fraud and repaid State Street.

Thereafter, Sharp went into bankruptcy and eventually brought an adversary proceeding against State Street asserting, among other claims, a constructive fraudulent transfer claim relating to the loan repayment. Despite State Street's knowledge that the money used for the repayment had been obtained by fraud, the Second Circuit held that State Street took the transfer in good faith. As the Court explained:

40

> [t]o find a lack of "good faith" where the transferee does not
> participate in, but only knows that the debtor created the other debt
> through some form of [] dishonesty is to void the transaction because
> it amounts to a kind of "preference" – concededly a most undesirable
> kind of preference, one in which the claims of alternative creditors
> differ considerably in their moral worth, but a kind of preference
> nonetheless.

*Id.* at 55. Applying that reasoning, the Circuit Court concluded that "knowledge of the [Sharp principals'] fraud, without more, does not allow an inference that State Street received the [repayment] in bad faith." *Id.* at 56.

Here, there is no allegation that the Expectancy Defendants directly participated in Madoff's defrauding of other investors, nor could there be. Instead, the Complaint falsely alleges that the Defendants "knew or should have known" that they were being paid from the proceeds of Madoff's fraud. Were that the case, which it is not, *Sharp* makes clear that knowledge alone, without direct participation, is not enough to establish bad faith where, as here, the transfers at issue were in satisfaction of an antecedent debt. Thus, regardless of the Expectancy Defendants' alleged knowledge, the Trustee has not pleaded a viable constructive fraudulent transfer claim and Counts Six, Seven and Eight should be dismissed.

## VIII. NO CLAIM TO AVOID SUBSEQUENT TRANSFERS HAS BEEN ALLEGED.

In Count Ten of the Complaint, the Trustee seeks avoidance of purported subsequent transfers that are nowhere identified and only exist "[o]n information and belief." (*See* Compl. ¶ 126.) As the Defendants demonstrated in their moving brief, that is not sufficient to state a claim under any pleading standard. (Def. Mem. at 50-51.)

In response, the Trustee does not even attempt to identify any purported subsequent transfers. Instead, he strings together a series of irrelevant facts about alleged common control and relatedness among the various Defendants, which he asserts is sufficient for the Defendants to frame a response, and then argues he may plead on "information and belief"

41

and use discovery to identify the subsequent transfers because the relevant information "is uniquely in the hands of the defendants." (Tr. Mem. at 59-62.) The Trustee's novel pleading method is without legal support.

Even under the more lenient pleading requirements of Rule 8, factual allegations in a complaint still must rise to a level above speculation; the Complaint must state a "plausible," not a "possible" claim. *See In re Bernard L. Madoff Inv. Sec. LLC*, 413 B.R. at 141; *see also Iqbal*, 129 S. Ct. at 1950. At a minimum, a plaintiff must provide at least some particulars relating to the allegedly voidable transfers. *See, e.g., Silverman v. K.E.R.U. Realty, Corp. (In re Allou Distribs.)*, 379 B.R. 5, 28-30 (Bankr. E.D.N.Y. 2007) (complaint identified time period when transfers occurred, and stated that "at least tens of millions of dollars" were transferred "and used to purchase [a specified property]"). Here, no such allegations related to purported "subsequent transfers" have been provided.

With respect to subsequent transfer claims that purport to apply to actual intent fraudulent transfers, moreover, the Trustee cannot escape the heightened pleading requirements of Rule 9(b) by relying on the fact that information purportedly is in the hands of the Defendants. First, supplemental Schedule B attached to the Trustee's responsive brief demonstrates that the Trustee has BLMIS books and records dating back to the early 1980s, at the least. Presumably, then, he has within his own hands the information he would need to identify subsequent transfers, if any, to the transfers he already identified. Second, even if the Trustee could plead on "information and belief," he still would need to include with his allegations (but has not) "a statement of clear and convincing probative facts which support such belief." *Madonna*, 878 F.2d at 66 (internal quotation marks and citation omitted); *see also In re Musicland Holding Corp.*, 398 B.R. at 774.

Finally, the Trustee cannot try to establish his claim through discovery, as "discovery is authorized solely for parties to develop the facts in a lawsuit in which the plaintiff has stated a legally cognizable claim, not in order for a plaintiff to find out whether he has such a claim." *Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004). In short, the Trustee has not stated a legally cognizable claim related to subsequent transfers, and Count Ten must be dismissed as a result.

## IX.   THE DEFENDANTS' SIPA CLAIMS SHOULD BE ALLOWED.

Count Eleven of the Complaint seeks disallowance of the Defendants' SIPA claims based on the Trustee's misinterpretation of "net equity." For the reasons stated in the Memorandum of Law Submitted by the SRZ Claimants in Opposition to the Trustee's Interpretation of "Net Equity", the Trustee's "net equity" interpretation must be rejected, and the Defendants' SIPA claims should be allowed.

