**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Email: dsheehan@bakerlaw.com

Marc E. Hirschfield

Email: mhirschfield@bakerlaw.com

Deborah H. Renner

Email: drenner@bakerlaw.com

Keith R. Murphy

Email: kmurphy@bakerlaw.com

Tracy L. Cole

Email: tcole@bakerlaw.com

Amy E. Vanderwal

Email: avanderwal@bakerlaw.com

Seanna R. Brown

Email: sbrown@bakerlaw.com

**Hearing Date: January 13, 2011 at 10:00 a.m.**

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                    Plaintiff, | Adv. Pro. No. 09-1197 (BRL) |

v.

JEFFRY M. PICOWER, individually and as trustee for the Picower Foundation, *et al*.

Defendants.

## TRUSTEE IRVING H. PICARD'S RESPONSE TO OBJECTIONS TO PICOWER SETTLEMENT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff, by and through his undersigned counsel, hereby responds to the objections (the "Objections") made to the motion (the "Motion") for the entry of an order, pursuant to Section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving that certain Agreement by and between the Trustee on the one hand and Barbara Picower, as executor of the estate of Jeffry M. Picower, and on behalf of certain other related entities and their accounts maintained at BLMIS on the other hand (the "Picower Defendants"), and (ii) enjoining customers or creditors of BLMIS, who filed or could have filed claims in the liquidation, from asserting certain claims (together, the "Picower Settlement").[1]

## PRELIMINARY STATEMENT

The Trustee, along with the United States Department of Justice (the "DOJ"), settled with the Picower Defendants for over $7 billion dollars, all of which will go to victims of the Madoff

---

[1] Unless stated otherwise, all defined terms retain the same meaning as provided in the Trustee's Memorandum of Law in Support of Motion for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Between the Trustee and the Picower BLMIS Account Holders and Enjoining Certain Claims ("Tr. Mem."), *Picard v. Picower*, 09-1197, Dkt. No. 25 (December 17, 2010).

Ponzi scheme. The settlement is remarkable not only for its size, but also because the Trustee and the DOJ are recovering every cent of the net fraudulent transfers that the Trustee alleges were made. Not surprisingly, there are only three objections to the Picower Settlement. Not one of them has any merit.

Two of those objections were made by purported class action plaintiffs who themselves would like to pursue claims against the Picower Defendants on behalf of general creditors of the BLMIS estate — the "Fox Objections" and the "Marshall Objections." Significantly, these purported class action plaintiffs and their lawyers were preliminarily enjoined by this Court from suing the Picower Defendants in May 2010. *Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010) (the "Injunction Decision"). At that time, their claims were held to be nothing more than disguised fraudulent transfer claims, and their cases were also held anathema to this Court's Net Equity Decision, in which the Court ruled that customers are not entitled to their false profits from the Ponzi scheme. Further, the cases brought by Fox and Marshall were held to be *void ab initio* under Section 362 of the Bankruptcy Code. *Id.* Fox and Marshall have appealed this Court's May 2010 ruling.[2] The Fox and Marshall Objections should be seen for what they are — attempts to allow a purported subgroup of BLMIS investors, who received "other people's money" from the Ponzi scheme, to obtain a greater recovery than other victims of the Madoff fraud. Indeed, a significant portion of any such recovery presumably would not go to BLMIS victims at all, but rather to the attorneys bringing these objections — in contrast to the funds to be received from the Picower Settlement (the "Picower Settlement Payment"), all of which will be distributed to BLMIS victims, since the

---

[2] Fox submitted her brief on appeal before the United States District Court for the Southern District of New York as an exhibit to her Objection and incorporated it by reference in her Objection. Accordingly, the Trustee hereby submits his opposition to the Fox appeal as Exhibit A hereto, and incorporates it by reference.

Trustee's fees are paid from funds advanced by SIPC and not from the estate.[3]  This Court did not allow such an affront to its jurisdiction when the Fox and Marshall putative class actions were brought, and should not allow the self-serving Fox and Marshall Objections to interfere with the Picower Settlement now.

Fox and Marshall make strained arguments to try to subvert the Picower Settlement in order to ensure the availability of a recovery for their putative class actions should those cases be resurrected on appeal.  First, they contend that, even though the proposed permanent injunction does not purport in the least to reach so-called "independent" claims, that it is defective because it does not specifically spell out that Fox and Marshall are not bound by the permanent injunction should their claims be held to be "independent" on appeal.  That sort of so-called "clarity" as to specific parties whose cases are *void ab initio*, and whose claims specifically have been held not to be independent, is not required.  It is difficult to imagine how any BLMIS-related claim against the Picower Defendants could be "independent" given that the Trustee has not seen any evidence that either Mr. Picower or any other Picower Defendant dealt directly or contractually with any BLMIS customer.  Mr. Picower was an investor himself, and there is no reason to believe that another customer could have an independent claim against the Picower Defendants, or other customers for that matter.  Regardless, in the unlikely event that any such claim existed, the Court would determine, on the relevant facts, whether such claim is barred by the proposed injunction before the Court.

Next, Fox and Marshall ask the Court to grant them discovery as to the Picower Settlement negotiations.  Incredibly, they contend that the Picower Settlement is too big — a

---

[3]  It is worth noting that counsel for Marshall, Helen Chaitman, represents both "net winners" and "net losers" and her efforts to deprive her net loser clients, who stand to benefit from the Picower Settlement, through the Marshall Objection, conflicts with her role as their counsel.

seven billion dollar recovery is more than the bankruptcy estate deserves, they argue. However, in the Trustee's complaint, filed over a year and a half ago, the Trustee identified — by date, amount, and receiving account — $6.7 billion in Transfers to the Picower Defendants that he asserted were fraudulently transferred, and disclosed in the Trustee's opposition to the Picower's motion to dismiss that the amount of transferred funds he sought to recover was in fact in excess of $7.2 billion. Any notion that the seven billion dollar figure is somehow new is thus flatly contradicted by the record. While Fox and Marshall would like to limit the Trustee's settlement to $2.4 billion, the amount of transfers attributed to the six year period preceding the filing date, there is no reason to so limit the Trustee's recovery. The Trustee is, as he has stated from the start, entitled to go beyond the six year period for recovery of fraudulent transfers because the relevant period is extended by the existence of creditors who could not reasonably have discovered the fraud until the Ponzi scheme was made public in December 2008. Thus, to the extent Fox and Marshall predicate their discovery demands on the amount of the settlement, their demands are built on false premises and should be denied on that basis.

As a related basis for discovery, Fox and Marshall ask the Court to believe that the Trustee, the Picower Defendants and the DOJ conspired together to increase the settlement amount for the sole purpose of ensuring that Fox and Marshall could not continue their lawsuits and thus recover for themselves and their purported classes: "[i]t appears that the Trustee has negotiated a settlement in excess of the amount he is entitled to receive … in order [to] divest the Picower Parties of the assets that should be available to satisfy Fox's valid and independent claims." (Fox Obj. ¶ 4; *see* Marshall Obj. at ¶ B.) To the contrary, the Trustee, the Picower Defendants and the DOJ have acted only in the best interests of the BLMIS estate and its victims to negotiate the return of a sizeable settlement that will be distributed to those victims. There is

no basis for Fox's and Marshall's outlandish and spurious belief, and the Court should not indulge their paranoid delusions.