In response to the Defendants' motion to dismiss, however, the Trustee attempts to assert Bankruptcy Code § 502(d) as an additional ground for disallowing the Defendants' SIPA claims, even though § 502(d) applies to "general unsecured claims." (Compl. ¶ 133.) Since the Defendants' claims are "on account of securities received, acquired, or held" by BLMIS, they are customer claims under SIPA, not "general unsecured claims." *See* 15 U.S.C. § 78*lll*(2); *In re First State Sec. Corp.*, 34 B.R. 492, 495-99 (Bankr. S.D. Fla. 1983). As pleaded, § 502(d), therefore, is not applicable.[23]

Even if the Trustee had asserted § 502(d) in connection with the Defendants' SIPA claims, it still would be irrelevant. Section 502(d) provides:

---

[23]   The only way the Defendants' claims could be treated as general unsecured claims in this case is if the "customer property" and SIPC advances are insufficient to satisfy the Defendants' net equity claims, *and* there are additional estate funds to pay out to creditors. *See* 15 U.S.C. § 78*fff*-2(c)(1). In this case, it is clear there are no funds for distribution beyond customer property and the SIPC advances, so it is a practical impossibility that the Defendants could ever be general unsecured creditors here.

43

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d). By its express terms, § 502(d) only becomes operative once a transferee fails to pay "the amount, or turned over any such property, for which such entity or transferee *is liable* under section . . . 550." 11 U.S.C. § 502(d) (emphasis added); *see Holloway v. IRS (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir. 2003); *GMAC Mortgage LLC v. Blitz Holdings Corp. (In re IFS Fin. Corp.)*, Adv. No. 08-03047, 2008 WL 4533713, at *3 (Bankr. S.D. Tex. Oct. 2, 2008). Thus, there are no grounds for disallowance under § 502(d) unless there has been a determination avoiding the transfer at issue, which has not occurred here.[24] *See, e.g., United States Lines (S.A.), Inc. v. United States (In re McLean Indus.),* 30 F.3d 385, 388 (2d Cir. 1994) ("Section 502(d) requires a court to disallow an entity's claim against the bankruptcy estate if the estate is entitled to recover property from that entity, such as because of a voidable preference, but that entity has failed to first transfer this property back to the bankruptcy estate."); *Hoggarth v. Kaler (In re Midwest Agri. Devel. Corp.)*, 387 B.R. 580, 586 (B.A.P. 8th Cir. 2008); *In re Odom*, 340 F.3d at 708; *SETA Corp. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*, 173 B.R. 858, 861-62 (S.D.N.Y. 1994).

Nor is it appropriate to link a disallowance claim under § 502(d) with the underlying avoidance action. As noted above, the disallowance provision of § 502(d) only goes

---

[24] The authorities the Trustee cites do not address the issue of when a § 502 claim arises, which is the issue here. For example, *In re Asia Global Crossing, Ltd.*, 333 B.R. 199 (Bankr. S.D.N.Y. 2005), related to whether § 502(d) applies to avoidable obligations, as opposed to avoidable transfers. *See id.* at 202-03. *In re Mid Atlantic Fund, Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y. 1986), addressed whether § 502(d) can be used defensively notwithstanding that the underlying avoidance claim is time-barred. *See id.* at 609-10.

44

into effect once a determination of voidability is made, and after the transferee has failed to satisfy the resulting judgment despite being given a reasonable time to satisfy that judgment. *See Campbell v. United States (In re Davis)*, 889 F.2d 658, 661 (5th Cir. 1989); *In re Atl. Computers*, 173 B.R. at 861-62. As the court in *In re Davis* explained, "[t]he creditor is still entitled to a reasonable time after the final determination until Section 502(d) is kicked into effect. Thus, a court may not order turnover in one instant and in the same instant disallow a creditor's claim for failing to comply with that order." 889 F.2d at 662.

Pairing a § 502(d) claim and an avoidance action serves no purpose because § 502(d) cannot have any effect until after judgment is rendered. The Trustee, therefore, has no basis to seek disallowance of the Defendants' SIPA claims under § 502(d) while this proceeding is still pending. His § 502(d) claim should be dismissed.

## X.   THE TRUSTEE IS NOT ENTITLED TO A CONSTRUCTIVE TRUST OR ASSIGNMENT OF DEFENDANTS' TAX REFUNDS.

As the Defendants demonstrated in their moving brief, the Trustee has sought relief in the Complaint to which he has no entitlement under the Bankruptcy Code or the DCL, namely a constructive trust and assignment of any tax refunds obtained by the Defendants. (Def. Mem. at 54-56.) Accordingly, those purported remedies should be stricken.

The Trustee contends that his requests for relief are not the proper subject of a motion to dismiss because the prayer for relief is not part of the claim. (Tr. Mem. at 65.) However, the Defendants do not argue that the Trustee's substantive claims are deficient because he seeks improper remedies, only that the remedies are not proper and should not be part of the Complaint. Such an argument is entirely appropriate on a motion to dismiss. *See, e.g., Onanuga v. Pfizer, Inc.*, No. 03 Civ 5405, 2003 WL 22670842, at *5 (S.D.N.Y. Nov. 7, 2003) (striking prayers for punitive damages, consequential damages and specific performance); *Helprin v.*

45

*Harcourt, Inc.*, 277 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2003) (striking prayer for punitive damages on motion to dismiss).