Finally, as to discovery and the fairness of the proposed settlement, Fox contends that the settlement proceeds are not necessarily "Customer Property" and thus may belong to the general estate rather than to "Customers." However, the Margin Loans, which were disclosed both in the Trustee's Complaint and in opposition to the Picower Defendants' motion to dismiss, are merely the mechanism by which BLMIS and the Picower Defendants accounted for the Transfers—the same Transfers that the Trustee has alleged as fraudulent transfers, and that consist of "other people's money," *i.e.*, Customer Property. That said, the Trustee has brought numerous lawsuits seeking over $90 billion in recoveries which, after satisfaction of net equity and other priority claims, may be available for distribution to the general estate. Those Ponzi scheme victims who seek their damages from the fraud in excess of their investment, such as Fox and Marshall and the classes they purport to represent, potentially could recover from the general estate as general creditors.

Contrary to Fox and Marshall, who contend that the settlement is too large, the remaining objection by *pro se* objectors Steven, Richard and Martin Surabian (the "Surabian Objection" or the "Surabians"), contends that the settlement is not large enough. It is not enough to obtain the entire amount of the alleged fraudulent transfers in settlement, the Surabians argue. Rather, they contend that this amount should be supplemented by whatever gains the Picower Defendants may have made on these funds, and that Mrs. Picower's net worth should be evaluated. However, while the Surabians may purport to express a theory of damages, they do not and cannot overcome the fact that a settlement that, when combined with the amounts forfeited to the

Government, recovers 100 cents on the dollar is fair and reasonable and more than passes muster under Bankruptcy Rule 9019.

Neither the self-serving and frivolous objections of Fox and Marshall, nor the mistaken belief of the Surabians, should be allowed to derail the Picower Settlement, which stands to greatly benefit the many victims of the Ponzi scheme. The Picower Settlement should be approved.

## I. THE INJUNCTION AND RELEASE ARE PROPER AND IMPORTANT TO THE SETTLEMENT

### A. The Injunction Is Narrow and Clear

The proposed injunction is unassailable, as shown by Fox's and Marshall's need to pretend that it says something other than what it clearly says in order to attack it.[4] As Fox admits, "the Trustee states at several times … that the injunction will only enjoin third parties from pursuing claims that 'belong' to the Trustee …." (Fox Obj. ¶ 2; *see also* Marshal Obj. ¶ 2.) Nevertheless, Fox conjures up concern of a "stealth order to enjoin independent Third-party claims." (Fox Obj. ¶ 12; *see* Marshall Obj. ¶ 10.) There is simply no basis for such a concern. Moreover, as this Court previously held, Fox and Marshall have not asserted independent claims against the Picower Defendants.

Fox and Marshall cite *Johns-Manville Corp. v. Chubb Indemnity Insurance Company* (*In re Johns-Manville Corp.*), 517 F.3d 52 (2d Cir. 2008), *rev'd sub nom. Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195 (2009), to argue that "[t]he bankruptcy court has no jurisdiction to enjoin the independent claim of a third party against a non-debtor where the claim does not directly

---

[4] As set forth in the Trustee's opening papers, the Rule 7065 injunction standard is not relevant here. (Trustee's Opening Memorandum of Law at 24 n. 8.) That said, the proposed injunction is narrowly tailored and unambiguous, as provided for under Rule 7065.

effect the *res* of the bankruptcy estate." (*See* Fox Obj. ¶ 12; Marshall Obj. ¶ 13;.) Their reliance on *Johns-Manville* is inappropriate and fails for at least three reasons.

First, the Trustee is not seeking to permanently enjoin any independent claims. Rather, the Trustee seeks to enjoin only those claims that he himself has asserted or could have asserted, or which are duplicative or derivative of those claims he asserted or could have asserted:

> any BLMIS customer or creditor of the BLMIS estate who filed or could have filed a claim in the liquidation, anyone acting on their behalf or in concert or participation with them, or anyone whose claim in any way arises from or is related to BLMIS or the Madoff Ponzi scheme, is hereby permanently enjoined from asserting any claim against the Picower BLMIS Account Holders or the Picower Releasees that is <u>duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee</u> against the Picower BLMIS Account Holders or the Picower Releasees.

Tr. Mem. Exhibit C (proposed order) (emphasis added).

Second, Fox and Marshall do not have independent claims, and, as opposed to claimants in *Johns-Manville*, can allege no independent duty owed to them by the Picower Defendants and no separate harm caused them by the Picower Defendants. *Compare* Injunction Decision, 429 B.R. at 431-32 (finding, *inter alia*, that Fox and Marshall did not contend that Picower Defendants owed them a separate duty or caused a separate harm), *with Johns-Manville*, 517 F.3d at 63-64 (holding that, as part of the inquiry into whether a court has jurisdiction to enjoin non-debtor third-party claims, the court must determine whether the non-debtor third-party had any independent legal duty to the third-party claimants). Fox and Marshall were not in privity with the Picower Defendants, and their claims, which are entirely duplicative and derivative of the Trustee's fraudulent transfer allegations, are based solely on the fact that Fox and Marshall were investors with BLMIS. *See* Injunction Decision, 429 B.R. at 431-32.

Third, *Johns-Manville* does not restrict the bankruptcy court's jurisdiction as severely as Fox and Marshall suggest. In *Johns-Manville*, the Second Circuit found that the bankruptcy court did not have jurisdiction to enjoin third-party actions against the debtor's insurers because the third-party actions at issue neither affected property of the estate *nor* threatened to otherwise affect the estate, as the estate had been closed over twenty years prior. 517 F.3d at 65. Thus, *Johns-Manville* does not prohibit bankruptcy courts from enjoining claims against non-debtors that directly affect property of the estate *or, alternatively*, that threaten the equitable administration of the estate. *Id.* (quoting *Feld v. Zale Corp.* (*Matter of Zale Corp.*), 62 F.3d 746, 753 (5th Cir. 1995)) (emphasis added); *see also* 28 U.S.C. § 157(b). In contrast to the third-party actions in *Johns-Manville*, Fox's and Marshall's actions, if allowed to continue, would interfere with the ongoing administration of the active BLMIS estate. This Court is empowered to enforce the permanent injunction against them, just as it preliminarily enjoined them.

Concerned solely with whether their own purported class actions could continue in the face of the permanent injunction, Fox and Marshall ask for special language to be added to the injunction that addresses their suits in particular. Fox suggests adding the following language:

> provided however, the injunction … shall not apply to any claims that are not property of the SIPA Trustee or the BLMIS Estate (the "Property Issue"), and the Property Issue shall be determined by the United States District Court for the Southern District of New York Consolidated Appeals 10 CV 4652 (JGK) and 10 CV 7101 (JGK), or by such higher appellant court(s) if further appeal is taken from that Court's decision.

(Fox Obj. ¶ 10, *see* Marshall Obj. ¶ 10.) This additional language should be rejected for three reasons.