Here, with respect to the prayer for a constructive trust, the Trustee does not dispute that such relief is unavailable under either SIPA, the DCL, or the Bankruptcy Code. *See Pfohl Bros. Landfill Site Steering Comm. v. Allied Waste Sys., Inc.*, 255 F. Supp. 2d 134, 168 (W.D.N.Y. 2003) (fraudulent conveyance claim is "alternative basis for relief" from claim for constructive trust); *FDIC v. Marke Painting Co.*, No. 88 Civ. 8675, 1992 WL 212372, at *5 (S.D.N.Y. Aug. 25, 1992) (constructive trust "is not a remedy provided by section 278 [of the DCL]"). Accordingly, the Trustee's prayer for a constructive trust should be stricken.[25]

Similarly, neither SIPA, the Bankruptcy Code, nor the DCL authorize the Trustee to obtain an assignment of the Defendants' tax refunds. The Trustee contends he is entitled to such an assignment because "a refund constitutes a return to the Defendants of . . . fictitious profits." (Tr. Mem. at 66.) However, to the extent the Trustee were to prevail on any of his avoidance claims against the Defendants, he would be awarded a judgment for the value of the avoided transfers. The Trustee would have no authority to dictate how the Defendants satisfy that judgment.[26] *See* 11 U.S.C. § 550.

---

[25] The Trustee alternatively argues that he has alleged facts sufficient to state a claim for a constructive trust under New York law. The Defendants disagree. However, the issue is purely academic because the Trustee has made clear he is not asserting a claim for constructive trust. (Tr. Mem. at 65.) Thus, the Court need not resolve the issue.

[26] *Bertrum v. Laughlin (In re Laughlin)*, 18 B.R. 778 (Bankr. W.D. Mo. 1982), cited by the Trustee, is not to the contrary. *In re Laughlin* merely stands for the proposition that recovery can be obtained from multiple sources when necessary.

46

## CONCLUSION

For all of the foregoing reasons, the Defendants respectfully request that the Court enter an Order:

(1) dismissing the Complaint in its entirety, with prejudice, against Favorite Fund, JMP LP, JFM Investment, Picower P.C., JA Primary, JA Special and the Picower Institute because there are no actionable transfers alleged against those Defendants;

(2) dismissing Count One of the Complaint (Section 542 Turnover and Accounting), with prejudice, against all Defendants because Section 542 does not apply to purportedly fraudulent transfers;

(3) dismissing Count Two of the Complaint (Section 547 Preferential Transfers), with prejudice, against all Defendants except the Picower Foundation because no transfers are alleged to have been made to those Defendants within 90 days of the Filing Date;

(4) dismissing Count Five of the Complaint (DCL § 276 Actual Intent Fraudulent Conveyance), with prejudice, against all Defendants to the extent the claim seeks avoidance of transfers made more than six years prior to the commencement of this Adversary Proceeding, because such transfers are not voidable under New York law;

(5) dismissing Counts Six, Seven and Eight of the Complaint (Constructive Fraudulent Conveyance under the DCL), with prejudice, against all Defendants because the Trustee has failed to allege sufficiently that any transfers were made without fair consideration;

(6) dismissing Count Nine of the Complaint (Undiscovered Fraudulent Transfers), with prejudice, against all Defendants because the Trustee has failed to allege a basis for application of the "discovery rule" to extend the applicable statute of limitations beyond six years under New York law;

(7) dismissing Count Ten of the Complaint (Recovery of Subsequent Transfers), with prejudice, against all Defendants because the Trustee has not identified any subsequent transfers allegedly made to the Defendants;

(8) dismissing Count Eleven of the Complaint (Objection to Defendants' SIPA Claims), with prejudice, against all Defendants because the Picower Foundation, Capital Growth, JF, JEMW, JLN, JAB, JA Special and Mr. and Mrs. Picower are entitled to recover under SIPA their "net equity" reflected on their last BLMIS account statements, and the Trustee's claim is moot as against the remaining Defendants because they did not file SIPA claims;

(9)     dismissing the Trustee's requests for a constructive trust and an assignment of any tax refunds against all Defendants, with prejudice, because the Trustee has no entitlement to such relief; and

(10)    dismissing, with prejudice, all claims against Mr. Picower alleging fraud, for failure to plead fraud in accordance with Rule 9(b), and all claims against him based on an "alter ego" theory, because none of the factors that could support those claims has been alleged.

Dated: New York, New York
       November 25, 2009

SCHULTE ROTH & ZABEL LLP

By: /s/ Marcy R. Harris
    William D. Zabel
    Michael L. Cook
    Marcy Ressler Harris
    Frank J. LaSalle
919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for the Picower Defendants*