First, the permanent injunction will apply to Fox and Marshall if entered by this Court because this Court already has ruled that their claims are not independent of the Trustee's claims. *See* Injunction Decision, 429 B.R. at 431-32. Under Fox's and Marshall's proposed language,

the injunction would not apply unless and until there were a ruling by the district court or a higher appellate court that the claims were "property of the estate." Given the ruling of this Court, there can be no question that Fox and Marshall would be permanently barred by the proposed injunction and they will have to appeal the injunction if they are unhappy with the result. The notion that they would be carved out of the permanent injunction in the face of a pre-existing finding that their claims are not independent is mistaken at best.

Second, Fox seeks improperly to inject the question of whether her claims are property of the estate, *i.e.*, the "Property Issue," into the injunction. Such an insertion is inconsistent with the rest of the injunction, which is articulated clearly to bar only those claims that are duplicative or derivative of claims brought by the Trustee or which could have been brought by the Trustee.

Third, the myopic nature of the suggested language is demonstrated in its specific reference to Fox's and Marshall's appeals. Fox and Marshall should be subject to the permanent injunction unless and until on final appeal, their actions are held not to be *void ab initio* <u>and</u> their claims are held to be independent, and thus not duplicative or derivative of the Trustee's claims.

## B.    The Settlement Is Not An "End-Run" Around *In Pari Delicto*

Fox and Marshall argue that the proposed injunction is "over-broad and improper" because the Trustee does not have standing under the *Wagoner* Rule and the *in pari delicto* doctrine "to assert or release claims that do not belong to him." (Marshall Obj. ¶ A; *see* Fox Obj. ¶¶ 2-3, 22, 29.) Their focus on the *Wagoner* Rule and the doctrine of *in pari delicto* has nothing to do with the Picower Settlement and has everything to do with their unavailing efforts to exempt their putative class actions from being barred. Their theory — that the Trustee could not have brought their specific claims because he stands in the shoes of BLMIS and Madoff — already has been rejected by this Court as irrelevant to the applicability of the Fox/Marshall injunction. *See Picard v. Fox*, Adv. Pro. No. 10-03114, Dkt. No. 49, at 5-6 (Bankr. S.D.N.Y.

Aug. 3, 2010).  The relevance of this argument has been fully briefed on appeal.[5]  The proposed

permanent injunction is clearly limited to only those claims which are "duplicative or derivative

of the claims brought by the Trustee, or which could have been brought by the Trustee against

the Picower BLMIS Account Holders or the Picower Releasees[.]"   (Tr. Mem. Exhibit C

(proposed order).)  The Wagoner Rule and *in pari delicto* simply are not implicated.

###   C.      The Release Is Narrow and Proper

Fox and Marshall argue that the release to the Picower Defendants is overly broad

because it would release independent claims that a third party would have against the Picower

Defendants.  Fox's reasoning is nonsensical: "… the Trustee expressly relies upon *Metromedia*

to justify the injunction …, and since that case was concerned with releases of independent, non-

estate claims, the logical assumption is that the Trustee believes the injunction language he and

the 'releasees' agreed to applies to third party claims." (Fox Obj. ¶ 15.)  Consistent with the

permanent injunction, the Trustee only releases the Picower Defendants from claims that are,

have been, or could have been, brought, or might in the future be asserted by, the Trustee on

behalf of customers and creditors of the estate:

>             upon the Trustee's or the Government's receipt of funds up to the
> Bankruptcy Settlement Amount, the Trustee, on behalf of himself,
> his attorneys, agents and advisors, and BLMIS and its estate, shall
> release, remit and forever discharge … the "Picower Releasees"…
> and each of their executors, administrators, attorneys, agents,
> trustees, heirs and assigns, from any and all past, present and future
> claims or causes of action (including any suit, petition, demand, or
> other claim in law, equity or arbitration) and from any and all
> allegations of liability or damages (including any allegation of
> duties, debts, reckonings, contracts, controversies, agreements,

---

[5]  The "Wagoner Rule" relates to a trustee's standing to bring common law claims against third parties *in pari delicto* with the debtor.  The "*in pari delicto* doctrine" is an affirmative defense under state law that a third party may assert against a claim by the debtor when the debtor itself shared in the fault alleged.  *See* Ex. A (District Court Brief of Appellee Irving H. Picard in Support of Orders Enforcing Automatic Stay/Issuing Preliminary Injunction, dated November 23, 2010, D.Ct. Case No. 10-CV-4652(JGK)), at 39-41.

promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, in tort, contract, federal or state statutory liability, including, without limitation, under SIPA or the Bankruptcy Code, or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty, unjust enrichment, constructive trust, fraudulent transfer, or otherwise (including attorneys' fees, costs or disbursements), <u>that are, have been, could have been or might in the future be asserted by the Trustee, on behalf of himself, his attorneys, agents and advisors, and BLMIS and its estate, against any of the Picower Releasees and each of their executors, administrators, attorneys, agents, trustees, heirs and assigns, and that arise out of, are based on, or relate in any way to BLMIS, the Picower BLMIS Accounts, the Adversary Proceeding Defendants, or the Picower Releasees</u>.

(*See* Trustee's Memorandum of Law in Support of Motion, dated December 17, 2010, at Exhibit A ("Settlement Agreement"), ¶ 4 (emphasis added.))

The Release to the Picower Defendants is clearly made in the Trustee's capacity as the representative of the estate, and is fully consistent with the proposed injunction. The main concern for the Fox and Marshall Objectors is the injunction, which has already been applied to them in its preliminary form. Their claims were held to not be independent. *See* Injunction Decision, 429 B.R. at 430-35. Indeed, it is difficult to imagine a scenario in which there could be "independent" claims against the Picower Defendants arising from BLMIS given that Mr. Picower was an investor and was not in privity with other customers, as far as the Trustee knows.

### D.     The Injunction and Release Are Important to the Settlement

Again conflating the release and the injunction (and ignoring that there are mutual releases), Fox and Marshall contend that because the settlement funds will still be forfeited even if the injunction and release are not approved, the injunction and release are not "critical" to the settlement and therefore should not be approved. (Fox Obj. ¶ 18; Marshall Obj. ¶ 17.) However, that is not the standard. *See In re Dreier, LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010)

(explaining that the primary consideration in non-plan settlements is the subject matter jurisdiction of the court).  The issue is whether the Court has subject matter jurisdiction to issue the injunction.  This Court clearly has subject matter jurisdiction to order the injunction, which, along with the mutual releases, were highly significant factors in the settlement being reached. Indeed, given the importance of the injunction and releases, the Trustee agreed to use his best efforts to obtain approval of the 9019 Order containing a permanent injunction barring "any customer or creditor of the BLMIS estate, anyone acting on their behalf or in concert or participation with them, or person whose claim in any way arises from or relates to BLMIS or the Madoff Ponzi scheme, from asserting any claim against the [Picower Defendants] that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the [Picower Defendants]."   (Settlement Agreement ¶ 7.)   Without agreeing to these protections, the Trustee would have been hampered in his ability to pursue and ultimately settle with the Picower Defendants, or with any transferee defendants "fearful of paying twice for the same transfer — once on the Trustee's claim and a second time on the derivative claim."  *See In re Dreier, LLP*, 429 B.R. at 133 (citing *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Lambert Group, Inc.*), 960 F.2d 285, 293 (2d Cir. 1992)).  The injunction and release help to eliminate duplicative or derivative claims and thus are important to the Picower Settlement.

## II.      A PERMANENT INJUNCTION UNDER SECTION 105 IS WARRANTED

As set forth in detail in the Trustee's Opening Memorandum of Law, the Section 105 injunction sought is narrowly tailored and necessary to the orderly administration of the estate. (*See* Trustee's Memorandum of Law at 19-28.)   Fox and Marshall simply ignore all of the Trustee's arguments, as they attempt to thwart the Picower Settlement and thus seek to deprive

the victims of the Ponzi scheme of the benefit of that settlement for one reason alone — Fox's and Marshall's self-interested efforts to recover false profits.

Section 105 of the Bankruptcy Code authorizes the bankruptcy court to enjoin third-party suits if those suits impair the court's jurisdiction with respect to the case before it. *Calpine Corp. v. Nev. Power Co. (In re Calpine Corp.)*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006), *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007). Part of the Court's injunctive power is the ability to enjoin third parties from proceeding against defendants if the actions of the third parties will adversely impact upon the debtor's estate. *See In re Adelphia*, 2006 WL 1529357, at *4 (Bankr. S.D.N.Y. June 5, 2006).

Permanent injunctions, too, are appropriate under Section 105. Section 105 recently provided the basis for a permanent injunction in the context of a global settlement in the *Dreier* case. *In re Dreier, LLP*, 429 B.R. at 132. The District Court upheld the Bankruptcy Court's determination on appeal. *See In re Dreier, LLP*, 2010 WL 3835179, at *1 (S.D.N.Y. Sep. 10, 2010). Similarly, other courts in this district have upheld permanent injunctions in chapter 7 non-reorganization cases. *See, e.g., In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 364-65 (Bankr. S.D.N.Y. 2002) (upholding a permanent injunction in the context of the transfer of the debtor's assets).[6]

Nor are Section 105 injunctions appropriate only in chapter 11 cases, as Fox and Marshall contend. For example, *Dreier*, which, as here, involved a chapter 7 trustee, was not a reorganization case, and did not involve a plan. The court issued a permanent injunction under Section 105. *In re Dreier, LLP*, 429 B.R. at 132. Other courts, too, have allowed for third-party

---

[6] The bankruptcy court ultimately approved the settlement and injunction in the chapter 7 case. *See In re Mrs. Weinberg's Kosher Foods, Inc.*, No. 96-44620, ECF No. 142 (June 5, 2002) (Order Approving Settlement Agreement and Release).

injunctions under chapter 7 where a plan of reorganization was not implemented. *See, e.g., In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. at 364-65; *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 191 (2d Cir. 2003) (upholding bankruptcy court order in chapter 7 case permanently enjoining creditors and other parties from pursuing civil claims against owners of the corporate-debtor); *In re Artra Grp., Inc.*, 300 B.R. 699, 706 (Bankr. N.D. Ill. 2003) (recognizing that a permanent injunction might be permissible in a non-plan context "so long as the injuries suffered were based upon or derivative of injuries to [debtor] or its estate"). Plainly, bankruptcy courts may order third-party injunctions in chapter 7 cases under Section 105, which empowers the court to issue orders, processes or judgments that are "necessary or appropriate" to carry out the provisions of the Bankruptcy Code, including provisions incorporated into SIPA, such as Section 362(a) of the Bankruptcy Code.

The only case cited by Fox and Marshall to support their arguments that there is no basis under Section 105 for a permanent injunction and that permanent injunctions are not intended to extend beyond plan confirmation and the administration of the estate is the Ninth Circuit case of *In re American Hardwoods, Inc.*, 885 F.2d 621, 624-25 (9th Cir. 1989). (Fox Obj. ¶ 19; Marshall Obj. ¶ 18.) Significantly, by omitting the second of three sentences from the quoted section of that court's decision, Fox and Marshall neglected to include that the Ninth Circuit in *In re American Hardwoods* did, in fact, expressly state that permanent injunctions *are* permitted under § 105 of the Bankruptcy Code. Moreover, the Ninth Circuit's comment, about not being aware of any cases permanently enjoining a creditor, related specifically to a state court judgment against a non-debtor "guarantor of a contract liability," a situation vastly different from Fox and Marshall's own situation. The full quote is below (previously omitted parts are underlined):

> Section 105 empowers the court to enjoin preliminarily a creditor from continuing an action or enforcing a state court judgment against a nondebtor prior to confirmation of a plan. <u>Furthermore, section 105 permits the court to issue both preliminary and permanent injunctions after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate.</u> [The debtor], however, points to no case, and we are aware of none, in which a court permanently enjoined, past confirmation of a plan, a creditor from enforcing a state court judgment against a nondebtor <u>guarantor of a contract liability</u>.

*In re American Hardwoods, Inc.*, 885 F.2 at 624 – 625 (citations omitted) (emphasis added).[7]  In addition, as noted earlier herein, permanent injunctions are not limited to chapter 11 cases involving a plan.[8]

The primary limitation to the imposition of third-party injunctions under relevant case law is that the court must have subject matter jurisdiction under 28 U.S.C. § 1334(b), which confers original subject matter jurisdiction to district courts of civil proceedings that arise under, arise in, or relate to cases under Title 11.   The test for determining whether "related to" jurisdiction exists is "whether the outcome of a proceeding 'might have any conceivable effect

---

[7] In their briefs, the Fox and Marshall Objectors contend that, in his memorandum in support of the Settlement Agreement, the Trustee cited to *Fisher v. Apostolou, In re Adelphia and Lyondell Chem. Co.* for the proposition that "[c]ourts have repeatedly enjoined suits against non-debtor third parties to protect the administration of the estate." (Marshall Obj. at Fn. 4; Fox Obj. at Fn. 11.)  The Fox and Marshall Objectors go on to argue that these cases do not support this proposition simply because they involved temporary injunctions under Section 105 instead of permanent ones.  (*See id.*)  First, the Fox and Marshall Objectors incorrectly note the cases cited by the Trustee in support of this particular proposition since the only case actually cited out of the aforementioned three cases was *In re Adelphia.*  (Tr. Mem. at 23.)  Second, the Fox and Marshall Objectors are again attempting to create a meaningful distinction where one does not exist.  None of these cases suggests that their principles and holdings under Section 105 are only applicable to temporary injunctions.  *See Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998); *In re Adelphia*, 2006 WL 1529357; *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009).

[8] In an attempt to bolster their argument that the injunction proposed in the Settlement Agreement violates established Second Circuit law, the Fox and Marshall Objectors contend that the Trustee mistakenly relied on *Metromedia* because both *Metromedia* and the Second Circuit case it quotes, *In re Drexel Burnham*, are inapplicable to the issue of third party injunctions outside the context of a chapter 11 reorganization.  (Marshall Obj., ,¶ 14; Fox Obj., ¶ 16.)  This is a complete mischaracterization.  While both cases happen to have occurred in the context of a chapter 11 reorganization, neither one limited their holdings and principles to chapter 11 plans only.  *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005); *In re Drexel Burnham*, 960 F.2d at 293.

on the bankruptcy estate,' or if the proceeding has 'a significant connection' with the bankrupt estate." *In re Adelphia*, 2006 WL 1529357, at *6 (quoting *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992)). The Bankruptcy Court here has subject matter jurisdiction over Fox's and Marshall's duplicative and derivative causes of action. As held by this Court, they are not distinct from other creditors' or investors' claims against BLMIS and the purported injuries suffered are not unique or particular, as detailed in the Trustee's appellate brief in the current appeal before the United States District Court for the Southern District of New York, incorporated herein by reference and attached as Exhibit A hereto. A permanent injunction is not only appropriate in the Fox and Marshall actions in particular, but necessary to preserve the bankruptcy estate.

The bankruptcy court in *In re Dreier* explained that the same subject matter jurisdiction principles that applied in *In re Manville*, *In re Metromedia* and *In re Drexel* also apply to non-plan settlements. *In re Dreier*, 429 B.R. at 132. In other words, in determining whether a bankruptcy court has jurisdiction to enjoin a third-party dispute as part of a settlement, the question is not whether the court has jurisdiction over the settlement itself, but rather whether the court has jurisdiction over attempts to enjoin the creditors' unasserted claims against the third party. *Id.* at 131. So long as the bankruptcy court has subject matter jurisdiction over the claims asserted against the Picower Defendants, the court also has the power under § 105 to permanently bar general creditors of the estate from seeking to recover their claims from the funds transferred to the Picower Defendants.[9]

---

[9] The Fox Objectors cite to *In re Devon Capital Management*, a decision from the Bankruptcy Court in the Western District of Pennsylvania. (Fox Obj., ¶ 21.) This case is inapposite as it involved an overly broad bar order, unlike the proposed order here. *Fin. Mgmt. Scis., Inc. v. Hefren-Tillotson, Inc. (In re Devon Capital Mgmt., Inc.)*, 261 B.R. 619, 626 (Bankr. W.D.Pa. 2001). Here, the proposed injunction is limited to only those claims that are

*continued on the following page…*

III. **THE PROPOSED SETTLEMENT IS FAIR**

    A.    **The Settlement Proceeds Are Customer Property**

Fox incorrectly states that the Bankruptcy Settlement Amount is not "customer property," as that term is defined in SIPA § 78*lll*(4) ("Customer Property"). (Fox Obj. ¶ 25.) As a result, Fox argues that the funds should be distributed using the forfeiture remission procedures rather than under SIPA, operating under the mistaken belief that the remission process would provide recompense to "net winners" such as Fox and the class she purports to represent. Instead, the DOJ regulations mandate that only victims that suffered "pecuniary losses" will be paid in remission. *See* 28 C.F.R. §§ 9.2(v); 9.8(b). A "pecuniary loss" is defined as "the fair market value of the property of which the victim was deprived as of the date of the occurrence of the loss." 28 C.F.R. § 9.8(b). As the fair market value of false profits would be zero[10] – and net winners such as Fox cannot show a pecuniary loss, having already received all of her principal – it appears that the Madoff victims entitled to receive a distribution in remission would be consistent with those with allowable customer claims under SIPA: net losers. Thus, having the funds distributed through remission under the forfeiture laws would not likely result in recoveries for net winners such as Fox.

In any event, the assertion that the Bankruptcy Settlement Amount is not "Customer Property" is flatly contradicted by SIPA. Customer Property is defined as "cash and securities

---

*…continued from the preceding page*

duplicative or derivative of claims brought by the Trustee, or which could have been brought by the Trustee, against the Picower Defendants.

[10] *Cf. Horowitz v. Am. Int'l Group, Inc.*, 2010 U.S. Dist. LEXIS 103489, at *21-24 (S.D.N.Y. Sept. 25, 2009) (holding that alleged loss of fictitious profits, in insurance case relating to Madoff, "was not truly a loss but rather was as illusory as the initial, fraudulent gain" and that "a fraudulent loss following a fraudulent gain does not count as an actual loss, because the victim remains in the same position in which he or she was before any fraud occurred").

… at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." SIPA § 78*lll*(4). Specifically enumerated categories of Customer Property under SIPA include any amounts that were or should have been set aside or reserved for customers under applicable regulations and the realization of customers' cash debit balances. SIPA § 78*lll*(4)(D), (B). Consistent with its statutory mandate of customer protection, SIPA liquidations generally use a broad and inclusive approach and have at times deemed all or virtually all of the property of a failed broker-dealer to be Customer Property.[11]

No discovery is needed to determine whether the Bankruptcy Settlement Amount constitutes Customer Property under SIPA. As set forth in the Trustee's Motion, the Bankruptcy Settlement Amount constitutes a large majority of the transfers received by the Picower Defendants in excess of their investment over the life of their accounts. (Tr. Mem. at 18.) Whether called "margin loans" or "fraudulent transfers," the Bankruptcy Settlement Amount falls squarely within the definition of Customer Property, having been "property transferred by the debtor," and such transfers were avoidable under the provisions of Title 11. SIPA §§ 78*lll*(4); 78fff-2(c)(3). Indeed, the realization of customer debit balances — one way to characterize the return of property by the Picower Defendants — is specifically defined in SIPA as Customer Property. SIPA § 78*lll*(4)(B). Moreover, by definition, because BLMIS was a Ponzi scheme, funds that passed through BLMIS are the ultimate embodiment of Customer

---

[11] *See, e.g.*, *In re Meridian Asset Management, Inc.*, No. 00-90029, Dkt. No. 127, Order Approving Final Report (Bankr. N.D. Fla. Dec. 6, 2006) (allocating all of debtor's assets to customer property); *In re Klein Maus & Shire, Inc.*, No. 00-8193, Dkt. No. 112, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property).

Property — other people's money.  When the Picower Defendants and others received funds from BLMIS, they necessarily received Customer Property.

Fox also argues that the Bankruptcy Settlement Amount should not be allocated to the fund of customer property but instead to the general estate.  This objection is both premature and misplaced.  In due course, the Trustee will file an application for an order approving the allocation of property of the estate, consistent with the statute.  SIPA provides that Customer Property that is not necessary to satisfy customer and priority claims becomes part of the general estate.  Thus, any excess in the property initially allocated to the fund of Customer Property will become part of the general estate only after all allowed customer claims and any other priority claims under SIPA have been satisfied in full.  SIPA § 78fff-2(c).[12]  Only upon the satisfaction of all allowed customer claims — and only in response to an allocation motion—would such an objection be timely or appropriate.

### B.    The Settlement Benefits BLMIS Customers and Creditors

The Fox and Marshall Objectors attempt to distance themselves from their participation and role as customers and creditors in this case as a means to convince the Court that the settlement ignores their rights.  The Fox Objectors contend that "the Trustee would have [them] enjoined from pursuing their independent claims against the Picower Defendants without receiving any consideration for their claims."  (Fox Obj. ¶ 20.)  Marshall objects that "[t]he amount of the settlement to be paid by the Picower Parties exceeds by over 100% the amount

---

[12] Marshall also argues that, with the Picower Settlement, the Trustee now has more funds than is necessary to satisfy all allowed customer claims.  (Marshall Obj., ¶ 24).  The current amount of allowed claims is approximately $6 billion.  Because there is significant litigation pending against entities and individuals who also have claims against the estate, however, the amount of allowed claims will only increase as parties pay back certain avoidable transfers to the estate and/or as claims objections and the Trustee's claims under section 502(d) of the Bankruptcy Code are resolved.  Indeed, the Trustee currently estimates that investors lost approximately $20 billion of principal.  Thus, any suggestion that the Trustee currently has enough funds to satisfy all customer claims that have been — or will be — allowed is not only premature but false.

that the Trustee sought in his complaint." (Marshall Obj. ¶ 19.)  Thus, she fears, the settlement payment by the Picower Defendants may prejudice her ability to collect for her putative class action should she be permitted to bring it.  (*Id.*)  As an initial matter, no class has been certified, which means that neither Fox nor Marshall represents the masses of general creditors they would like to represent.  In addition, without even disputing the value of the estate they claim to represent, it is indisputable that the proposed Fox and Marshall classes are comprised of general creditors of the estate, and the Trustee already represents the estate on behalf of its customers and creditors.[13]  Injunction Decision, 429 B.R. at 431 n. 10 (finding that, because Fox and Marshall are customer claimants in the SIPA proceeding, the Trustee has standing to represent their interests).

Fox and Marshall both submitted customer claims pursuant to the Court's Claims Procedure Order entered in December 2008.  Marshall received payment on her customer claim from funds advanced to the Trustee by SIPC, and Fox has objected to the Trustee's denial of her customer claim, which objection is still pending adjudication by the Bankruptcy Court.  Both may still be entitled to payment if the Second Circuit reverses the Net Equity Decision, or as discussed below, in the event there are funds available for the general estate through which they may receive distributions.  Moreover, to the extent Fox and Marshall claim a right to payment, they are defined as creditors under the Bankruptcy Code.  11 U.S.C. § 101(10).  *See, e.g., Rosenman Family LLC v. Picard*, 401 B.R. 629, 634 n.8 (Bankr. S.D.N.Y. 2009); *Mishkin v. Siclari (In re Adler Coleman Clearing Corp.)*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999).  Just

---

[13]  Moreover, even if they were allowed to proceed, neither Fox nor Marshall could ever meet the Fed. R. Civ. P. 23 criteria, given, for example, the specifics of their claims, and the fact that the "classes" they purport to represent are represented by the Trustee.

because Fox and Marshall received no money or less money than they wanted from the estate thus far does not mean that they are not customers or creditors of the estate. As this Court previously held, "[Marshall and Fox and those they purport to represent] are creditors who filed customer claims in the case and are bound by section 362(a)." Injunction Decision, 429 B.R. at 437 n.15.

At their base, the claims that Fox and Marshall seek to assert against the Picower Defendants are founded entirely upon claims that they would otherwise have against BLMIS. But for their investments with BLMIS, and any claim they may have arising out of those investments, they would have no allegations to bring against the Picower Defendants. The attempt by Fox and Marshall to pursue claims, whether characterized as "damages" or "taxes" or another form of loss which are not truly independent causes of action, is misplaced. The purpose of the SIPA liquidation is to ensure that BLMIS's "customers" with net equity are prioritized over other creditors. Fox and Marshall seek an end-run around this Court's Net Equity Decision, and to improperly recover, outside this liquidation proceeding, on claims for the same injury out of the same assets sought by the Trustee. They seek priority for themselves not only over other BLMIS creditors, but also over BLMIS customers, thus undermining the statutory scheme mandated by SIPA. Such actions by Fox and Marshall, as well as similar attempts to pursue non-independent causes of action by any others, should be permanently enjoined in connection with the Picower Settlement.

In addition, Fox's and Marshall's assertion that they represent the balance of claims beyond the allowed "net equity" claims of customers is simply untrue. The Trustee represents the BLMIS estate on behalf of all of its customers and creditors, and has brought over one thousand lawsuits against defendants around the world to recover avoidable transfers and other

monies in claimed amounts aggregating over $90 billion for the benefit of the BLMIS estate. While the statutory scheme under SIPA Section 78fff-2(c) sets forth the basis for the distribution of recovered customer property and prioritizes payment to customers with net equity, to the extent funds are recovered in excess of claims with priority and net equity amounts, such funds will be included in the general estate for distribution to creditors in accordance with Section 726 of the Bankruptcy Code. *See* SIPA §§ 78fff-2(c)(1), 78fff(e).

## IV. DISCOVERY IS NOT WARRANTED AND AN ADJOURNMENT IS NOT NECESSARY

### A. There is No Basis for Discovery

The Fox and Marshall Objectors make the incredible objection that the Trustee has recovered *too much money* for the BLMIS Estate. The Trustee's success, Marshall argues, suggests that the Trustee appointed by this Court has "conspired" with the United States Government and Mrs. Picower. The purpose of the conspiracy, she contends, is to "shield" the Picower Estate from the Objectors by distributing every dollar of net withdrawals that the Picower Defendants received from BLMIS to BLMIS victims who lost their investments. (Marshall Obj., ¶ B.) The Fox Objectors, using a more restrained tone, offer the same theory. (Fox Obj. ¶ 4) ("It appears that the Trustee has negotiated a settlement in excess of the amount he is entitled to receive from [the] Picower Parties in order [to] divest the Picower Parties of the assets that should be available to satisfy Fox's valid and independent claims.") Fox and Marshall go so far as to seek discovery so that they can determine whether the settlement represents "a legitimate settlement" or "an attempt to cooperate with the Picower Parties in defeating the Objectors' claims."[14] (Marshall Obj. ¶ 29.) Fox also seeks discovery on the equally spurious

---

[14] Contrary to the Fox and Marshall Objectors' empty assertions concerning the Trustee's alleged "inconsistent allegations regarding Picower's fraudulent conduct[,]" the Trustee's and the Picower Defendants' respective

*continued on the following page…*

issue of whether the bankruptcy settlement constitutes "customer property." (Fox Obj. ¶ 31 (first).) The Objectors have asserted no basis whatsoever to support their meritless objections, much less to seek any discovery in connection with the proposed settlement or invade the work product privilege or the confidentiality accorded to settlement discussions under Fed. R. Evid. 408.

### B. The Objectors' Conspiracy Theory is Baseless

The Fox and Marshall arguments are based on two false premises. First, the Objectors contend that "the settlement payment exceeds by more than 100% the amount that the Trustee sought (and had standing to seek) in his complaint ($2.4 billion constituting withdrawals within the last six years of BLMIS' operation vs. $5 billion being paid to the Trustee)." (Marshall Obj. ¶ 4, s*ee* Fox Obj. ¶ 18.) Second, they claim that "[t]he Trustee has inflated the amount of the Picower Parties' liability . . . based on his purportedly recent 'discovery' of the Margin Loans" which, they argue, constitute "recently discovered additional claims against the Picower Parties." (Marshall Obj. ¶¶ 25, 21, *see* Fox Obj. ¶ 27.) Both of these assertions are flatly contradicted by the Trustee's pleadings and the briefs filed in this matter.

### 1. The Trustee's Complaint and Brief Identify, Seek, and Allege Grounds for the Avoidance and Recovery of More Than $7.2 Billion in Transfers to the Picower Defendants

The Trustee's Complaint, filed in May 2009, alleges that BLMIS fraudulently transferred more than $6.7 billion to one or more of the Picower Defendants between December 1995 and the Filing Date. Each Transfer was identified by date, amount and the Picower Defendant account that received the Transfer. (*See* Compl. Ex. B.) The Complaint seeks the avoidance and

---

*...continued from the preceding page*

positions are clearly set forth in the Picower Settlement Agreement and are not inconsistent. (Marshall Obj., ¶¶ 26-28; Fox Obj., ¶ 27.)

recovery for the BLMIS Estate of each of these Transfers. (*See* Compl. Count Nine.) In his

Opposition to the Picower Defendants' Motion to Dismiss dated September 30, 2009, the Trustee

disclosed that he had identified additional transfers to the Picower Defendants, bringing the total

amount of false profits sought by the Trustee to more than $7.2 billion. (*See* Trustee's

Memorandum of Law in Opposition to Motion to Dismiss ("Tr. Mem. in Opp. of Motion to

Dismiss"), at 2.)

The number focused on by the Fox and Marshall Objectors — $2.4 billion — represents

only the amount of alleged false profits transferred by BLMIS to the Picower Defendants in the

six years prior to the Filing Date (the "Six Year Transfers"). But as the Trustee has maintained

in his Complaint, in his opposition, and in the 9019 Motion, his recovery is not limited to the Six

Year Transfers. Rather, the Trustee's Complaint seeks the recovery of Transfers over the life of

the accounts, pursuant to the "discovery rule."

The discovery rule is based on Section 544(b) of the Bankruptcy Code, which bestows

standing on the Trustee to avoid transfers that are voidable under applicable law by a creditor

holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code. *See In

re OPM Leasing Servs., Inc.*, 32 B.R. 199, 201 (Bankr. S.D.N.Y. 1983). A creditor under New

York law may set aside fraudulent conveyances made by a debtor, *see, e.g*., N.Y. Debt. & Cred.

L. 276, 276-a, 278 & 279 (McKinney 2009), and may bring his action within six years from the

commission of the fraud or two years from the time of discovery of the fraud, whichever is later.

N.Y. C.P.L.R. 213(8) & 203(g) (emphasis added); *see also Hoffenberg v. Hoffman & Pollok*, 288

F. Supp.2d 527, 535-36 (S.D.N.Y. 2003); *Lefkowitz v. Appelbaum*, 685 N.Y.S.2d 460, 461 (2d

Dep't 1999); *Phillips v. Levie*, 593 F.2d 459, 462 n.12 (2d Cir. 1979); *Schmidt v McKay*, 555

F.2d 30, 36-37 (2d Cir. 1977); *Lippe v. Bairnco Corp.*, 225 B.R. 846, 852-53 (S.D.N.Y. 1998).

As the Trustee has alleged in his Complaint, "[a]t all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS" (Compl. ¶ 120), and that "[a]t all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable…." (Compl. ¶ 121.) The Objectors have never suggested that such innocent investors do not exist. To the contrary, for example, Objector Marshall, whose claim was allowed by the Trustee in July 2009 for the amount of her net investment into BLMIS and who has sued the Picower Defendants for allegedly assisting BLMIS' fraud, presumably would include herself among those creditors who could not with reasonable diligence have discovered the fraud. (*See, e.g.*, Marshall Compl. ¶ 81) (alleging steps by the Picower Defendants to conceal the BLMIS fraud).) Accordingly, since the Trustee's Complaint was filed within two years of the announcement of the BLMIS Ponzi scheme, he is entitled to seek recovery for all of the Transfers over the life of the Defendant Accounts.

> 2.  **The Existence of the Margin Loans Was Identified in the Trustee's Complaint and Brief and is Relevant Only in That It Provides an Additional Basis for the Trustee's Recovery of the Transfers**

Contrary to the arguments expressed by the Objectors, the Motion does not identify newly discovered evidence against the Picower Defendants or rely on any such evidence to "inflate" the amount of recovery to which the Trustee is entitled. As the Trustee explained in the Motion, the Margin Loans appear to have been the primary vehicle through which the Transfers alleged in the Trustee's Complaint were made to the Picower BLMIS Account Holders. The fact that billions of dollars' worth of the Transfers made to the Picower Defendants were recorded by BLMIS as Margin Loans was identified by the Trustee in his Complaint and emphasized in his opposition. (*See* Compl. ¶ 63(d) (noting the negative cash balance of $6 billion in one account

on the date of Madoff's arrest); Tr. Mem. in Opp. of Motion to Dismiss at 4 (noting the "staggering" $6 billion margin balance in this account).) During settlement negotiations, it was confirmed that the Picower Defendants' records, as well as the records of BLMIS, reflected a significant Margin Loan debt to BLMIS, and that both parties to the relevant transactions had treated the relevant Transfers as loans. For these reasons, the Picower Settlement is characterized as a repayment to the BLMIS estate of virtually all of the outstanding Margin Loan balance, rather than solely as the avoidance and recovery of fraudulent transfers. However, under either theory, the Transfers that the Picower Defendants received from BLMIS remain the same, and therefore, recovery of the Transfers by the Trustee is appropriate. Regardless of how the Picower Settlement Payment is characterized, it (together with the forfeited funds) represents every dollar that the Picower Defendants withdrew from BLMIS over what was deposited. Whether characterized as the avoidance and recovery of fraudulent transfers or the realization of customer debit balances, the Picower Settlement Payment constitutes Customer Property properly recoverable by the Trustee for distribution by the Estate.

As the Motion indicates, the Trustee maintains that he would have prevailed at trial in recovering all Transfers to the Picower Defendants. The Picower Defendants point to evidence that, they contend, calls into question certain of the Trustee's fraudulent transfer allegations. Both the Trustee and the Picower Defendants, nonetheless, have agreed to a settlement that represents 100 percent recovery of the Picower Defendants' net withdrawals from BLMIS. There is no rational basis whatsoever to suggest that the Picower Settlement is unreasonable.

### C. The Objectors Are Not Entitled to Any Discovery

The Fox and Marshall Objectors essentially seek all of the Trustee's records relating to the Picower Defendants, including all records relating to the Picower Settlement and to the Trustee's underlying claims in the adversary proceeding. Specifically, the Marshall Objectors

claim to seek this discovery "because the settlement payment exceeds by more than 100% the amount that the Trustee sought (and had standing to seek) in his complaint." (Marshall Obj. ¶ B.) They assert that the settlement raises "unanswered questions' and they are, therefore, "entitled to discovery relating to: (1) the factual basis of the Trustee's new claim that Picower may not have been complicit in the Madoff Ponzi scheme, and (2) the factual basis for the Trustee's new claim relating to the Margin Loans." (Marshall Obj. ¶ 29.) For their part, the Fox Plaintiffs similarly express an entitlement to discovery on these issues, but base their "cross motion for adjournment and for discovery" on "the issue of whether the Bankruptcy Settlement is customer property and whether the fund of money is best administered pursuant to the forfeiture statutes and not in a SIPA proceeding." (Fox Obj. ¶ 31 (first).) The Fox Plaintiffs further assert that the "Trustee has marshaled facts to support his new positions." (Fox Obj. ¶ 31 (second).)

As discussed above, the premises underlying these objections are patently false: the Picower Settlement Payment is entirely consistent with the amount sought by the Trustee; and the Margin Loans, disclosed in the Trustee's original pleadings in this matter, are simply another basis supporting the Trustee's recovery of the Transfers. Nor is there anything suspect in a decision to reach a commercially reasonable settlement and avoid the delays and risks inherent in any litigation, while achieving a 100 percent net recovery for the victims of the fraud. Similarly, for the reasons discussed above, the Picower Settlement Payment constitutes Customer Property under the provisions of SIPA as a matter of law and there is no need for "discovery" to determine that issue.

The discovery sought by the Objectors is clearly not in furtherance of their spurious objections to the Picower Settlement, but rather is sought to investigate the underlying claims

brought by the Trustee in the adversary proceeding against the Picower Defendants. Such discovery is inappropriate. In determining the propriety of a proposed bankruptcy settlement, it is not necessary for the bankruptcy court to conduct a "mini-trial" of the facts or merits underlying the dispute. *In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *In re Charter Commc'ns*, 419 B.R. 221, 252-53 (Bankr. S.D.N.Y. 2009). Instead, the bankruptcy court need only be apprised of those facts that are necessary to enable it to evaluate the reasonableness of the settlement and to make a considered and independent judgment about the settlement. *In re Chemtura Corp.*, 439 B.R. at 594. Indeed, "little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims." *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522-23 (S.D.N.Y. 1993).

The only issue at hand is whether the settlement is reasonable and in the best interests of the estate. The discovery Fox and Marshall seek goes beyond this issue and should not be permitted. Indeed, the discovery they request relates to the merits of the underlying adversary proceeding against the Picower Defendants. As Fox and Marshall are not parties-in-interest in the underlying adversary proceeding against the Picower Defendants, any discovery relating to the merits of that adversary proceeding is beyond the scope of this contested matter.

### D.     Even if Any Discovery Whatsoever Were Warranted, the Document Requests Seek Material that is Irrelevant to the Reasonableness of the Settlement and/or Privileged

The sole issue before the Court is whether the proposed Settlement falls above or below the lowest range of reasonableness, taking into account such factors as the probability of success of and expense, inconvenience, and delay of litigation, and the paramount interests of the customers and other creditors. (*See* Tr. Mem. at 16-17 and cases cited therein.) The documents requested by Fox and Marshall include requests for documentation concerning the Trustee's

factual allegations in his pleadings, *see, e.g.*, Fox/Marshall Request 11 ("All Documents…relating to or supporting the allegations at paragraphs 3, 4, 28, 62, 63…in the Trustee's Complaint against the Picower Parties), communications with the Picower Defendants and the government, *see, e.g.*, Fox/Marshall Request 10 ("To the extent not provided above, all Communications among the Trustee, the Government and the Picower Parties regarding the Picower Settlement"), and documents that do not relate to the Settlement at all but rather relate to Fox and Marshall's own claims against the Picower Defendants, *see, e.g.*, Marshall Request 12 ("All Documents, including Communications, relating to the actions against the Picower Parties by Madoff investors").  None of these documents is relevant to the reasonableness of the Settlement and Fox and Marshall have shown no basis to request any of them.  Moreover, to the extent any documents requested pertain to discussions between the Trustee and the government (*see, e.g.* Fox/Marshall Request 10), they are protected from discovery by the work product and common interest privileges.

The common interest privilege protects litigants who share confidences or work-product with an outside party as part of a joint legal strategy or effort.  *See In the Matter of a Grand Jury Subpoena Duces Tecum dated November 16, 1974*, 406 F. Supp. 381, 386 (S.D.N.Y. 1975).  This privilege extends legal protection of confidentiality to documents or communications that are revealed as part of and in furtherance of an ongoing legal enterprise among the parties who share a common legal interest.  *Id.*

The privilege can and has been invoked by private litigants who share information while engaged in cooperative investigation with government entities.  *See Castle v. Sangamo Weston, Inc.*, 744 F.2d 1464, 1466–67 (11th Cir. 1984).  Any such documents requested were shared confidentially and with the understanding they would be kept confidential.  The Trustee and the

government had the common legal goal of recovering assets from the Picower Defendants, and the communications were made in furtherance of these goals. As such, the documents are privileged.

## V. THE SURABIANS' OBJECTION HAS NO MERIT

The Surabians,[15] along with several other family members, filed customer claims that were denied by the Trustee on the basis that they did not have accounts with BLMIS and were thus not Madoff customers. The Surabians have since filed an objection to the Trustee's determination of their claims. The Surabians argue that the settlement should be denied because: (1) the recovery of $7.2 billion of customer property only represents the actual dollar amounts transferred from the estate and the Trustee should have recovered "full 2010 dollars and penalties;" and (2) without knowing Mrs. Picower's current net worth it is impossible to determine whether the settlement is fair and reasonable under Bankruptcy Rule 9019(a). (Surabian Obj. at 6.) The Surabians' arguments are irrelevant as to whether the Court should approve the settlement. The settlement is fair and reasonable and the issues the Surabians raise, while they may purport to be a damages theory, do not challenge the fairness and reasonableness of the settlement.

A court will uphold an agreement under Bankruptcy Rule 9019(a) if that agreement is fair and equitable, reasonable, and in the best interests of the debtor's estate. *See In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). In considering whether to approve a settlement agreement, the Second Circuit has stated that a

---

[15] The Surabians, along with several other family members, filed customer claims that were denied by the Trustee on the basis that they did not have accounts with BLMIS and were thus not Madoff customers. The Surabians have failed to demonstrate that they were ever direct or indirect Madoff customers or creditors of the estate. Thus, they lack standing to object to the Picower Settlement Agreement. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 641-42 (2d Cir. 1988) ("A person who seeks to appeal an order of the bankruptcy court must be "directly and adversely affected pecuniarily" by it").

bankruptcy court should "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.), *cert. denied sub nom. Cosoff v. Rodman*, 565 U.S. 822 (1983) (*internal quotation omitted*). As set forth in the Trustee's opening papers, the terms of the agreement fall well above the lowest point in the range of reasonableness. One hundred percent of the net funds withdrawn from BLMIS by the Picower Defendants will be recovered for distribution to customers. Furthermore, the settlement agreement allows the Trustee to avoid lengthy, costly, and uncertain litigation and still recover all of the Customer Property held by the Picower Defendants. The Surabians' damages theories fall far short of raising any deficiency in the face of the inherent reasonableness of a full recovery.

## CONCLUSION

For the foregoing reasons and the reasons set forth in his moving papers, the Trustee respectfully requests that the Picower Settlement be approved in its entirety.

Dated: New York, New York
      January 11, 2011

Respectfully submitted,

*/s/ David J. Sheehan*            
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Tracy L. Cole
Email: tcole@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*